1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

| | |
|---|---|
| G.G., A.L., and B.S., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>VALVE CORPORATION, a Washington corporation,<br><br>Defendant. | NO. 16-2-28798-1 SEA<br><br>PLAINTIFFS' COMPLAINT - CLASS ACTION FOR DAMAGES<br><br>DEMAND FOR JURY TRIAL |

## PLAINTIFFS' CLASS ACTION COMPLAINT

Plaintiffs G.G., individually and on behalf of her minor son J.P.; A.L., individually and on behalf of his minor son C.L.; and B.S., individually and on behalf of her minor son, E.B. ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against Defendant Valve Corporation and state as follows:

## NATURE OF THE CASE

1.      On October 5, 2016, the State of Washington's Gambling Commission sent Defendant Valve Corporation ("Valve"), a Cease and Desist letter.  This letter stated that Valve's actions, and its refusal to act, had created, maintained, and facilitated a gambling ecosystem, targeted at teenagers, through its Steam Marketplace platform ("Steam") and video games such

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

as Counter Strike: Global Offensive ("CS:GO"). The letter showed that Valve knew as early as February 2016, and potentially even earlier, that its actions and inactions created these problems and that such a gambling ecosystem was illegal under Washington law.

2.      CS:GO is a world-wide video game phenomenon, attaining such popularity that the cable channel TBS broadcasts competitive CS:GO league matches on Friday nights. More than 380,000 people play CS:GO worldwide at any given time.[1] Websites such as Twitch also stream live CS:GO matches to significant audiences.

3.      Valve knowingly[2] allowed, supported, facilitated, and/or sponsored illegal gambling by allowing millions of Americans, including Plaintiffs, to link their individual Steam accounts to third-party websites like CSGOLounge ("Lounge"), CSGOShuffle ("Shuffle") CSGO Diamonds ("Diamonds"), CSGOSpeed ("Speed"), CSGOCrash ("Crash"), Skin Arena ("Arena"), CSGO Lotto ("Lotto"), and OPSkins Group, Inc. ("OPSkins") (collectively "Skins Gambling Websites") and by allowing third-party sites to operate their gambling transactions within Valve's Steam marketplace. (Throughout this Complaint, the Plaintiffs use the terms Steam and Valve interchangeably.) Before shutting down, Lounge allowed players to gamble on the outcome of CS:GO matches, while other Skins Gambling Websites offered (and, in some cases, continue to offer) casino-style games, jackpots, lotteries, and other pure gambling games.

4.      Valve created this gambling system by creating a virtual currency called "Skins," which Valve sells for a fee through various methods.

5.      Skins are guns and knives with a variety of different looks and textures that players use during CS:GO gameplay.  However, linked Steam accounts permit players to trade,

---

[1] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[2]  http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

buy, sell, and use Skins as collateral for bets placed on Skins Gambling Websites. In the Valve gambling economy, Skins are the casino chips that have monetary value outside the game itself because of the ability to convert them directly into cash. Valve takes a 15 percent fee on the sale of each Skin (casino chip) through its marketplace.[3]

6.    Unlike traditional casino chips, however, Valve created Skins out of thin air and can therefore control the ultimate real world value of these items through its control over supply in the marketplace.[4]  And, unlike a traditional casino, Valve does not risk anything by selling these Skins, does not allow users to directly exchange these for cash, and only makes a fee from selling these Skins.

7.    All of the actual gambling transactions take place under Valve's virtual roof and require Valve's affirmative support to continue. Skins never actually leave Valve's servers. Each of the third-party Skins Gambling Websites has their own accounts they use to trade Skins with players so that players can gamble on the Skins Gambling Websites, or sell Skins for cash on OPSkins and similar sites. These Skins Gambling Websites and OPSkins have to create hundreds or even thousands of "bot" accounts to facilitate the volume of trading with users, and Valve has affirmatively helped these companies set up and operate bot accounts, scripts, automation and other methods to allow third party sites to facilitate gambling transactions that, without Valve's direct support, these sites would not be able to do.

8.    Indeed, after undersigned counsel filed the first lawsuits against Valve, Valve took steps to shut down Skins gambling, including a public announcement and cease and desist letters to various gambling websites. In response, many gambling websites shut down, and sites like

---

[3] https://support.steampowered.com/kb_article.php?ref=6088-UDXM-7214
[4] http://store.steampowered.com/news/19618/

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 3

Lounge closed their doors to U.S. players.[5] These lawsuits brought nothing new to Valve's attention; Valve's actions could have taken place at any time before it actually took steps to shut down Skins gambling. Valve simply chose not to take action, even though its later actions show it possessed the power to do so.

9.    That power arises from Valve's similarity to the barkeeper who allows illegal gambling operators to set up shop in its backroom: it sells chips for a fee to customers on their way in, and allows another person to cash out customers inside the bar. Valve had the power to prevent the gambling operators from setting up shop, chose not to stop them, and in fact gave them the keys to the backroom.

10.    Valve profits from Skins Gambling in the following ways:

a.    Gambling increases the demand for and the price of new Skins, which Valve creates and sells to consumers;[6]

b.    Gambling increases the volume of Skins sales and prices on Valve's secondary market, Steam Marketplace, where Valve takes a percentage of each sale;

c.    Gambling increases the number of people watching Valve-sponsored CS:GO tournaments and Valve sells the tournament broadcast rights to television and online steaming;

d.    the Steam Marketplace functions like an app store in which third-party publishers sell items to users, from which Valve takes a fee. So while users cannot cash out proceeds from Skins sales in their Steam wallet for cash, they can use it to buy real world software, and Valve takes a fee on these transactions.

Valve's actions take on an additional degree of unconscionability because most of the people in the CS:GO gambling economy are teenagers and/or under 21 years old.

11.    The Plaintiffs in this case, parents of minor children on behalf of themselves and their minor children, bring this case on behalf of all consumers, parents of minor children, and

---

[5] http://www.esportsbettingreport.com/skin-betting-sites-status-valve-api-crackdown/
[6] Valve sells electronic access to skins players find within games. See ¶ 6.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

minor children nationwide against Valve for its unconscionable and illegal online gambling system, which targets and harms teenagers and kids.

## **PARTIES, JURISDICTION AND VENUE**

12.     Defendant Valve is a Washington Corporation headquartered at 10900 NE 4th St., Suite 500, Bellevue, Washington 98004. Valve is authorized to conduct business and does conduct business throughout the United States, and does business in King County, Washington. Valve is the publisher and developer of the videogame CS:GO.

13.     Plaintiff G.G. is the guardian of the minor child J.P., who is a resident and citizen of Naperville, located in DuPage County, Illinois. J.P. is an online player of CS:GO and has entered into wagering as described *infra*. Specifically, J.P. purchased CS:GO from Valve, purchased numerous Skins, gambled them and lost money, and knew that he could cash out the value of the Skins for real money prior to losing them while gambling. Plaintiff gambled Skins on third-party sites including CSGOLotto, CSGOWild, CSGODouble, CSGOPolygon, CSGOMassive, CSGOBig, and CSGOCrash. Plaintiff G.G. brings claims both individually and as guardian for J.P.

14.     Plaintiff A.L. is the guardian of the minor child C.L., who is a resident and citizen of Albany, located in Linn County, Oregon. C.L. is an online player of CS:GO and has entered into wagering as described *infra*. Specifically, C.L. purchased CS:GO from Valve, purchased numerous Skins, gambled them and lost money, and knew that he could cash out the value of the Skins for real money prior to losing them while gambling. Plaintiff gambled Skins on CSGOBig, CSGOLotto, CSGOCrash, and CSGODouble.  Plaintiff A.L. brings claims both individually, for his money that was used to purchase Skins, and as guardian for C.L.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

15.     Plaintiff B.S. is the guardian of the minor child E.B., who is a resident and citizen of St. Louis, located in St Louis County, Missouri. E.B. is an online player of CS:GO and has entered into wagering as described *infra*. Specifically, E.B. purchased CS:GO from Valve, purchased numerous Skins, gambled them and lost money, and knew that he could cash out the value of the Skins for real money prior to losing them while gambling. Plaintiff gambled Skins on third-party sites including CSGODouble, CSGOLounge, CSGOWild, CSGODiamonds, and CSGOCrash while also utilizing OPSkins. B.S. unwittingly supported E.B.'s gambling habit, supplying money to purchase Skins that were ultimately used to gamble. Plaintiff B.S. brings claims both individually and as guardian for E.B.

16.     King County, Washington, is the appropriate venue for this action because Valve is headquartered in King County and a substantial number of the transactions between Plaintiffs and Defendant, if not all of the transactions, took place in the Valve/Steam marketplace, which is based in King County, Washington.

## FACTUAL BACKGROUND

**A.      The Rise of eSports and CS:GO**

17.     Valve has manufactured video games for nearly 20 years.  In 1999, it introduced the Counter-Strike series, culminating in CS:GO's release in 2012.

18.     CS:GO was one of many similar video games involving players who play as either terrorists or counter-terrorists.  Because the player views the video game through the eyes of a character and shoots guns, it is known as a "first person shooter" game.  When CS:GO was released in 2012, the market was flooded with such franchises as Call of Duty, Halo and Battlefield.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

19.     Seeking to differentiate itself, CS:GO introduced Skins.  The announcement made was August 14, 2013 through a post on its website titled "The Arms Deal Update" ("Skins Announcement").[7]

20.     The Skins Announcement told players that they could "experience all the illicit thrills of black market weapons trafficking without any of the hanging around in darkened warehouses getting knifed to death."  Specifically, "[t]he Arms Deal Update lets you collect, buy, sell and trade over 100 all-new decorated weapons that you can equip in-game."

21.     The Skins Announcement discussed how the new marketplace would work: "You can start collecting decorated weapons via timed weapon drops just by playing CS:GO on official and community servers. You can also get them by opening dropped weapon cases with the appropriate key, or by trading with other players through Steam's Trading interface. Additionally, any decorated weapons you've found, bought or traded can be sold on the Steam Marketplace." Players have to pay Valve for a key to open a weapons drop box, which could contain Skins worth less or more than the cost of the key.

22.     Valve directed players to Reddit (the "front page of the internet" forum website with numerous sub-forums for specific interests), the Steam Community Discussions and the CS:GO Forums on steampowered.com for more information and to discuss Skins.

23.     Steam and steampowered.com are wholly owned properties of Valve. Steam operates as a wholly enclosed ecosystem wherein players can play games, communicate with other players, initiate trades with other players, list items for sale, buy games, buy items, deposit money into their "Steam Wallet," participate in forum discussions, and communicate with Valve directly.

---

[7] http://blog.counter-strike.net/index.php/2013/08/7425/

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR DAMAGES - 7

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

24.    When items are bought and sold on the Steam Marketplace, Valve Steam takes a 5% cut on all total sales, and an additional percentage depending on the game the item is related to. If a sale is related to CS:GO, Steam takes an additional 10%, resulting in a 15% fee in all marketplace sales related to CS:GO.

25.    The creation of Skins was a deliberate attempt by Valve to increase its sales and profits by adding an element of gambling and market economies to its products.  And it worked: as a result of the gambling ecosystem, explained in depth below, that grew up around CS:GO Skins, the number of players on CS:GO increased more than 1,500 percent, and CS:GO became the subject of televised and monetized eSports.  Despite its slow initial sales, Valve has now sold more than 21 million copies of CS:GO, earned more than $567 million in total revenue from sales of CS:GO alone, and earned a percentage of gambling proceeds on CS:GO through various websites and third parties.[8]

26.    This was a deliberate strategy on Valve's part.  One of its employees explained at a developer's conference in 2014 that the company determined that the "best way to get players deeply engaged in games…was to give away virtual items of random value and encourage a robust market to trade them."  That employee was quoted as saying: "This is not an accident. This is by design.  We see more blogs popping up and more and more emails from our players saying, 'I'm not really sure what happened but I've been playing DotA for the last week or two, and I made $100 selling these items that I got.'  This is hugely successful for us."[9]  "DotA" refers to Defense of the Ancients, another Valve game with a similar Skin gambling ecosystem like CS:GO.

---

[8] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[9] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 8

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

27.     Valve went so far as to hire an internationally renowned economist to help it develop currencies and cross-platform economies.[10]

28.     From their inception, Valve intentionally applied the look and feel of gambling to Skins.

29.     In addition to purchasing or trading Skins through the Steam Marketplace or from third party websites like OPSkins, Valve provides CS:GO players with "cases" during in-game play that contain Skins. Players cannot open these cases without purchasing a "key" from Valve for $2.50. Thus, even the nominally "free" in-game Skins require users to pay money to Valve to use.

30.     The value of the Skins inside these cases may be less than or more than the money players paid to Valve to open the cases. This makes the mere opening of the cases akin to gambling. Valve furthered this gambling-like experience by creating a slot-machine experience when players open cases, as seen in this video at 2:40: https://www.youtube.com/watch?v=oqle-lQjac8 (last accessed November 24, 2016).  The full video shows the look and feel of opening multiple cases, but the screenshot below shows the slot-like effect of different skins rolling through the top of the screen until a red line lands on the Skin that the player actually "won":

---

[10] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 9

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

1
2
3
4
5
6
7
8
9
10
11
12
13



14    31.    Skins Gambling Websites, such as Lotto, copied this look and feel when users

15    won    Skins    jackpots.    See,    for    example,    this    YouTube    video:

16    https://www.youtube.com/watch?v=oqle-lQjac8.

17    32.    The results were stunning: in addition to TBS broadcasting video games on

18    television, eSports matches have sold out arenas, been watched by tens of millions of viewers

19    online, and have resulted in a multi-billion dollar global gambling marketplace.

20

21    33.    There is an increase in betting — and therefore the purchase of Skins on Valve's

22    website — during televised eSports.  Since TBS debuted CS:GO matches, as many as 3.38

23    million Skins were bet on matches on Lounge.  The average value of Skins traded across various

24
25
26

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

platforms was $9.75. The total "handle" — that is, dollars wagered — is more than $33 million. The matches televised in TBS result in the highest amount of wagering.[11]

34.      Valve receives a direct financial benefit from televised CS:GO matches.

35.      The online gambling ecosystem around CS:GO is illegal in Washington and in the United States. Valve had no license, permission or legal authority to create, sustain, profit from or otherwise support an online gambling platform, and, as discussed more in depth below, Valve's affirmative actions both created this online gambling system and allow it to continue.

36.      On October 5, 2016, the State of Washington Gambling Commission announced that it had told Valve to stop facilitating gambling through the Steam Marketplace.

**B.      The Mechanics of Gambling on CS:GO and How Valve Has Created, Facilitated, Fostered and Affirmatively Allowed Skins Gambling**

37.      Valve sells Skins through its website and Steam platform. Valve takes a 15% fee on all CS:GO Skins sold through its website or sold on its Marketplace.

38.      These Skins can be won, bought, trade, sold, and otherwise have in-game value through Steam's marketplace and the CS:GO game itself. It also sells versions of Skins called Knives using the same system.[12]

39.      Unlike apps and other computer games with such in-game purchases, Valve has created and currently supports a secondary marketplace where these in-game purchases can be gambled and cashed out.

40.      Skins, in gambling terms, can be seen as casino chips.

---

[11] http://www.esportsbettingreport.com/eleague-handle-for-skin-betting/
[12] http://www.pcgamer.com/how-400-virtual-knives-saved-counter-strike/2/

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 11

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

41.     "People buy skins for cash, then use the skins to place online bets on pro CS:GO matches.  Because there's a liquid market to convert each gun or knife back into cash, laying a bet in skins is essentially the same as betting with real money."[13]

42.     Players must link their Steam account to third-party websites such as OPSkins and Skins Gambling Websites in order to be able to gamble or cash out their Skins on the third-party sites.

43.     OPSkins and Skins Gambling Websites such as Lotto have their own accounts on the Steam marketplace that are used to facilitate transfers, sales and gambling.  That is, if a user logs into a Skins Gambling Website and wants to gamble, technically they transfer their Skins to the Skins Gambling Website's own Steam account, or one of that Skins Gambling Website's numerous "bot" accounts.  If the user wins, the Skins Gambling Website transfers Skins back to the user's Steam account.  OPSkins does the same and has numerous Steam accounts of its own to facilitate users turning Skins into real cash.

44.     These third party websites require permission and cooperation from Valve in order to access a player's account on Steam, and Valve specifically allows players to transfer Skins to third-party accounts on the Steam Marketplace. Valve allows this knowing exactly what these sites' accounts are, what users are doing, and is affirmatively supporting these transactions, and receiving income from transactions on these sites.  "The gambling sites run on software built by Valve, and whenever CS:GO Skins are sold, the game maker collects 15 percent of the money."[14]

---

[13] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[14] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

45.     Upon information and belief, Valve had an ownership interest, partnership or otherwise a direct business relationship with Lounge.

46.     Valve has helped develop the gambling economy and third-party sites such as Lotto and has worked with Lotto and other third-party sites to continue operations.  Valve affirmatively facilitates the gambling through allowing third-parties to create thousands of accounts through automation, "whitelists" or other shortcuts, and knowingly allows these steps of the gambling process to occur within the Steam marketplace.

47.     For instance, in January 2015, Valve instituted a new security measure that required users to prove they were real human beings known as a "Captcha" tool.  Valve did this in order to "prevent malware on users' machines making trades on their behalf."  However, Valve specifically "excluded a few of the existing third-party trading services from this requirement so they can continue to function."[15]  Those third-party trading services are sites like OPSkins and the Skins Gambling Websites that use hundreds and/or thousands of Steam accounts to facilitate gambling.[16]

48.     Valve is well aware of the Skins gambling that goes on, is well aware that Skins have real world cash value, which has increased their popularity and value, and actively encourages and facilitates Skins gambling.

49.     Valve is aware that these third-party gambling sites can and do cheat CS:GO players betting Skins.  An anonymous Valve employee told a reporter that "I don't think the rigged roulette sites in Russia give two f--ks" about the original lawsuit filed against Valve that mentions third-party websites based overseas.[17]  The full context of that quote is as follows:

---

[15] http://steamcommunity.com/groups/tradingcards/discussions/1/622954023422884592/
[16] https://www.reddit.com/r/Steam/comments/3lvvao/how_safe_are_third_party_websites_that_allow_you/; http://steamcommunity.com/id/drunkenf00l/
[17] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR DAMAGES - 13

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

## The Daily Dot

Our Picks    Popular    Sections

The alleged co-conspirators in the suit, skin gambling sites CSGO Lounge, Diamonds, and OPSkins, will also likely be unaffected.

Ward acknowledged that even reaching these sites would be difficult. "Who are these sites?" he said. "We know Lounge is a real business in Poland, but for Diamonds, we have no idea ... this can be a problem that prevents offshore-gambling suits from going forward."

The Valve employee added: "I don't think the rigged roulette sites in Russia give two fucks."

Valve did not respond to requests for comment on this article.

50.    In addition to anonymous employees bashing lawsuits to reporters and admitting Valve is aware that rigged third-party sites are taking money from Valve's teenage customers, Valve has publicly discussed gambling on CS:GO in other forums.  For instance, in order to stem the increased hacking, fraud, and other harms to consumers that had arisen out of Skins gambling in 2015, Valve introduced new security measures.   Valve announced these measures on December 9, 2015, in a post called "Security and Trading" on the Steam marketplace website.[18]

51.    In this post, Valve wrote: "Account theft has been around since Steam began, but with the introduction of Steam Trading, the problem has increased twenty-fold as the number one complaint from our users… This was an unacceptable status quo and we needed to address

---

[18] http://store.steampowered.com/news/19618/

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 14

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

it. In revisiting our strategy to stop it, we found two things of note. First, enough money now moves around the system that stealing virtual Steam goods has become a real business for skilled hackers. Second, practically every active Steam account is now involved in the economy, via items or trading cards, with enough value to be worth a hacker's time. Essentially all Steam accounts are now targets."[19]

52.    Valve admitted that it knew Skins had real world cash value: "If hackers couldn't move the stolen goods off the hacked account, then they couldn't sell them for real money, and that would remove the primary incentive to steal the account."[20]

53.    Indeed, in August 2016, the United Kingdom's Gambling Commission, responsible for regulating and licensing gambling operations within the United Kingdom, issued a whitepaper stating that "[w]here 'skins' are traded or are tradeable and can therefore act as a de facto virtual currency and facilities for gambling with those items are being offered, we consider that a [gambling] license is required."[21]

54.    Valve thus knows and has admitted that its in-game Skins have real world monetary and cash value through third-party websites it knowingly supports and assists on the Steam Marketplace.

55.    Valve could have stopped this hacking and theft perpetrated against consumers — again, mostly teenagers — by "removing trading" – but chose not to.  Instead, Valve instituted new two-factor security and an "escrow" system where Valve held onto items for a short period of time before delivery between users' accounts and third-party bot or trading accounts.[22]

---

[19] http://store.steampowered.com/news/19618/
[20] http://store.steampowered.com/news/19618/
[21] http://www.gamblingcommission.gov.uk/pdf/Discussion-papers/Virtual-currencies-eSports-and-social-gaming-discussion-paper-August-2016.pdf
[22] http://store.steampowered.com/news/19618/

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

56.     Valve is aware users get scammed from gambling bots operating inside the Valve Marketplace, and publishes a list of Frequently Asked Questions to deal with this issue, including one called Gambling Bot Trade Offer: "A fake gambling bot tells you that you have won an item jackpot, but in order to receive the items, you must first accept their trade offer. After receiving your items, the user blocks your messages and keeps your items. Tip: Never trade an item away when prompted by another user or bot if you cannot verify their claim."[23]

57.     In the summer of 2015, Valve was notified of potential match-fixing, and worked with a European eSports league to ban the alleged perpetrators. Valve admitted it could monitor players' accounts for activity consistent with gambling and match-fixing. It also introduced a new rule: "[p]rofessional players, teams and anyone involved in the production of CS:GO events, should under no circumstances gamble on CS:GO matches, associate with high volume CS:GO gamblers, or deliver information to others that might influence their CS:GO bets."[24]

58.     On its own website, Valve explained this decision in greater detail, in the screenshot and full text reproduction below, emphasis by Valve in the original:[25]

> We frequently sponsor third-party events to add to their entertainment value for viewers and broaden the audience for competitive CS:GO. To be eligible to participate in a Valve-sponsored event, players are required to follow the rules provided by that event's organizers. In addition to that organizer's rules, we expect that players who plan to participate in any future Valve-sponsored event will hold themselves to a high standard of professional integrity. Professional players, teams, and anyone involved in the production of CS:GO events, should under no circumstances gamble on CS:GO matches, associate with high volume CS:GO gamblers, or deliver information to others that might influence their CS:GO bets. To clarify – as a professional player, team manager or event production staff, it is common to have personal relationships and/or privileged information about other teams and players. **Because of this, we will always assume that you have access to private CS:GO-related "inside information" that might give you an unfair advantage when placing a bet on any CS:GO game or match.** Betting using inside information, or even the perception or suspicion thereof, carries a significant risk

---

[23] https://support.steampowered.com/kb_article.php?ref=3415-WAFH-6433&l=english

[24] http://en.esl-one.com/csgo/katowice-2015/news/update-on-the-offline-qualifier-including-disqualifications-invites-and-more/

[25] http://blog.counter-strike.net/index.php/unnecessary_risks/

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

of damaging your personal brand, your team, your community, and may lead to exclusion from future Valve-sponsored events. To avoid these risks, we recommend that you never bet on any CS:GO game or match. This recommendation applies both to current professional players and anyone who wishes to participate in a Valve-sponsored CS:GO event in the future. It's important to consider the substantial impact an individual professional Counter-Strike player has on the health and stability of the sport. Performing before an audience of millions of fans, you are ambassadors for your game – the strength of professional Counter-Strike comes from the integrity of its players and teams.

59.    Valve employees communicated directly with Lounge and provided technical support to the website, according to a Lounge employee and spokesperson.[26] The Lounge website prominently displays the Valve logo and users must log in to their Steam account to wager on matches on Lounge:[27]



60.    In a post on Valve's forum, a moderator — that is, a Valve spokesperson who manages the forums on behalf of Valve — told "younger" users who think they have been scammed through third-party sites such as Lounge to not post on the forums about it. Rather,

---

[26] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[27] https://csgolounge.com/

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

that moderator advised "younger" users who were scammed on a third-party gambling site to contact Valve directly.[28] In this post, the moderator on Steam's own forums told users, including its "younger" users: "Safe betting and trading!"[29]

61.    The screenshot below shows that users must first log in to their Steam accounts before placing bets on matches on Lounge.  Lounge has since shut down its gambling website.



62.    Finally, once users have accumulated Skins or Knives in their Steam accounts through third-party gambling sites, they can convert them to cash through OPSkins.

---

[28] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[29] http://steamcommunity.com/groups/csgolounge/discussions/8/627456486705186974/

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 18

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

63.    OPSkins, based in Canada, links directly to a user's Steam account as well:[30]





[30] https://opskins.com/;
https://steamcommunity.com/openid/login?openid.ns=http%3A%2F%2Fspecs.openid.net%2Fauth%2F2.0&openi
d.mode=checkid_setup&openid.return_to=https%3A%2F%2Fopskins.com%2Findex.php&openid.realm=https%3
A%2F%2Fopskins.com&openid.identity=http%3A%2F%2Fspecs.openid.net%2Fauth%2F2.0%2Fidentifier_select
&openid.claimed_id=http%3A%2F%2Fspecs.openid.net%2Fauth%2F2.0%2Fidentifier_select

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

64.     Users on OPSkins can cash out their Skins for real money through their PayPal accounts.

65.     Valve admits that it allows Skins Gambling Websites, including but not limited to Lotto and Shuffle, to have authenticated Steam accounts and trade on the Steam marketplace.[31]

66.     Valve always possessed the power to stop Skins Gambling Websites from accessing the Steam Marketplace and engaging in gambling transactions, but chose not to until after users filed lawsuits against it.

67.     Thus, users deposit real money on Valve's website, connect that real money account to nominal third-party websites with direct connections to Valve where users can participate in various forms of gambling, and then cash out their account balances, converting Skins into real money.  All of these gambling transactions between users and third party gambling websites actually take place on the Valve servers because Skins are never actually transferred from Valve's servers and computer system.

68.     Put another way: Valve's servers host the gambling website accounts and OPSkins accounts, and the trades physically take place among these Valve accounts - users, gambling websites and cash-out websites. In the barkeeper analogy, users buy chips from the bartender, gamble in one backroom and cash out in another, all under Valve's roof.

69.     This is an illegal scheme designed to bypass state-by-state gambling laws.

70.     Because Valve has helped to create an unregulated, international gambling concern with no oversight that targets teenagers specifically, Plaintiffs and the class have been damaged.

---

[31]http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 20

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

71.     This unregulated market is ripe for scams, cheating, fraud, and other harm to users.  For instance, there have been numerous instances of match-fixing in CS:GO matches: in January 2015, it became clear that a highly qualified team of CS:GO players fixed matches against lesser teams.[32]

72.     For instance, there are rigged roulette websites operating in Russia, according to Valve.[33]

73.     Valve has the technical capabilities to block access to any gambling site it chooses to, but instead made an affirmative decision to work directly with third-party gambling websites to give them access to Valve's computers to facilitate their gambling transactions.

74.     In sum, Valve has always had the ability to modify, regulate, begin, and end the Skins market and gambling as it saw fit, but refused to do so. Instead, it took several recent controversies to force Valve to respond to the realities of the economy it created and to act accordingly to protect its own users.

**C.     Valve's Cease and Desist Letter and Subsequent Closing of Skins Gambling Websites**

75.     On July 13, 2016, shortly after undersigned counsel filed the first three lawsuits involving Skins gambling, Valve posted an "In-Game Item Trading Update" that addressed Skins gambling ("Skins Gambling Update").[34]

76.     The Skins Gambling Update acknowledged that, as a result of the in-game trading capabilities in Steam, "a number of gambling sites started leveraging the Steam trading system"

---

[32] http://www.dailydot.com/esports/match-fixing-counter-strike-ibuypower-netcode-guides/
[33] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/
[34] [34] http://store.steampowered.com/news/22883/

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

but that "we have no business relationships with any of these sites.  We have never received any revenue from them."

77.    In the Skins Gambling Update, Valve described how gambling on Steam works: "These sites have basically pieced together their operations in a two-part fashion.  First, they are using the OpenID API as a way for users to prove ownership of their Steam accounts and items…Second, they create automated Steam accounts that make the same web calls as individual Steam users."

78.    In the Skins Gambling Update, Valve alleged that "making the same web calls as Steam users to run a gambling business is not allowed by our API nor our user agreements."

79.    Valve has thus alleged unauthorized use of Steam by Skins Gambling Websites such as Lotto, Lounge, and Diamonds for the actions giving rise to Plaintiffs' claims.

80.    In the Skins Gambling Update, Valve claimed that it would "start sending notices to these sites requesting they cease operations through Steam, and further pursue the matter as necessary."

81.    Recognizing that the value of Skins was inflated by the ability to gamble and cash them out, Valve warned that "Users should probably consider this information as they manage their in-game item inventory and trade activity."

82.    No facts in the "Skins Gambling Update" were unknown to Valve before undersigned counsel filed the first lawsuits.

83.    There was nothing preventing Valve from taking the actions described in the Skins Gambling Update before it did, and the publicity and attention that resulted from litigation against Valve precipitated Valve's actions.  In the alternative, the information about Lotto as described above, alone or in conjunction with the lawsuits, precipitated Valve's actions.

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 22

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

84.     Valve's actions in the Skins Gambling Update definitively shows that Valve is aware of how it facilitates the Skins gambling ecosystem and how it has the absolute control over Skins gambling.

85.     Immediately after this announcement, Skins gambling websites such as CSGODouble, CSGOWild, CSGOCasino, CSGOHouse, Diamonds, CSGO500, and other gambling websites closed down and/or stopped accepting deposits.[35]

86.     In an undated letter to 23 websites, Valve's General Counsel, Karl Quackenbush communicated a cease and desist warning on Valve's letterhead to gambling sites ("Cease and Desist").  In the Cease and Desist, Valve alleged that the gambling sites use of Steam accounts was unauthorized use in violation of the Subscriber Agreement:

> We are aware that you are operating one of the gambling sites listed below. You are using Steam accounts to conduct this business. Your use of Steam is subject to the terms of the Steam Subscriber Agreement ("SSA").  http://store.steampowered.com/subscriber_agreement/. Under the SSA Steam and Steam services are licensed for personal, non-commercial use only. Your commercial use of Steam accounts is unlicensed and in violation of the SSA. You should immediately cease and desist further use of your Steam accounts for any commercial purpose. If you fail to do this within ten (10) days Valve will pursue all available remedies including without limitation terminating your accounts.

Karl Quackenbush

General Counsel, Valve Corp.

87.     The Subscriber Agreement, in Section 4, prevents users, such as OPSkins, Lounge and the other Skins Gambling Websites, from using "automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process." Thus, unless a Skins Gambling Website and/or OPSkins has been

---

[35] http://www.dexerto.com/news/2016/07/28/richard-lewis-summarises-csgo-betting-sites-closed/; http://www.esportsbettingreport.com/skin-gambling-sites-status-valve-cease-and-desist/

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

specifically authorized to create bots to trade Skins, Plaintiffs' claims in this case are allegations of unauthorized use of Steam.

88.    To the extent Valve has knowingly allowed, authorized and/or facilitated the use of bots and other automated processes for Skins Gambling Websites and OPSkins, Valve has knowingly allowed, authorized and/or facilitated gambling and violations of the Subscriber Agreement, and has waived its rights to enforce any part of the Subscriber Agreement against any Steam subscriber, such as any Plaintiff.

89.    Valve threatened to terminate these gambling website accounts, which shows that Valve has had the power all along and still retains the power to end Skins Gambling, but chooses not to.

90.    Within 10 days of the Skins Gambling Update and after Valve sent its Cease and Desist, according to an analysis from Esports Betting Report, approximately nine (9) of the twenty three (23) gambling websites had shut down or announced plans to shut down, with the others operating normally or affirmatively stating they would not shut down.[36]  That number increased to more than 20 by August 13, 2016.[37]

91.    Valve's Cease and Desist letter also forced CSGOLounge, the preeminent online sports book for betting on professional CS:GO matches, to seek gambling licenses in order to legalize their operations, and prevent users within the United States from betting on the website.[38]

92.    It is unclear whether, despite these gambling websites continuing to operate more than 10 days after the Cease and Desist, Valve has taken any additional steps to shut down Skins Gambling.

---

[36] http://www.esportsbettingreport.com/skin-gambling-sites-status-valve-cease-and-desist/
[37] http://www.esportsbettingreport.com/skin-betting-sites-status-valve-api-crackdown/
[38] https://csgolounge.com/notice

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 24

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

93.     Valve is well aware that many of their users are teenagers and/or young adults. Steam's account requires users to check a box indicating they are just 13 years of age or older, and does not require users to read the Subscriber Agreement before creating a Steam account:[39]



94.     Plaintiffs signed into their Steam accounts through the third-party websites including Lounge, Lotto, Shuffle, Diamonds, Speed, and Crash.

95.     Plaintiffs were aware Skins had real world value and could be cashed out on sites such as OPSkins, and did in fact cash out their Skins through OPSkins.

96.     Plaintiffs then used those Skins to place bets on Lounge, Shuffle, Lotto, Diamonds, Speed, Crash, and other sites through trading Skins to each via their Steam accounts, hosted and facilitated by Valve, and lost Skins, and therefore the real world cash value of these Skins, in these transactions.

97.     Plaintiffs paid a premium for Skins that they otherwise would not have paid because the ability to gamble and cash them out for real money inflated the value in the Skins market.

---

[39] https://store.steampowered.com/join/?

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

98.     Minor children, including Plaintiffs, used their parents' money for Skins gambling transactions, and parents of minor children, including Plaintiffs listed above who are parents of minor children, suffered financial harm as a result.

**D.    Plaintiffs' Specific Allegations**

99.     Plaintiff C.L. was 14 years old when he first signed up on the Steam Marketplace and was 15 years old when he first played CS:GO.  He purchased Skins on OPSkins, purchased keys from Valve to open cases to access Skins, and deposited Skins into Skins Gambling Websites such as Lotto, Shuffle, CSGO Big, and CSGO Crash.  His parent, A.L., was not aware that C.L. was gambling online with Skins, would not have allowed him to gamble online had he known what Skins truly were, and gave C.L. money that was used to purchase Skins, keys, and cases, including Skins used for gambling. As a result, C.L. lost money because of Valve's actions.

100.    Plaintiff J.P. first signed up for the Steam Marketplace at the age of 14 and first purchased and gambled Skins at the age of 14.  J.P. gambled Skins on Skins Gambling Websites like Wild, Lotto, Big, CSGO Strong, and CSGO Sweep.  He purchased more than $730 worth of Skins on OPSkins, purchased keys from Valve to open cases to access Skins, and has lost more than $6,000 worth of Skins.  G.G., J.P.'s parent, was not aware that J.P. was gambling online with Skins, would not have allowed him to gamble online had she known what Skins truly were, and gave J.P. money which was used to purchase Skins, keys, and cases, including Skins used for gambling.  As a result, G.G. lost money because of Valve's actions.

101.    Plaintiff E.B. first purchased CS:GO and began Skins Gambling when he was 13 years old; he first played videogames on the Steam Marketplace when he was 11.  He purchased Skins on sites like OPSkins and purchased keys from Valve to open cases and engaged in Skins Gambling on Skins Gambling Websites like Lounge, CSGO Double, CSGO Diamonds, Crash,

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

1  and CSGO Wild, losing more than $3,000. His parent, B.S., was not aware that E.B. was

2  gambling online with Skins, would not have allowed him to gamble online with Skins had she

3  known what Skins truly were, and gave E.B. money with which to purchase Skins, keys, and

4  cases, and therefore lost her own money because of Valve's actions.

5  102.    Plaintiffs' experiences are typical and representative of the hundreds of thousands,

6  if not millions, of Skins gambling users from the United States and the world. A large percentage

7  of those users are minors, or were minors when Valve first enticed them into the Skins Gambling

8  economy that Valve allowed and facilitated through its Steam Marketplace.

9

10                                   **CLASS ALLEGATIONS**

11  103.    A class action is the proper forum to bring Plaintiffs' claims under Washington

12  CR 23. The potential Class is so large that joinder of all members would be impracticable.

13  Additionally, there are questions of law or fact common to the Class, the claims or defenses of

14  the representative parties are typical of the claims or defenses of the Class, and the representative

15  parties will fairly and adequately protect the interests of the Class.

16

17  104.    This action satisfies all of the implicit and explicit requirements of CR 23,

18  including numerosity, commonality, typicality, adequacy, predominance and superiority.

19  105.    **Ascertainability:** Plaintiffs can and shall propose an administratively feasible

20  method by which class members can be identified.

21  106.    **Numerosity**: the Class is so numerous that joinder of all members is

22  impracticable. While the exact number is not known at this time, it is generally ascertainable by

23  appropriate discovery. News accounts discuss how millions of users compete on the websites of

24  Defendant and its unnamed co-conspirators.

25

26

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 27

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

107.    **Commonality:** the claims made by Plaintiffs meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the class wide litigation. These shared questions predominate over individual questions, and they include, without limitation:

  a. Whether Plaintiffs and members of the Class entered into contracts with Valve over the past four years;
  b. Whether such contracts are *per se* void, pursuant to applicable state law;
  c. Whether such contracts are void pursuant to applicable civil law;
  d. Whether the Terms of Use are unconscionable, illusory, fraudulent, or otherwise invalid;
  e. Whether Plaintiffs and members of the Class paid monies to Valve in consideration of those contracts;
  f. Whether Valve's operations, and those of certain Skins Gambling Websites that Valve facilitates and supports, are games of chance under all applicable laws and rules;
  g. Whether Valve's operations as described in this Complaint violate Washington law;
  h. Whether Plaintiffs and members of the class are entitled to restitution and entitled to recovery of lost wagers from Valve, or the disgorgement of Valve's profits and revenue;
  i. Whether Valve was negligent or otherwise acted wrongfully in allowing and encouraging users to utilize its service to bet and gamble on CS:GO games;
  j. Whether Valve owed duties to the Plaintiffs and the proposed Class members, the scope of those duties, and if it breached those duties;
  k. Whether consumers such as the Plaintiffs and the proposed Class members were harmed by Valve's actions, as described in detail above;
  l. The extent of the damages caused by Valve's acts; and
  m. Whether Valve violated state consumer protection statutes as described below.

108.    **Typicality**: Plaintiffs' claims are typical of those of the other Class members because Plaintiffs, like every other Class member, was induced to use Valve's services based on false and misleading advertisements of fair play, legality, safety, and lack of information about having to compete against players with inside information.

109.    The claims of the Class Representative Plaintiffs are furthermore typical of other Class members because they make the same claims as other class members. Plaintiffs have an interest in seeking compensation from Valve.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

110.    **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class members.

111.    **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

112.    The nature of this action and the nature of Washington laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged. Without the class action mechanism, Valve would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class, and will establish the right of each member of the Class to recover on the cause of action alleged; and

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

113.    The proposed class is described as follows:

> **"All persons in the United States ("National Class") and/or in Washington ("Washington Subclass") who (1) purchased Skins or (2) are parents/guardians of a minor child who purchased Skins."**

114.    Plaintiffs reserve the right to modify or amend the definition of the proposed class and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

115.    Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the class representatives are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

116.    The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

117.    Excluded from the Class are the following:
   a.    Valve and any entities in which Valve has a controlling interest;
   b.    Any entities in which Valve's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Valve;
   c.    The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;
   d.    All persons or entities that properly execute and timely file a request for exclusion from the Class; and
   e.    Any attorneys representing the Plaintiff or the Class.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

**COUNT I**
**VIOLATION OF THE CONSUMER**
**PROTECTION ACT, RCW 19.86 *ET SEQ*.**

118.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

119.    Valve is headquartered in Washington; its strategies, decision-making, and commercial transactions originate in Washington; most of its key operations and employees reside, work, and make company decisions in Washington; and Valve and many of its employees are part of the people of the State of Washington.  The conduct that Plaintiffs challenge directly affects the people of the State of Washington.

120.    The Skins Gambling Websites engaged in commerce inside Washington with both Valve and all Plaintiffs, and that commerce gives rise to the allegations in this Complaint.

121.    Washington's Consumer Protection Act, RCW 19.86 *et seq.* ("CPA"), protects consumers by promoting fair competition in commercial markets for goods and services.

122.    To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."  RCW 19.86.020.

123.    Valve's acts, omissions, and practices, as alleged herein, constitute unfair competition in violation of the CPA.

124.    Valve's acts, omissions, and practices constitute *per se* violations of the CPA.  As set forth above, Valve violated WAC 230-06-010 by permitting underage gambling and violated the Gambling Act of 1973, RCW 9.46 *et seq.*, by engaging in professional gambling.

125.    Plaintiffs were within the class of consumers WAC 230-06-010 seeks to protect because many Plaintiffs and many members of the class were under the age of 18 when they participated in Valve's gambling activities.

126.    Plaintiffs also were within the class of consumers the Gambling Act of 1973 seeks to protect.  The Legislature enacted the Gambling Act "to restrain all persons from seeking profit

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling." RCW 9.46.010. To these ends, the Legislature provided that the Gambling Act is to be liberally construed. *Id.*

127.    Valve's acts, omissions, and practices constitute unfair competition because they are contrary to Washington's legislatively declared policies condemning unregulated gambling and condemning the promotion or legitimization of gambling as entertainment for children. In violation of the public policies of Washington, Valve created and maintained an unregulated gambling market, knowingly permitted minor children to gamble in this market, and profited from these gambling activities.

128.    Valve's acts, omissions, and practices constitute immoral, unethical, oppressive, and unscrupulous business conduct that caused substantial injury to Plaintiffs.

129.    The gravity of the harm resulting from Valve's conduct described above outweighs any utility of this conduct. There are reasonably available alternatives that would further Valve's legitimate business interests, such as ensuring that any lawful gambling enterprises obtain proper licenses and implementing suitable age verification protocols.

130.    As a direct and proximate result of Valve's violations of the Consumer Protection Act, Plaintiff and Class members sustained injuries, including out-of-pocket losses from gambling, purchasing CS:GO Skins, paying an inflated price for Skins because of their increased value due to the ability to gamble them, and paying Skins-related fees.

131.    The injuries caused by Valve's conduct were not reasonably avoidable. Plaintiff and Class members did not know, and had no reasonable means of learning, of Valve's violations of law. Minor Plaintiffs were not in a position to make contracts or understand the consequences of gambling online, and the use of Skins as an in-game purchase and other actions by Valve obscured to parents the true nature of what their children were doing. The injuries that Plaintiffs and Class members sustained as a result of Valve's unlawful and unfair conduct outweigh any

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

benefits that could be attributed to that conduct.

## COUNT II
## RECOVERY OF MONEY LOST AT GAMBLING,
## RCW 4.24.070

132.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

133.    Plaintiffs incorporate each and every one of the above allegations by reference.

134.    Under Washington law, "[a]ll persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover . . . the amount of the money or the value of the thing so lost."  RCW 4.24.070.

135.    Under Washington law, "no person must allow anyone under the age of eighteen to participate in gambling activities."  WAC 230-06-010.  None of the limited exceptions to this prohibition applies to the gambling activities offered by Valve.

136.    Washington law defines "[g]ambling" as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome."  RCW 9.46.0237.

137.    Valve facilitated and offered gambling games, within the meaning of RCW 9.46.0237, to Plaintiff and Class members through the Steam Marketplace and the use of Steam accounts to use Skins on Skins Gambling Websites.

138.    On October 5, 2016, after an eight-month investigation, the State of Washington Gambling Commission concluded that Valve's facilitation of Skins transfers was gambling contrary to Washington state gambling laws.[40]

139.    The gambling games offered to Plaintiff and Class members were illegal.  Valve violated WAC 230-06-010 by allowing persons under the age of 18 to access their online gambling market and to participate in gambling activities in this market.

---

[40] http://www.esportsbettingreport.com/wp-content/uploads/2016/10/10-2016-Valve-Press-Release.pdf

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

140.    Plaintiff and Class members sustained pecuniary losses as a direct and proximate result of playing on Valve's illegal gambling marketplace, including gambling losses and paying inflated prices for Skins because of their increased market value in the Skins Gambling economy.

141.    Under RCW 4.24.070, Plaintiff and Class members are entitled to recovery in an amount to be proven at trial.

### COUNT III
### VIOLATIONS OF THE GAMBLING ACT OF 1973, RCW 9.46 *ET SEQ.*

142.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

143.    Washington law provides that a person is engaged in "professional gambling" when, "[a]cting other than as a player or in the manner authorized by this chapter, the person knowingly engages in conduct which materially aids any form of gambling activity."  RCW 9.46.0269(1)(a).

144.    Professional gambling is illegal under Washington law.  RCW 9.46.220-222.

145.    Valve engaged in professional gambling in the course of creating and maintaining an online gambling market.  Valve acted other than as a player and in a manner that was not authorized by the Gambling Act of 1973 or any other Washington law.

146.    Valve failed to act in accordance with the rules and regulations of Washington's Gambling Commission.  Valve did not obtain any gambling licenses from the Gambling Commission.

147.    In violation of RCW 9.46.220, Valve, acting in concert with five or more people, engaged in professional gambling and knowingly caused, aided, abetted, and conspired with others to engage in professional gambling.  Valve devised and created a common online gambling currency and built the platform for an online network of gambling games.  The Skins Gambling Websites, their owners, and websites like OPSkins, among other actors, conspired with Valve to offer gambling games on this network.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

148.    As a direct and proximate result of Valve's violations of the Gambling Act, Plaintiff and Class members sustained injuries, including out-of-pocket losses from gambling, paying inflated prices for Skins because of their increased market value in the Skins Gambling economy, purchasing Skins, and paying Skins-related fees.

149.    Under RCW 9.46.200, Plaintiff and Class members are entitled to money damages, plus statutory interest at a six percent rate, in an amount to be proven at trial, as well as reasonable attorneys' fees.

**COUNT IV**
**UNJUST ENRICHMENT**

150.    Plaintiffs on behalf of themselves and the proposed Class, repeat and reallege all preceding paragraphs as if fully set forth herein.

151.    Plaintiffs and members of the proposed Class conferred a benefit on Defendant by purchasing CS:GO, depositing money, purchasing in-game items, and playing in contests on various websites with which Valve had a financial relationship.

152.    Valve has further benefited monetarily from unlawful and/or illegal conduct directed to its customers, including from Plaintiffs and members of the class. Because of the popularity of Skins gambling, Valve has received financial benefit from increased sales, increased exposure and a contract with TBS, fees from the sale of Skins and fees from the sale of other items on the Steam Marketplace where users buy third party software using money in their Steam wallet from the sale of Skins, and from which Valve takes a fee.

153.    Valve's benefit came at the expense and detriment of Plaintiff and Class members.

154.    Valve has thus unjustly enriched itself in retaining the revenues derived from enforcement of illegal contracts, deposits, wagers, purchases and gambling by Plaintiffs and the members of the proposed class, which retention under these circumstances is unjust and

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 35

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

inequitable because Valve entered into or caused to be created illegal, voidable, and unconscionable gambling contracts with Plaintiff and other members of the proposed class, and has created an illegal international gambling economy operating in the United States and targeted at teenagers.

155.    Valve has benefited from its creation of an illegal gambling scheme through the creation of Skins and the assistance provided to international companies that provide ways to gamble Skins and convert in-game Skins with no cash value into cash value. Valve has also benefited from the creation of an illegal gambling market by inflating the value of Skins, something with no intrinsic value, which they then sell or facilitate selling for a fee. Valve has also benefited from the increased sales, increased exposure, marketing revenue, sponsorship revenue and other financial benefits that CS:GO has brought Valve because of its popularity, which is due almost entirely to Skins gambling.

156.    Plaintiffs and members of the proposed class were injured as a direct and proximate result of Valve's illegal activities because they paid for items and wagers that were unregulated, illegal gambling activities ripe for fraud, abuse and theft, and with no way of knowing whether they were fairly run.

157.    Because Valve's retention of the non-gratuitous benefit conferred on it by Plaintiffs and the members of the proposed class is unjust and inequitable, Valve must pay restitution to Plaintiffs and the members of the proposed class for its unjust enrichment, as ordered by the Court.

158.    Equity and good conscience require that Valve disgorge profits made thereby, and Plaintiffs and members of the class further seek restitution on this basis.

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 36

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**COUNT V**
**NEGLIGENCE**

159.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

160.    At all times relevant to this Complaint, Valve owed Plaintiffs and the proposed class as users and paying customers a duty to use reasonable care to provide true, reliable and safe gaming experience.

161.    Valve breached its duties to Plaintiffs and the proposed class by creating, allowing and maintaining a system of Skins gambling that resulted in unregulated, third-party websites harming Plaintiffs and the classes through rigged gambling websites, such as CS:GO Lotto and CS:Go Shuffle.

162.    As a direct and proximate result of Valve's negligence, Plaintiffs and the proposed class suffered financial losses through the unregulated, rigged, unfair and unsafe Skins Gambling Websites.

**COUNT VI**
**DECLARATORY RELIEF**

163.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

164.    Valve's Subscriber Agreement, as described above, contains terms that seek to eliminate Valve's liability for any and all claims, allow Valve to modify the Subscriber Agreement unilaterally, eliminates the rights of consumers to protect their rights in Court, and otherwise contain complicated legal language over its seventeen pages, twelve sections and numerous subsections.

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

165. This Subscriber Agreement purports to be a binding contract, but requires that users check a box indicating that they are thirteen (13) years or older, meaning Valve specifically seeks to contract with minors.

166. Any agreement set forth in the Subscriber Agreement is illusory because it does not require Valve to do anything in exchange for the user to use Valve's website.

167. The provisions of the Subscriber Agreement are complicated, ambiguous, unfairly one-sided towards Valve, the drafter, and are otherwise difficult for the average consumer, especially teenagers, to understand. Any ambiguity or lack of clarity in the Subscriber Agreement must be held against Valve, and Valve may not change the meaning of the plain language terms of the Subscriber Agreement in an unrelated document.

168. Plaintiffs, as minor children, by and through their parents/guardians and undersigned counsel, hereby disaffirm any waivers of rights, limitations on liability, dispute resolution, and/or the Subscriber Agreement as a whole to the extent Plaintiffs have not received any benefit from the Subscriber Agreement.

169. Plaintiffs paid consideration for the goods and services provided by Valve and used their accounts to participate in Valve's online marketplace, and the Subscriber Agreement and its terms were not material to that basic transaction and did not provide any benefit to Plaintiffs.

170. Valve waived its ability to enforce the Subscriber Agreement by knowingly and affirmatively allowing Skins Gambling Websites to use Steam in violation of the Subscriber Agreement as described above.

171. Plaintiffs who continue to play games on Valve's servers do so because they have paid cash consideration to Valve for the right to own and use Valve's software, and do not adopt,

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

affirm or otherwise assent to the Subscriber Agreement by continuing to use Valve's marketplace to make purchases unrelated to Skins and/or CS:GO and/or to play Valve's other games for which Plaintiffs and the proposed class have already paid.

172.    Plaintiffs seek declaratory relief from the Court that the Subscriber Agreement is invalid as to all minors under the age of 18 and all Valve users under the age of 21 who first entered into the Subscriber Agreement when they were under the age of 18, and specifically any clause in which Plaintiffs and/or other customers of Valve purportedly waived their rights to proceed in Court and/or on a class wide basis, and/or waived Valve's liability.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the proposed class pray for relief and judgment against Valve, as follows:

    a.    For an order certifying the proposed classes, appointing Plaintiffs and their counsel to represent the proposed class and notice to the proposed classes to be paid by Valve;

    b.    For damages suffered by Plaintiffs and members of the proposed class;

    c.    For restitution to Plaintiff and the proposed class of all monies wrongfully obtained by Valve;

    d.    For injunctive relief requiring Valve to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

    e.    An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Valve from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Valve's past conduct;

    f.    For Plaintiffs' reasonable attorneys' fees, as permitted by law;

    g.    For Plaintiffs' costs incurred;

    h.    For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

1    i.    For such other and further relief that this Court deems just and proper under equity or law.

2

3    DATED this 29th day of November, 2016.

4

5    By: */s/ Kim D. Stephens*
     By: */s/ Jason T. Dennett*
6        Kim D. Stephens, WSBA #11984
         Email: KStephens@tousley.com
         Jason T. Dennett, WSBA #30686
7        Email:  jdennett@tousley.com
         **TOUSLEY BRAIN STEPHENS PLLC**
8        1700 Seventh Avenue, Suite 2200
         Seattle, WA 98101
9        Tel:  (206) 682-5600
         Fax: (206) 682-2992
10
         Jasper D. Ward IV
11       Alex C. Davis
         Patrick Walsh
12       **JONES WARD PLC**
         Marion E. Taylor Building
13       312 S. Fourth Street, Sixth Floor
         Louisville, Kentucky 40202
14       Tel. (502) 882-6000
         Fax (502) 587-2007
15       jasper@jonesward.com
         alex@jonesward.com
16       patrick@jonesward.com

17       Paul C. Whalen (PW1300)
         **LAW OFFICE OF PAUL C. WHALEN,**
18       **P.C.**
         768 Plandome Road
19       Manhasset, NY 11030
         Tel. (516) 426-6870
20       Fax (212) 658-9685
         pcwhalen@gmail.com

21

6225/001/363826.1
22

23

24

25

26

PLAINTIFFS' COMPLAINT - CLASS ACTION FOR
DAMAGES - 40