1
2
3
4
5
6
7

The Honorable John C. Coughenour

8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   G.G., A.L., and B.S., individually and on behalf
     of all others similarly situated,

11
                                    Plaintiffs,
12
     v.
13
     VALVE CORPORATION, a Washington
14   corporation,

15                                  Defendant.

No. 16-cv-01941-JCC

**VALVE CORPORATION'S
RESPONSE TO PLAINTIFFS'
MOTION TO REMAND**

16

## I.    <u>INTRODUCTION</u>

17
18          Plaintiffs argue that a dismissal order by this Court in a separate case that involved
19   different legal claims and rested on a different basis for federal jurisdiction is law of the case
20   here and prevents Valve from establishing the amount in controversy for removal under the Class
21   Action Fairness Act ("CAFA").  Plaintiffs are wrong on the facts and the law.
22          <u>First</u>, the law of the case doctrine applies only to earlier decisions made in the *same* case.
23   This Court's prior order in a *different* case is not law of the case here.
24          <u>Second</u>, Plaintiffs misstate this Court's ruling in the *McLeod* case.  The plaintiffs there
25   did not assert CAFA jurisdiction in their complaint, and the Court held only that their
26

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

unsupported assertions about potential damages were insufficient proof of the amount in controversy.

Third, Valve's business records and Plaintiffs' allegations in this case readily show by a preponderance of the evidence that Plaintiffs' claims put more than $5 million in controversy in this case, regardless of whether the *McLeod* plaintiffs made a sufficient showing.

In *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 551 (2014), the Supreme Court held that "no antiremoval presumption attends cases invoking CAFA …." Rather, "CAFA's 'provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.'" *Id*. at 554 (quoting S. Rep. No. 109-14 at 43 (2005)). This liberal standard leaves no doubt that the allegations here, combined with evidence provided by Valve, prove that the amount in controversy exceeds $5 million.

Plaintiffs' Motion to Remand should be denied.

## II.   BACKGROUND

A group of over 40 plaintiffs filed the *McLeod, et al. v. Valve et al.,* No. 2:16-cv-01227-JCC (W.D. Wash. 2016) ("*McLeod*"), class action lawsuit on August 4, 2016, asserting a variety of state and federal claims against Valve and other defendants on behalf of a putative national class. (*McLeod*, Dkt. #1 (Complaint) & Dkt. #11 (Amended Complaint).) The claims asserted included violation of RICO, violations of gambling and consumer protection statutes of all 50 states, and various common law claims. (*McLeod*, Dkt. #11.) The *McLeod* plaintiffs alleged federal question jurisdiction over their RICO claim, and supplemental jurisdiction over their state law claims; they did not invoke CAFA jurisdiction. (*McLeod*, Dkt. #11 ¶¶ 80-81.)

This Court dismissed all of the plaintiffs' claims on a motion brought by two other defendants (CSGOLotto Inc. and Trevor A. Martin). (*McLeod*, Dkt. #38.) The Court first dismissed their RICO claim for failure to allege a concrete injury for RICO standing, then considered whether the Court still had jurisdiction after dismissing the plaintiffs' only federal

claim.  (*McLeod*, Dkt. #38 at 7.)  The *McLeod* plaintiffs argued that CAFA gave the Court

jurisdiction over the remaining claims.  But instead of submitting evidence of the amount in

controversy, they simply repeated allegations from their complaint about the size of the CS:GO

market and allegations that millions of dollars are gambled, asserting that "[t]hese facts, common

sense, experience, and simple math" established that over $5 million was in controversy.

(*McLeod*, Dkt. #31 at 27-28.)  The Court disagreed.  Noting that the *McLeod* plaintiffs neither

invoked CAFA in their complaint nor pled a specific amount of damages, this Court held that the

plaintiffs' "conclusory allegations" were insufficient to show the amount in controversy:

> Here, Plaintiffs provide no factual support for their claim, only
> allegations of 'common sense,' that this matter totals more than $5
> million in damages.  (Dkt. No. 31 at 28.)  Plaintiffs' allegations do
> not meet the preponderance of the evidence standard because they
> are nothing more than conclusory allegations that because CSGO
> is a popular game and Valve made more than $567 million in
> revenue from CSGO last year, Plaintiffs have over $5 million in
> damages.  Further, CAFA jurisdiction was never alleged in the
> amended complaint.  Therefore, this Court does not have
> jurisdiction over the state law claims under CAFA.

(*McLeod*, Dkt. #38 at 8-9.)

Three plaintiffs subsequently filed this lawsuit against Valve in King County Superior

Court.  (Complaint ("Compl.") (Dkt. # 1-3).)  Unlike the *McLeod* lawsuit, Plaintiffs here asserted

claims solely under Washington law on behalf of the entire class.  Valve invoked CAFA

jurisdiction and timely removed this case to federal court.  (Dkt. #1.)  Plaintiffs now move to

remand, arguing that the dismissal order in *McLeod* binds this Court as law of the case and that

this Court "has already determined that there are no allegations Plaintiffs could make that would

meet the amount in controversy requirements under CAFA."  (Dkt. #14-1 at 6.)

## III.   ANALYSIS

### A.   The Law of the Case Doctrine Does Not Apply.

Simply put, the law of the case doctrine applies only in the same case, and this case is not

the same as *McLeod*.  Nor were the issues before this Court already decided in *McLeod*.

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

1    "The law of the case doctrine generally prohibits a court from considering an issue that

2    has already been decided by that same court or a higher court in the same case." *Stacy v. Colvin,*

3    824 F.3d 563, 567 (9th Cir. 2016) (emphasis added); *Pepper v. United States,* 562 U.S. 476, 506

4    (2011) (law of the case doctrine applies "in subsequent stages in the same case") (quoting

5    *Arizona v. California,* 460 U.S. 605, 618 (1983)); *Overseas Shipholding Grp., Inc. v. Skinner*,

6    767 F. Supp. 287, 296 (D.D.C. 1991) ("[I]t is hornbook law that the law of the case doctrine

7    operates as a form of issue preclusion *within the same case.*") (italics in original, citation

8    omitted).

9        That the plaintiffs here are represented by the same lawyers and allege similar facts as in

10   *McLeod*—though they now allege them in support of different legal claims—does not make the

11   two distinct lawsuits the "same case" or render decisions in *McLeod* the law of this case.  *See*

12   *Delta Savings Bank v. United States,* 265 F.3d 1017, 1027 (9th Cir. 2001) (when initial case was

13   voluntarily dismissed then refiled and transferred to another judge, the second action was not the

14   "same case" and rulings in the first action were not law of the case for the second action); *see*

15   *also Farina v. Nokia Inc.,* 625 F.3d 97, 117 n.21 (3d Cir. 2010) (law of the case did not apply to

16   case initially removed based on federal question jurisdiction but remanded, then later removed to

17   federal court under CAFA based on amended complaint because "[t]he doctrine only applies

18   within the same case—an identical issue decided in a separate action does not qualify as law of

19   the case"); *Brown v. U.S.*, 327 F.3d 1198, 1204 (D.C. Cir. 2003) (unappealed district-court ruling

20   in a different action did not establish law of the case); *Soc. of Separationists, Inc. v. Herman,* 939

21   F.2d 1207, 1214 (5th Cir. 1991), *aff'd en banc,* 959 F.2d 1283 (5th Cir. 1992) (even though

22   earlier suit was premised on identical facts, law of the case did not apply because it was an

23   "altogether separate proceeding"); *Harbor Ins. Co. v. Essman,* 918 F.2d 734, 738 (8th Cir. 1990)

24   (when a lawsuit was voluntarily dismissed, then later re-filed between the same parties related to

25   the same events but adding new legal claims, rulings in the first case were not law of the case in

26   the second because it "is not the same case as the [prior action]").

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

Plaintiffs argue that the *McLeod* ruling is law of the case under *Davis v. Homecomings Financial*, No. C05-1466RSL, 2007 WL 905939 (W.D. Wash. Mar. 22, 2007).  But *Davis* involved only one lawsuit, and the issue was whether the Court's class certification ruling was law of the case when the plaintiffs later challenged the existence of federal jurisdiction in the same case.  *Id.* at *1.  *Davis* does not apply because here two separate lawsuits are involved.

Moreover, the issue of whether the amount in controversy exceeds $5 million on the facts and legal claims pled in *this* Complaint was not before the Court in *McLeod*.  Nor did the *McLeod* court have the evidence submitted by Valve in support of this brief.  Accordingly, the law of the case doctrine is also inapplicable because the issues now before this Court were not previously decided.  *See United States v. Lummi Nation,* 763 F.3d 1180, 1185 (9th Cir. 2014) (for a prior ruling to become the law of the case, "the issue in question must have been decided explicitly or by necessary implication in the previous disposition").

Finally, the law of the case doctrine is discretionary; even if this lawsuit and *McLeod* were considered the "same case"—which they are not—the Court should decline to apply the doctrine because Valve did not have the opportunity in *McLeod* to make a showing that over $5 million was in controversy.  *See Gallagher v. San Diego Unified Port Dist.,* 14 F. Supp. 3d 1380, 1389 (S.D. Cal. 2014) (recognizing discretion and noting that law of the case doctrine "should not be applied woodenly in a way inconsistent with substantial justice") (citation omitted).

### B.  The Amount in Controversy Requirement is Readily Met.

The Court did not hold in *McLeod* that it was impossible that over $5 million was at issue in this controversy, as Plaintiffs incorrectly claim.  Rather, the Court held only that the *McLeod* plaintiffs' assertions were not supported by evidence.  (*See McLeod*, Dkt. #38 at 8-9.)  Here, evidence from records kept by Valve in the regular course of its business and Plaintiffs' allegations establish that over $5 million is in controversy.

Plaintiffs criticize Valve for not including evidence of the amount in controversy in its notice of removal, but in 2014 the Supreme Court held in *Dart Cherokee Basin Operating Co.,*

VALVE'S RESPONSE TO PLAINTIFFS' MOTION TO REMAND -
(No. 16-cv-01941-JCC) -5
4816-7096-5312.01
011717/1217/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600

135 S. Ct. at 551, that a notice of removal need only contain "a short and plain statement of the grounds for removal" and "need not contain evidentiary submissions." *Id.* at 551.  Now that Plaintiffs have challenged jurisdiction, Valve need only show by a preponderance of the evidence that Plaintiffs' claims put over $5 million in controversy.  *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015).  "Under this system, CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." Id. at 1198.  A defendant meets its burden of proof by relying on a reasonable chain of logic and evidence sufficient to show that the amount in controversy exceeds $5 million. *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1201 (9th Cir. 2015).

Plaintiffs' legal claims and damages theories put well over $5 million in controversy. Plaintiffs seek to represent a nationwide class alleged to include "hundreds of thousands, if not millions, of Skins gambling users …." (Compl. ¶¶ 102, 106.)  Plaintiffs seek extensive damages on behalf of that proposed class, including all skins gambling losses, the cost of skins purchases, the allegedly inflated prices paid for skins, and fees related to skins transactions.  (Compl. ¶¶ 107, 130, 140, 148.)  Plaintiffs also seek disgorgement of Valve's revenue and profits.  (Compl. ¶¶ 107.h, 154-158.)  Although the Complaint does not plead a specific dollar amount of damages for the class, the amount in controversy requirement is readily met by Plaintiffs' allegations, evidence from Valve's business records, and a reasonable chain of logic regarding Valve's potential exposure.

### 1.   *Evidence From Valve's Business Records Shows That Plaintiffs' Allegations Put Over $5 Million In Controversy.*

"[I]n assessing the amount in controversy, a court must 'assume that the allegations of the complaint are true and assume that a jury will return a verdict for the plaintiff on all claims made in the complaint.'"  *Campbell v. Vitran Exp., Inc.*, 471 F. App'x 646, 648 (9th Cir. 2012) (quoting *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 1001

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

(C.D. Cal. 2002)); *see also Coleman-Anacleto v. Samsung Elec. Am., Inc.,* No. 16-CV-02941-LHK, 2016 WL 4729302, at *5 (N.D. Cal. Sept. 12, 2016) (same); *Henry v. Gerber Prods. Co.*, No. 3:15-cv-02201-HZ, 2016 WL 1589900 (D. Or. Apr. 18, 2016) (same).

Valve does not have records of the number or value of skins that Plaintiffs and the potential class members allegedly wagered or lost on the third-party skins gambling websites identified in the Complaint because Valve does not own or have any interest in these websites. (Declaration of Kristian Miller ¶ 8 ("Miller Decl.").)  And because bot account trades look like any other Steam user trade, Valve is not always able to identify the "bot" Steam accounts allegedly used by third-party gambling websites to trade skins.  (*Id.*) (*See also* Compl. ¶ 43 (alleging that Steam subscribers trade skins to gambling websites' bot accounts in order to gamble).)

However, through extensive work Valve had previously identified Steam accounts that appeared to be associated with CSGOLounge, and queried its sales database for skins trade information for those accounts.  (Miller Decl. ¶ 9.)[1]  Valve's records show that approximately 10% of the Steam subscribers trading skins to those CSGOLounge bot accounts during the proposed class period live in the United States, with trades from United States Steam subscribers making up approximately 10% of the total volume of skins traded to those accounts.  (*Id.* ¶ 12 & Ex. A.)  About the same percentage of alleged skins gambling losses on CSGOLounge were likely incurred by Steam subscribers in the United States, because there is no reason to think that

---

[1] The exhibits to the accompanying Declaration of Kristian Miller are screenshots and printouts showing the results of database queries of Valve's sales database for the trade and sales data discussed in this brief. Valve is a privately held company and its business records of CS:GO-related trades and sales are highly confidential and are not publicly disclosed by Valve.  (Miller Decl. ¶ 7.)  To protect that confidentiality, Valve has redacted the confidential information from its business records attached as Exhibits A and B to the accompanying Miller declaration.  (*Id.*)  However, Valve has offered to provide unredacted copies to Plaintiffs' counsel under an interim confidentiality agreement, and is finalizing a proposed protective order for submission to the Court to formalize confidentiality protections and to authorize filing of confidential materials under seal.

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

1  United States residents were more or less likely than foreigners to lose when gambling on

2  CSGOLounge.  (*Id.*)

3        Plaintiffs allege that more than $33 million was gambled on the CSGOLounge third-party

4  website.  (Compl. ¶ 33.)  Because every wager has a winner and a loser in equal amounts, at least

5  $33 million in skins must have been lost on gambling on CSGOLounge alone.  (Miller Decl. ¶

6  12.)  Therefore Plaintiffs' allegations would result in expected gambling losses by United States

7  Steam subscribers of approximately $3.3 million, which, when trebled, results in potential

8  damages of roughly $9.9 million from alleged gambling losses just on CSGOLounge.  (*Id.*)

9  Plaintiffs allege that there are six skins gambling sites in addition to CSGOLounge (Compl. ¶ 3),

10 so the amount in controversy is higher than $9.9 million.

11       Valve's business records show that approximately 381,010 Steam subscribers in the

12 United States traded at least one skin to a bot account Valve identified as being used by

13 CSGOLounge from CS:GO's release in August 2012 through November 29, 2016, when

14 Plaintiffs filed their Complaint.  (Miller Decl. ¶ 11 & Ex. A.)  Plaintiffs allege that each such

15 skin had an average value of $9.75.  (Compl. ¶ 33.)  It is reasonable to conclude that at least one-

16 half of these United States Steam subscribers gambled and lost at least one skin because each

17 gambling transaction will have one winner and one loser.  (Miller Decl. ¶ 11.)  One-half likely

18 understates the percentage of gambling losers, and one skin likely understates the gambling

19 losses, because many Steam subscribers traded more than once with the bot accounts mentioned

20 above, and many traded more than one skin to those bot accounts.  (*Id.*)  But assuming one-half

21 of the United States subscribers who traded with these bot accounts lost only one skin, the losses

22 would be approximately $1,857,423.75 (one-half of 381,010 Steam subscribers * $9.75 each).

23 (*Id.*)  Those losses are trebled under the CPA when calculating the amount in controversy.  *See*

24 *Burke Family Living Trust v. Metro. Life Ins. Co.*, No. C09-5388 FDB, 2009 WL 2947196, at *3

25 (W.D. Wash. Sept. 11, 2009); *Peck v. Cingular Wireless, LLC*, No. 09-0106, 2009 WL 775385,

26 at *2 (W.D. Wash. Mar. 20, 2009).  Trebling boosts potential damages to $5,572,271.25

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

1  ($1,857,423.75 *3 = $5,572,271.25).  (Miller Decl. ¶ 11.)  For the reasons noted above (more

2  than one trade per person and more than one skin per trade in many cases), the potential damages

3  are most likely higher than these estimates.  *Id.*

4      Moreover, the six additional websites that allegedly conduct skins gambling (Compl. ¶

5  3), increase the amount in controversy above $5.572 million.  If proposed class members

6  suffered gambling losses on each of those sites in the same magnitude as the losses alleged on

7  CSGOLounge, the amount in controversy would be tens of millions of dollars.

8          **2.**    ***Plaintiffs' Individual Damage Allegations Show That Over $5 Million Is In Controversy.***

9

10      Unlike the named plaintiffs in *McLeod* who did not plead any specific dollar damages,

11  two of the three Plaintiffs here pled specific individual losses, allowing a reasonable estimate of

12  potential classwide damages.  Plaintiffs J.P. and E.B. allege individual skins gambling losses

13  averaging $4,500.  (Compl. ¶¶ 100-101).  Trebled under the CPA, their average alleged

14  individual damages from skins gambling losses are $13,500.

15      The named plaintiffs claim their "experiences are typical and representative of the

16  hundreds of thousands, if not millions, of skins gambling users from the United States and the

17  world."  (Compl. ¶ 102.)  If the named Plaintiffs' gambling losses are representative of those

18  incurred by the rest of the proposed class as alleged, a class of just 371 people would, after CPA

19  trebling, place more than $5 million in controversy (($4,500 * 3) * 371 = $5,008,500).  But

20  Plaintiffs allege that the class includes "hundreds of thousands, if not millions, of Skins gambling

21  users …."  (Compl. ¶ 102.)  Moreover, as discussed above, approximately 381,010 Steam

22  subscribers in the United States traded skins to CSGOLounge during the proposed class period.

23  (Miller Decl. ¶ 11 & Ex. A.)  A reasonable chain of logic and evidence from Valve's business

24  records, along with the named Plaintiffs' alleged individual gambling losses, establishes that well

25  over $5 million is in controversy.

26

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

3. **Plaintiffs' Claims Seeking Damages Related To Steam Marketplace Fees Put Over $5 Million In Controversy.**

Plaintiffs plead damages from "paying Skins-related fees." (Compl. ¶¶ 130, 148, 152, 155.) Valve charges a 15% fee on Steam subscribers' sales to each other of CS:GO skins and other CS:GO-related virtual items in the Steam Community Market. (Compl. ¶ 5; Miller Decl. ¶ 4.) Valve creates and maintains data in the regular course of business regarding those fees, which can be queried and segregated to identify fees paid by Steam subscribers in the United States from August 2013 through Nov. 29, 2016. (*Id.* ¶¶ 5, 13-14 & Ex. B.)

Valve's records show that the total fees collected from Steam subscribers in the United States during that time for Community Market sales of CS:GO-related virtual items are many times higher than $5 million. (*Id.* ¶ 14 & Ex. B). Although the majority of those transactions involve fees charged on skins rather than other virtual items, even if the total were reduced by 50% to account for fees on non-skin items, the fees collected during the class period from Steam subscribers in the United States are still many times higher than $5 million, without even considering the treble damages Plaintiffs seek under the Washington Consumer Protection Act. (*Id.*)

4. **Plaintiffs' Claims Seeking Damages Related To In-Game Purchases Put Over $5 Million In Controversy.**

Plaintiffs plead damages from "purchasing CS:GO skins." (Compl. ¶ 130.) Valve does not sell skins directly to Steam subscribers. Instead, among other ways, Steam subscribers can acquire skins when playing CS:GO through free random "drops" or by using a virtual key purchased from Valve to open virtual weapon cases, or "crates," that appear during game play. (Compl. ¶ 21; Miller Decl. ¶ 4.) Valve creates and maintains data in the regular course of business regarding virtual key purchases, which can be queried and segregated to identify purchases by Steam subscribers in the United States from August 2013 through Nov. 29, 2016. (Miller Decl. ¶¶ 5, 13, 15 & Ex. B.)

Plaintiffs' allegations put far more than $5 million in controversy because Valve's business records show that purchases of keys to open weapon crates by Steam subscribers in the United during that time are many times higher than $5 million, without even considering the treble damages Plaintiffs seek under the Washington Consumer Protection Act.  (Miller Decl. ¶ 15 & Ex. B.)

### 5.   Plaintiffs' Claims Seeking Damages Or Disgorgement Related To CS:GO Game License Purchases Put Over $5 Million In Controversy.

Plaintiffs also claim that they conferred a benefit on Valve by purchasing licenses for the CS:GO game, and seek restitution and disgorgement of Valve's revenue and profits.  (Compl. ¶¶ 107.h, 151, 157-158.)  Valve creates and maintains data in the regular course of business regarding CS:GO game license sales, which can be queried and segregated to identify game purchases by Steam subscribers in the United States from August 2013 through Nov. 29, 2016. (Miller Decl. ¶¶ 5, 13, 16 & Ex. B.)  Valve's business records show that total sales of CS:GO game licenses to Steam subscribers in the United States during the class period are many times higher than $5 million.  (Miller Decl. ¶ 16 & Ex. B.)

### 6.   Plaintiffs' Consolidation Of 50 Different Consumer Protection Claims Into A Single Washington CPA Claim Further Boosts The Amount In Controversy.

The plaintiffs in *McLeod* sought recovery under the consumer protection statutes of putative class members' home states.  Those 50 different consumer protection statues have various remedies, and many do not allow doubled, trebled, or punitive damages, or cap them at low levels.  *See, e.g.,* Fla. Stat. § 501.211(2) (plaintiff may recover only actual damages under Florida Deceptive and Unfair Trade Practices Act); Utah Code Ann. § 13-11-19 (Utah Consumer Sales Practices Act limits recovery in a class action to actual damages); N.Y. Gen. Bus. Law § 349(h) (treble damages authorized but capped at $1,000 under consumer protection law).

In contrast, the Plaintiffs here assert claims for the entire proposed nationwide class under the Washington CPA, which authorizes treble damages to each class member up to a $25,000 cap.  *See* RCW 19.86.090; *Smith v. Behr*, 113 Wash. App. 306, 345-46, 54 P.3d 665, 686 (2002);

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

1   *Peck v. Cingular Wireless, LLC*, No. 09-0106, 2009 WL 775385, at *2 (W.D. Wash. Mar. 20,

2   2009).  That puts additional exemplary damages at issue, boosting the amount in controversy

3   over *McLeod*.

4          The attorney fee awards authorized under the Washington CPA and the Washington

5   Gambling Act similarly swell the amount in controversy over *McLeod*, where the individual state

6   statutes the plaintiffs there relied on for analogous claims may not have authorized an award of

7   fees and costs.  *See Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) (attorney

8   fees and costs included in determining amount in controversy).

9                                  **IV.   CONCLUSION**

10          The reasonable chain of logic and evidence from Valve's records and the Complaint's

11   allegations readily shows by a preponderance of the evidence that each individual component of

12   Plaintiffs' claimed damages by itself puts more than $5 million in controversy.  Combined,

13   Plaintiffs' claimed damages far exceed the amount-in-controversy threshold.  A decision in a

14   different case does not prevent this Court from concluding—as it should—that the requirements

15   for removal under CAFA are satisfied.  Plaintiffs' motion to remand should be denied.

16

17

18

19

20

21

22

23

24

25

26

VALVE'S RESPONSE TO PLAINTIFFS' MOTION TO REMAND -
(No. 16-cv-01941-JCC) -12
4816-7096-5312.01
011717/1217/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington  98154-1192
206.624.3600

1

2    DATED this 17th day of January, 2017.

3                                RIDDELL WILLIAMS P.S.

4

5                                By   */s/ Gavin W. Skok*
                                     Gavin W. Skok, WSBA #29766
6                                    Sarah E. Joye, WSBA #44357
                                     James H. Wendell, WSBA #46489
7
                                     And
8
                                     MONTGOMERY MCCRACKEN WALKER &
9                                    RHOADS, LLP

10

11                               By   */s/ Charles B. Casper*
                                     Charles B. Casper (admitted *pro hac vice*)
12                                   123 S. Broad Street, 24th Floor
                                     Philadelphia, PA  19109
13                                   (215) 772-1500

14                                   Attorneys for Defendant Valve Corporation

15

16

17

18

19

20

21

22

23

24

25

26

1

## CERTIFICATE OF SERVICE

I certify that I am a secretary at the law firm of Riddell Williams P.S. in Seattle, Washington.  I am a U.S. citizen over the age of eighteen years and not a party to the within cause.  On the date shown below, I caused to be served a true and correct copy of the foregoing on counsel of record for all other parties to this action as indicated below:

| Service List | |
|---|---|
| Kim D. Stephens, WSBA #11984<br>Jason T. Dennett, WSBA #30686<br>**TOUSLEY BRAIN STEPHENS PLLC**<br>1700 Seventh Avenue, Suite 2200<br>Seattle, WA  98101<br>Tel: (206) 682-5600<br>Fax: (206) 682-2992<br>KStephens@tousley.com<br>jdennett@tousley.com<br>*Attorneys for Plaintiffs* | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via ECF/ Email<br>☐ Via over-night delivery |
| Jasper D. Ward IV<br>Alex C. Davis<br>Patrick Walsh<br>**JONES WARD PLC**<br>Marion E. Taylor Building<br>312 S. Fourth Street, Sixth Floor<br>Louisville, Kentucky 40202<br>Tel: (502) 882-6000<br>Fax: (502) 587-2007<br>jasper@jonesward.com<br>alex@jonesward.com<br>patrick@jonesward.com<br>*Attorneys for Plaintiffs* | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via ECF / Email<br>☐ Via over-night delivery |

| | |
|---|---|
| Paul C. Whalen (PW1300)<br>**LAW OFFICE OF PAUL C. WHALEN, P.C.**<br>768 Plandome Road<br>Manhasset, New York 11030<br>Tel: (516) 426-6870<br>Fax: (212) 658-9685<br>pcwhalen@gmail.com<br>*Attorneys for Plaintiffs* | ☐ Via US Mail<br>☐ Via Messenger<br>☒ Via ECF / Email<br>☐ Via over-night delivery |

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

EXECUTED this 17th day of January, 2017, in Seattle, Washington.

Courtney R. Tracy

VALVE'S RESPONSE TO PLAINTIFFS' MOTION TO REMAND -
(No. 16-cv-01941-JCC) -15
4816-7096-5312.01
011717/1217/63478.00052

**Riddell Williams P.S.**
1001 Fourth Avenue, Suite 4500
Seattle, Washington 98154-1192
206.624.3600