UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| Grace Galloway, Any Lesko, and Brenda Shoss, individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>VALVE CORPORATION, a Washington corporation,<br><br>　　　　　　　Defendant. | NO. 2:16-cv-1941-JCC<br><br>PLAINTIFFS' FIRST AMENDED COMPLAINT -- CLASS ACTION FOR DAMAGES<br><br>DEMAND FOR JURY TRIAL |

## **PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Grace Galloway, Andy Lesko, and Brenda Shoss, individually and on behalf of all others similarly situated, for their First Amended Class Action Complaint against Defendant Valve Corporation state as follows:

## **NATURE OF THE CASE**

1.　　Defendant Valve Corporation ("Valve"), a Bellevue, Washington-based video game and online content platform corporation, does business in Washington through the internet with individuals in Washington and across the United States.

2.　　Valve does not have a license to operate, facilitate or otherwise engage in any form

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

1   of gambling whatsoever.

2       3.      This case arises from Valve's illegal online gambling that resulted in Plaintiffs'

3   children and other parents' and guardians' children engaging in online gambling on Valve's

4   platform and with Valve's digital items.

5       4.      On October 5, 2016, the State of Washington's Gambling Commission announced

6   that it had sent Valve a Cease and Desist letter on September 27, 2016.  This letter stated that

7   Valve's actions, and its refusal to act, had created, maintained, and facilitated a gambling

8   ecosystem, targeted at teenagers, through its Steam Marketplace platform ("Steam") and video

9   games such as Counter Strike: Global Offensive ("CS:GO"). The letter showed that Valve knew

10  as early as February 2016, and potentially even earlier, that its actions and inactions created these

11  problems and that such a gambling ecosystem was illegal under Washington law.

12      5.      Beginning in 2013, Valve began selling digital items called "Skins" that could be

13  and in fact were sold for and exchanged for real money and property.

14      6.      Skins became the primary currency used by illegal, unregulated, and unlicensed

15

16  online gambling websites, and Valve profited handsomely from the use of its virtual items for

17  online gambling.

18      7.      CS:GO is a world-wide video game phenomenon, attaining such popularity that

19  the cable channel TBS broadcasts competitive CS:GO league matches on Friday nights. More

20  than 380,000 people play CS:GO worldwide at any given time.[1] Websites such as Twitch also

21  stream live CS:GO matches to significant audiences.

22      8.      While CS:GO is the primary source of online gambling, other Valve games,

23  including DOTA2 and TF2, both offer illegal online gambling crate opening games, and these

24

25

26

[1] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 2

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

items can be gambled online and/or sold for real money just like Skins.  Plaintiffs' losses stem from these games as well.  Throughout this Complaint, Skins refers not just to CS:GO Skins but the equivalent virtual items that are things of value in other Valve games such as DOTA2 and TF2.

9.      On information and belief, minor children in all fifty states, including tens of thousands in the state of Washington, have played and continue to play CS:GO and other games with lootbox games and virtual items through Valve's Steam platform, and routinely engage in illegal skins gambling.

10.     Valve facilitated illegal, unregulated and unlicensed online gambling of Skins in numerous ways.

11.     Valve sells users tokens called "keys" for $2.99. The *only* purpose of which is to allow users to engage in gambling through opening "weapons cases" commonly known as "crates", also supplied by Valve.  Purchasing a "key" allows players to engage in a game of chance indistinguishable from playing a slot machine.  Purchasing a "key" to open a crate gives players the chance to win virtual items that may be worth much more than the value of the "key," or to win virtual items with effectively *de minimis* value. The look, feel, sound and experience of opening crates was equivalent to an online slot machine, as seen in the following YouTube videos:

    a.  https://youtu.be/7Z4-s2VdpUE?t=72
    b.  https://www.youtube.com/watch?v=oqle-lQjac8
    c.  https://youtu.be/mDgTRd4mM9U
    d.  https://www.youtube.com/watch?v=eug9Q6hXfWo&t=2s
    e.  https://www.youtube.com/watch?v=tWuE-n5pSGc
    f.  https://www.youtube.com/watch?v=4QExMwc9rW0
    g.  https://www.youtube.com/watch?v=pyeapEaSh3o
    h.  https://www.youtube.com/watch?v=xULwQZhUFVE  (DOTA  2  virtual  item gambling)
    i.  https://www.youtube.com/watch?v=yO_pVJZgsRA

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 3

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

j. https://www.youtube.com/watch?v=GH2NZViiOVA
k. https://www.youtube.com/watch?v=1JlAiouGr8c

12.    Valve does not adequately disclose the true odds of a crate containing a given Skin, and cannot disclose the value of the various Skins contained within a given crate because the market values of said Skins are constantly fluctuating.

13.    Valve knowingly[2] allowed, supported, facilitated, and/or sponsored illegal gambling by allowing millions of Americans, including Plaintiffs' children, to link their individual Steam accounts to third-party websites like CSGOLounge ("Lounge"), CSGOShuffle ("Shuffle"), CSGO Diamonds ("Diamonds"), CSGOSpeed ("Speed"), CSGOCrash ("Crash"), Skin Arena ("Arena"), CSGO Lotto ("Lotto"), and OPSkins Group, Inc. ("OPSkins") (collectively "Skins Gambling Websites") and by allowing third-party sites to operate their gambling transactions within Valve's Steam marketplace. (Throughout this Complaint, the Plaintiffs use the terms Steam and Valve interchangeably.) Before shutting down, Lounge allowed players to gamble on the outcome of CS:GO matches, while other Skins Gambling Websites offered (and, in some cases, continue to offer) casino-style games, jackpots, lotteries, and other pure gambling games using Skins as the items or costs of gambling.

14.    All of the actual gambling transactions take place under Valve's virtual roof and require Valve's affirmative support to continue.  Skins never actually leave Valve's servers.  Each of the third-party Skins Gambling Websites has their own accounts they use to trade Skins with players so that players can gamble on the Skins Gambling Websites, or sell Skins for cash on OPSkins and similar third-party marketplace sites.  These Skins Gambling Websites and OPSkins have to create hundreds or even thousands of "bot" accounts to facilitate the volume of trading

---

[2] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 4

**STRITMATTER KESSLER
KOEHLER MOORE**
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

with users, and Valve has affirmatively helped these companies set up and operate bot accounts, scripts, automation and other methods to allow third party sites to facilitate gambling transactions that, without Valve's direct support, these sites would not be able to do.

15.     Indeed, after undersigned counsel filed the first lawsuits against Valve, Valve took steps to shut down Skins gambling, including a public announcement and cease and desist letters to various gambling websites.  In response, many gambling websites shut down, and sites like Lounge closed their doors to U.S. players.[3]  These lawsuits brought nothing new to Valve's attention; Valve's actions could have taken place at any time before it actually took steps to shut down Skins gambling.  Valve simply chose not to take action, even though its later actions show it possessed the power to do so.

16.     In addition, from August 2013 - July 2016, the time period from when Skins gambling began and before Valve took its first, incomplete and ineffective steps to address Skins gambling, Valve had actual knowledge of the identity of the Valve accounts that gambling websites used to effectuate gambling transactions, and chose not to take any action against them.

17.     At all times relevant to this Complaint, Valve allowed gambling websites to use Valve accounts on Valve's servers and Valve's computers to effectuate gambling transactions.

18.     Valve also provided technical support to gambling websites and real-money cash out websites, despite those websites violating Valve's Steam Subscriber Agreement, and would return control of gambling websites' Valve accounts back to the gambling website after being hijacked or hacked by other third parties.

19.     Valve also refused to shut down features of Valve's system - such as free trading or one-way "gift" trading - that would have eliminated the ability of Skins gambling websites to

---

[3] http://www.esportsbettingreport.com/skin-betting-sites-status-valve-api-crackdown/

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

1    operate on Valve's servers.

2        20.    Valve also refused to use "blacklists" to prevent known Skins gambling websites

3    from accessing Valve's servers through the OpenID authentication process and linking user's

4    accounts to gambling websites accounts.

5        21.    Plaintiffs and their children originally brought this action together, and were

6    referred to arbitration. After these arbitrations, with limited discovery, the arbitrators found that,

7    because the children, as teenagers, knowingly illegally gambled online with Skins, they could not

8

9    recover for their losses.

10       22.    These arbitrators ruled that Skins were a thing of value in that what the users were

11   doing was gambling and was illegal, and therefore the teenagers could not recover as a matter of

12   law.

13       23.    Valve profits from Skins Gambling in the following ways:

14

15       a.    Gambling increases the demand for and the price of new Skins, which
               Valve creates and sells to consumers;[4]

16       b.    Gambling increases the volume of Skins sales and prices on Valve's
               secondary market, Steam Marketplace, where Valve takes a percentage of
17             each sale;

18       c.    Gambling increases the number of people watching Valve-sponsored
               CS:GO tournaments and Valve sells the tournament broadcast rights to
19             television and online streaming;

20       d.    Gambling    websites    purchase    copies    of    CS:GO    on
               Steam in order to facilitate trading of skins with users;

21       e.    The Steam Marketplace functions like an app store in which third-party
               publishers sell items to users, from which Valve takes a fee. So while users
22             cannot cash out proceeds from Skins sales in their Steam wallet for cash,
               they can use it to buy real world software, and Valve takes a fee on these
23             transactions.

24       24.    Valve's actions take on an additional degree of unconscionability because most

25   of the people in the CS:GO gambling economy are teenagers and/or under 21 years old.

26
    _____
    [4] Valve sells electronic access to Skins that players find within games.  See ¶ 6.

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 6

STRITMATTER KESSLER
KOEHLER MOORE
413-8ᵀᴴ Street, Hoquiam, WA 98550
Tel: 360-533-271

25.     The Plaintiffs in this case, parents of minor children, bring this case on behalf of themselves and all parents of minor children nationwide who unwittingly supplied monies for use by their minor children in Valve's unconscionable and illegal online gambling and crate gambling ecosystem, which targets and harms both teenagers and their parents.

## PARTIES, JURISDICTION AND VENUE

26.     Defendant Valve is a Washington Corporation headquartered at 10900 NE 4th St., Suite 500, Bellevue, Washington 98004. Valve is authorized to conduct business and does conduct business throughout the United States, and does business in King County, Washington. Valve is the publisher and developer of the videogame CS:GO.

27.     Plaintiff Grace Galloway is a resident and citizen of Naperville, located in DuPage County, Illinois. Her son, J.P., is an online player of CS:GO who has engaged in gambling involving Skins as described below. Specifically, J.P. used funds provided by Ms. Galloway to purchase CS:GO from Valve and to purchase numerous Skins and keys, which he then gambled with and lost. J.P. knew that he could cash out the value of the Skins for real money prior to losing them while gambling. J.P. gambled Skins on third-party sites including CSGOLotto, CSGOWild, CSGODouble, CSGOPolygon, CSGOMassive, CSGOBig, and CSGOCrash. J.P. purchased keys in CS:GO to open lootboxes on Valve's platform in the slot machine format described above, felt like it was gambling, and when he did not receive high-value or rare Skins, he moved on to Skins gambling to continue to try to win high-value Skins.  Plaintiff Galloway would not have provided said funds to J.P. had she known that they were being used for illegal gambling facilitated by Valve.

28.     Plaintiff Andy Lesko is a resident and citizen of Albany, located in Linn County, Oregon. His son, C.L. is an online player of CS:GO who has entered into wagering as described

below. Specifically, C.L. used funds provided by Mr. Lesko to purchase CS:GO from Valve and to purchase numerous Skins and keys, which he then gambled with and lost.  C.L. purchased keys from Valve that he used to open lootboxes in CS:GO, in the slot machine format described above. C.L. knew that he could cash out the value of the Skins for real money prior to losing them while gambling. C.L. gambled Skins on CSGOBig, CSGOLotto, CSGOCrash, and CSGODouble.  Plaintiff Lesko would not have provided said funds to C.L. had he known that they were being used for illegal gambling facilitated by Valve.

29.     Plaintiff Brenda Shoss is a resident and citizen of St. Louis, located in St Louis County, Missouri. Her son, E.B. is an online player of CS:GO who has entered into wagering as described below. Specifically, E.B. used funds provided by Ms. Shoss to purchase CS:GO from Valve and to purchase numerous Skins and keys which he then gambled and lost. E.B. purchased keys from Valve that he used to open lootboxes in CS:GO, in the slot machine format described above.  E.B. knew that he could cash out the value of the Skins for real money prior to losing them while gambling. E.B. gambled Skins on third-party sites including CSGODouble, CSGOLounge, CSGOWild, CSGODiamonds, and CSGOCrash while also utilizing OPSkins. Plaintiff Shoss would not have provided said funds to E.B. had she known that they were being used for illegal gambling facilitated by Valve.

30.     The United States District Court for the Western District of Washington is the appropriate venue for this action because Valve is headquartered in this District and a substantial number of the transactions between Plaintiffs' minor children and Defendant, if not all of the transactions, took place in the Valve/Steam marketplace, which is operated using servers located in the Western District of Washington.

## **FACTUAL BACKGROUND**

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 8

**STRITMATTER KESSLER
KOEHLER MOORE**
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

2.      Valve has manufactured video games for nearly 20 years.  In 1999, it introduced the Counter-Strike series, culminating in CS:GO's release in 2012.

3.      CS:GO was one of many similar video games involving players who play as either terrorists or counter-terrorists.  Because the player views the video game through the eyes of a character and shoots guns, it is known as a "first person shooter" game.  When CS:GO was released in 2012, the market was flooded with such franchises as Call of Duty, Halo and Battlefield.

4.      Seeking to differentiate itself, CS:GO introduced Skins.  The announcement was made August 14, 2013 through a post on its website titled "The Arms Deal Update" ("Skins Announcement").[5]

5.      The Skins Announcement told players that they could "experience all the illicit thrills of black market weapons trafficking without any of the hanging around in darkened warehouses getting knifed to death."  Specifically, "[t]he Arms Deal Update lets you collect, buy, sell and trade over 100 all-new decorated weapons that you can equip in-game."

6.      The Skins Announcement discussed how the new marketplace would work: "You can start collecting decorated weapons via timed weapon drops just by playing CS:GO on official and community servers. You can also get them by opening dropped weapon cases with the appropriate key, or by trading with other players through Steam's Trading interface. Additionally, any decorated weapons you've found, bought or traded can be sold on the Steam Marketplace." Players have to pay Valve for a key to open a weapons drop box, which could contain Skins worth less or more than the cost of the key.

---

[5] http://blog.counter-strike.net/index.php/2013/08/7425/

STRITMATTER KESSLER KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

7.      Valve directed players to Reddit (the "front page of the internet" forum website with numerous sub-forums for specific interests), the Steam Community Discussions and the CS:GO Forums on steampowered.com for more information and to discuss Skins.

8.      Steam and steampowered.com are wholly owned properties of Valve. Steam operates as a wholly enclosed ecosystem wherein players can play games, communicate with other players, initiate trades with other players, list items for sale, buy games, buy items, deposit money into their "Steam Wallet," participate in forum discussions, and communicate with Valve directly.

9.      When items are bought and sold on the Steam Marketplace, Valve/Steam takes a 5% cut on all total sales, and an additional percentage depending on the game the item is related to. If a sale is related to CS:GO, Valve/Steam takes an additional 10%, resulting in a 15% fee in all marketplace sales related to CS:GO.

10.     The creation of Skins was a deliberate attempt by Valve to increase its sales and profits by adding an element of gambling and market economies to its products.  And it worked: as a result of the gambling ecosystem, explained in depth below, that grew up around CS:GO Skins, the number of players on CS:GO increased more than 1,500 percent, and CS:GO became the subject of televised and monetized eSports.  Despite its slow initial sales, Valve has now sold more than 21 million copies of CS:GO, earned more than $567 million in total revenue from sales of CS:GO alone, and earned a percentage of gambling proceeds on CS:GO through various websites and third parties.[6]

11.     This was a deliberate strategy on Valve's part.  One of its employees explained at a developer's conference in 2014 that the company determined that the "best way to get players

---

[6] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

deeply engaged in games…was to give away virtual items of random value and encourage a robust market to trade them."  That employee was quoted as saying: "This is not an accident. This is by design.  We see more blogs popping up and more and more emails from our players saying, 'I'm not really sure what happened but I've been playing DotA for the last week or two, and I made $100 selling these items that I got.'  This is hugely successful for us."[7] "DotA" refers to Defense of the Ancients, another Valve game with a similar Skin gambling ecosystem like CS:GO.

12.     Valve went so far as to hire an internationally renowned economist to help it develop currencies and cross-platform economies.[8]

13.     There is an increase in betting — and therefore the purchase of Skins on Valve's website — during televised eSports.  Since TBS debuted CS:GO matches, as many as 3.38 million Skins were bet on matches on Lounge.  The average value of individual Skins traded across various platforms was $9.75.  The total "handle" — that is, dollars wagered — is more than $33 million. The matches televised on TBS result in the highest amount of wagering.[9]

14.     Valve receives a direct financial benefit from televised CS:GO matches.

15.     Skins gambling websites are illegal in Washington and in the United States. Neither Valve nor these websites had a license, permission or legal authority to create, sustain, profit from or otherwise support an online gambling platform, and, as discussed more in depth below, Valve's affirmative actions, choices and failures to act created this online gambling system and allows it to continue to this day.

16.     Valve intentionally designed the process for purchasing and "winning" Skins

---

[7] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[8] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[9] http://www.esportsbettingreport.com/eleague-handle-for-skin-betting/

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

through the crate/lootbox-opening process to replicate the look, feel, sound and elements of gambling, specifically, a slot machine format.

17.     In addition to purchasing or trading Skins through the Steam Marketplace or from third party websites like OPSkins, Valve provides CS:GO players with "cases" that contain Skins during in-game play.  These cases cannot be opened without purchasing a "key" from Valve for $2.99.  Thus, even a "free" in-game Skin provided by Valve requires users to pay Valve $2.99 to open the case.

18.     When players open the cases, the value of the Skins inside could be less or more than $2.99, making the mere opening of cases a form of gambling, no different than playing a slot machine.  Valve in fact created a slot-machine experience and look and feel of gambling when opening cases, as seen in this video: https://www.youtube.com/watch?v=oqle-lQjac8. These videos show how the look and sound of the revealing of what Skins are inside the cases is equivalent to playing a slot machine.  The screenshot below shows the red line that the different pictures of Skins rotate through until landing on the Skin the user has "won":

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 12

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271



19.     The manner designed by Valve by which users obtain Skins by opening crates/loot boxes constitutes illegal gambling without a license.

20.     Skins gambling websites copied the look and feel of case opening, and users used Skins gambling websites to replace or supplement the feel and experience of crate opening.

21.     Valve does not have to disclose and in fact does not disclose the true odds of receiving certain items or the rules governing the crate opening system, and in fact affirmatively misleads users as to the true probability of receiving more valuable items.

22.     Specifically, each potential item available in a crate is listed for the user and has a picture displayed to the user, all in the same size and indicating an equal chance of being in the crate.  The pictures of the items scroll by at the same speed and in the same sizes, meaning the line indicating the winning item can seemingly land on any of the available items with an equal

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

chance.  However, the actual odds of receiving more valuable items are much lower (as low as less than 1 in 156 for the most valuable items) and Valve does not disclose this.

23.    The introduction of these gambling elements into Valve's video games was calculated and intentional.  It is well known that many minor children play Valve's games.  It is also well know that adolescents' brains are still developing and that they are susceptible to becoming addicted to gambling.  *See, e.g.,* D. Zendle, R. Meyer, and H. Over, *Adolescents and loot boxes:  links with problem gambling and motivations for purchase*, R. Soc. Open Sci., 6:190049, p.5 (2019) ("Adolescents, as a group, are particularly at risk of developing problem gambling.  Indeed, the prevalence of problem gambling among adolescents is far higher than in the adult population.  There are good theoretical reasons to believe that links between loot box spending and problem gambling may be stronger in adolescents than they are among adults.").

24.    Valve sells Skins through its website and Steam platform.  Valve takes a 15% fee on all CS:GO Skins sold through its website or sold on its Steam Marketplace.

25.    Skins can be won, bought, traded, sold, and otherwise have in-game value through Steam's Marketplace and the CS:GO game itself.  Valve also sells versions of Skins called Knives using the same system.[10]

26.    Unlike apps and other computer games with such in-game purchases, Valve has created and currently supports a secondary marketplace where these in-game purchases can be gambled and cashed out.

27.    Skins, in gambling terms, can be seen as casino chips.

---

[10] http://www.pcgamer.com/how-400-virtual-knives-saved-counter-strike/2/

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 14

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

28.     "People buy skins for cash, then use the skins to place online bets on pro CS:GO matches.  Because there's a liquid market to convert each gun or knife back into cash, laying a bet in skins is essentially the same as betting with real money."[11]

29.     Players must link their Steam account to third-party websites such as OPSkins and Skins Gambling Websites in order to be able to gamble or cash out their Skins on the third-party sites.

30.     OPSkins and Skins Gambling Websites such as Lotto have their own accounts on the Steam marketplace that are used to facilitate transfers, sales and gambling.  That is, if a user logs into a Skins Gambling Website and wants to gamble, technically they transfer their Skins to the Skins Gambling Website's own Steam account, or one of that Skins Gambling Website's numerous "bot" accounts.  If the user wins, the Skins Gambling Website transfers Skins back to the user's Steam account.  OPSkins does the same and has numerous Steam accounts of its own to facilitate users turning Skins into real cash.

31.     Valve easily identified these bot accounts, knew these bot accounts were in place and knew they were being used for gambling and cashing out skins.

32.     Skins are a thing of value under Washington law.  Users could sell Skins for real money on third party websites that operated with Valve's knowledge, approval, and facilitation.  Skins can be used to place bets where money or other things of value can be won.

33.     Skins are also a thing of value under Washington law because users could sell Skins for money in their Steam wallets that could be used to purchase hardware, software, movies, content, other virtual items, and video games directly from Valve: https://steamcommunity.com/market/.

---

[11] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

34.    Two arbitrators ruled in January 2019 that Skins are a thing of value and that illegal gambling occurred with Skins on third party websites with Valve's knowledge and without any action being taken by Valve to stop such gambling.

35.    In January 2015, Valve instituted a new security measure that required users to prove they were real human beings known as a "Captcha" tool.  Valve did this in order to "prevent malware on users' machines making trades on their behalf."   However, Valve specifically "excluded a few of the existing third-party trading services from this requirement so they can continue to function."[12]   Those third-party trading services are sites like OPSkins and the Skins Gambling Websites that use hundreds and/or thousands of Steam accounts to facilitate gambling.[13]

36.    Valve is well aware of the Skins gambling that goes on, is well aware that Skins have real world cash value, which has increased their popularity and value, and actively encourages and facilitates Skins gambling.

37.    Valve is aware that these third-party gambling sites can and do cheat CS:GO players betting Skins.  An anonymous Valve employee told a reporter that "I don't think the rigged roulette sites in Russia give two f--ks" about the original lawsuit filed against Valve that mentions third-party websites based overseas.[14]   The full context of that quote:

---

[12] http://steamcommunity.com/groups/tradingcards/discussions/1/622954023422884592/
[13] https://www.reddit.com/r/Steam/comments/3lvvao/how_safe_are_third_party_websites_that_allow_you/; http://steamcommunity.com/id/drunkenf00l/
[14] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/

STRITMATTER KESSLER KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

**The Daily Dot**

The alleged co-conspirators in the suit, skin gambling sites CSGO Lounge, Diamonds, and OPSkins, will also likely be unaffected.

Ward acknowledged that even reaching these sites would be difficult. "Who are these sites?" he said. "We know Lounge is a real business in Poland, but for Diamonds, we have no idea ... this can be a problem that prevents offshore-gambling suits from going forward."

The Valve employee added: "I don't think the rigged roulette sites in Russia give two fucks."

Valve did not respond to requests for comment on this article.

38.      In addition to anonymous employees bashing lawsuits to reporters and admitting Valve is aware that rigged third-party sites are taking money from Valve's customers, Valve has publicly discussed gambling on CS:GO in other forums.  For instance, in order to stem the increased hacking, fraud and other harms to consumers that had arisen out of Skins gambling in 2015, Valve introduced new security measures.  Valve announced these measures on December 9, 2015, in a post called "Security and Trading" on the Steam marketplace website.[15]

39.      In this post, Valve wrote: "Account theft has been around since Steam began, but with the introduction of Steam Trading, the problem has increased twenty-fold as the number one complaint from our users… This was an unacceptable status quo and we needed to address

---

[15] http://store.steampowered.com/news/19618/

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 17

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

it. In revisiting our strategy to stop it, we found two things of note. First, enough money now moves around the system that stealing virtual Steam goods has become a real business for skilled hackers. Second, practically every active Steam account is now involved in the economy, via items or trading cards, with enough value to be worth a hacker's time. Essentially all Steam accounts are now targets."[16]

40.     Valve admitted that it knew Skins had real world cash value: "If hackers couldn't move the stolen goods off the hacked account, then they couldn't sell them for real money, and that would remove the primary incentive to steal the account."[17]

41.     Indeed, in August 2016, the United Kingdom's Gambling Commission, responsible for regulating and licensing gambling operations within the United Kingdom, issued a whitepaper stating that "[w]here 'skins' are traded or are tradeable and can therefore act as a de facto virtual currency and facilities for gambling with those items are being offered, we consider that a [gambling] license is required."[18]

42.     Valve thus knows and has admitted that its in-game Skins have real world monetary and cash value through third-party websites it knowingly supports and assists on the Steam Marketplace.

43.     Valve could have stopped this hacking and theft perpetrated against consumers — again, mostly teenagers — by "removing trading" but chose not to.

44.     Valve employees communicated directly with Lounge and provided technical support to the website, according to a Lounge employee and spokesperson.[19]

---

[16] http://store.steampowered.com/news/19618/
[17] http://store.steampowered.com/news/19618/
[18] http://www.gamblingcommission.gov.uk/pdf/Discussion-papers/Virtual-currencies-eSports-and-social-gaming-discussion-paper-August-2016.pdf
[19] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 18

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

45.     In a post on Valve's forum, a moderator — that is, a Valve spokesperson who manages the forums on behalf of Valve — told "younger" users who think they have been scammed through third-party sites such as Lounge to not post on the forums about it.  Rather, those "younger" users who were scammed on a third-party gambling site should contact Valve directly.[20] In this post, the moderator on Steam's own forums told users, including its "younger" users: "Safe betting and trading!"[21]

46.     Finally, once users have accumulated Skins they can convert them to cash through OPSkins.

47.     OPSkins, based in Canada, links directly to a user's Steam account as well.

48.     Users on OPSkins can cash out their Skins for real money through their PayPal accounts.

49.     Valve admits that it allows these third-party websites to have authenticated Steam accounts and trade on the Steam marketplace.[22]

50.     Valve has the power to stop these third-party sites from trading with user accounts, which would eliminate illegal online Skins gambling.

51.     And even when Valve took action, it took incomplete or ineffective action.  Skins gambling continued, and still continues.  Valve took additional action on March 29, 2018, but there was nothing preventing Valve from having done this exact thing at any point before.

52.     In sum, users deposit real money on Valve's website, connect that real money account to nominal third-party websites where users can participate in various forms of gambling, and then cash out their account balances, converting Skins into real money.  All of these gambling

---

[20] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[21] http://steamcommunity.com/groups/csgolounge/discussions/8/627456486705186974/
[22] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

transactions between users and third party gambling websites actually take place on the Valve servers because Skins are never actually transferred from Valve's servers and computer system.

53.     Put another way: Valve's servers host the gambling website accounts and OPSkins accounts, and the trades physically take place among these Valve accounts - users, gambling websites and cash-out websites. In the barkeeper analogy, users buy chips from the bartender, gamble in one backroom and cash out in another, all under Valve's roof.

54.     This is an illegal scheme designed to bypass state-by-state gambling laws.  And this illegal gambling violates Washington law.

55.     Valve has the technical capabilities to block access to any gambling site it chooses to, but made an affirmative decision to instead work directly with third-party gambling websites to give them access to Valve's computers in order to facilitate their gambling transactions.

56.     Valve has always had the ability to modify, regulate, begin, and end the Skins market and gambling as it saw fit.

57.     In the July 2016 Skins Gambling Update, Valve alleged that "making the same web calls as Steam users to run a gambling business is not allowed by our API nor our user agreements."

58.     Notably, Plaintiffs, as the parents of minor children who engaged in illegal gambling by playing Valve's games and/or using Skins obtained from Valve to gamble on third-party websites, do not have any contractual relationship with Valve, and are therefore not subject to its user agreements.

59.     In the Skins Gambling Update, Valve claimed that it would "start sending notices to these sites requesting they cease operations through Steam, and further pursue the matter as necessary."

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 20

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

60.     Recognizing that the value of Skins was inflated by the ability to gamble and cash them out, Valve warned that "Users should probably consider this information as they manage their in-game item inventory and trade activity."

61.     No facts in the "Skins Gambling Update" were unknown to Valve before undersigned counsel filed the first lawsuits in June 2016.

62.     There was nothing preventing Valve from taking the actions described in the Skins Gambling Update before it did.  The publicity and attention that resulted from litigation against Valve precipitated Valve's actions.  In the alternative, the information about Lotto as described above, alone or in conjunction with the lawsuits, precipitated Valve's actions.

63.     Valve's actions in the Skins Gambling Update definitively show that Valve is aware of how it facilitates the Skins gambling ecosystem and how it has absolute control over Skins gambling.

64.     Immediately after this announcement, Skins gambling websites such as CSGODouble, CSGOWild, CSGOCasino, CSGOHouse, Diamonds, CSGO500, and other gambling websites closed down and/or stopped accepting deposits.[23]

65.     In an undated letter to 23 websites, Valve's General Counsel, Karl Quackenbush communicated a cease and desist warning on Valve's letterhead to gambling sites ("Cease and Desist").  In the Cease and Desist, Valve alleged that the gambling sites' use of Steam accounts was unauthorized use in violation of the Subscriber Agreement:

---

[23] http://www.dexerto.com/news/2016/07/28/richard-lewis-summarises-csgo-betting-sites-closed/;
http://www.esportsbettingreport.com/skin-gambling-sites-status-valve-cease-and-desist/

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 21

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

We are aware that you are operating one of the gambling sites listed below. You are using Steam accounts to conduct this business. Your use of Steam is subject to the terms of the Steam Subscriber Agreement ("SSA"). http://store.steampowered.com/subscriber_agreement/. Under the SSA Steam and Steam services are licensed for personal, non-commercial use only. Your commercial use of Steam accounts is unlicensed and in violation of the SSA. You should immediately cease and desist further use of your Steam accounts for any commercial purpose. If you fail to do this within ten (10) days Valve will pursue all available remedies including without limitation terminating your accounts.

Karl Quackenbush

General Counsel, Valve Corp.

66.     The Subscriber Agreement, in Section 4, prevents users, such as OPSkins, Lounge and the other Skins Gambling Websites, from using "automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process." Thus, unless a Skins Gambling Website and/or OPSkins has been specifically authorized to create bots to trade Skins, Plaintiffs' claims in this case are allegations of unauthorized use of Steam.

67.     Valve threatened to terminate these gambling website accounts, which shows that Valve has had the power all along and still retains the power to end Skins Gambling, but chooses not to.

68.     Within 10 days of the Skins Gambling Update and after Valve sent its Cease and Desist, according to an analysis from Esports Betting Report, approximately nine (9) of the twenty three (23) gambling websites had shut down or announced plans to shut down, with the others operating normally or affirmatively stating they would not shut down.[24]   That number increased to more than 20 by August 13, 2016.[25]

---

[24] http://www.esportsbettingreport.com/skin-gambling-sites-status-valve-cease-and-desist/
[25] http://www.esportsbettingreport.com/skin-betting-sites-status-valve-api-crackdown/

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

69.     Valve's Cease and Desist letter also forced CSGOLounge, the preeminent online sports book for betting on professional CS:GO matches, to seek gambling licenses in order to legalize their operations, and to prevent users within the United States from betting on the website.[26]

70.     Valve is well aware that many of their users are teenagers.  Steam's account requires users to check a box indicating they are just 13 years of age or older, and does not require users to read the Subscriber Agreement before creating a Steam account:[27]



71.     Plaintiffs' minor children signed into their Steam accounts through third-party websites including Lounge, Lotto, Shuffle, Diamonds, Speed, and Crash.

72.     Plaintiffs' minor children were aware Skins had real world value and could be cashed out on sites such as OPSkins, and did in fact cash out their Skins through OPSkins.

73.     Plaintiffs' minor children used Skins to place bets on Lounge, Shuffle, Lotto, Diamonds, Speed, Crash, and other sites through trading Skins to each via their Steam accounts,

---

[26] https://csgolounge.com/notice
[27] https://store.steampowered.com/join/?

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 23

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

hosted and facilitated by Valve, and lost Skins, and therefore the real world cash value of these Skins, in these transactions.

74.     Plaintiffs' minor children paid a premium for Skins that they otherwise would not have paid because the ability to gamble and cash them out for real money inflated the value in the Skins market.

75.     Plaintiffs were unaware of the illegal gambling ecosystem facilitated by Valve when providing money for the purchase of Skins and keys to their minor children, and would not have allowed their minor children to purchase Skins and keys had they been aware that the keys were part of a slot machine-like gambling process and that Valve allowed Skins to be used for gambling.

76.     Valve's facilitation of the gambling transactions engaged in by Plaintiffs' minor children caused Plaintiffs to suffer financial harm.

77.     C.L. was 14 years old when he first signed up on the Steam Marketplace and was 15 years old when he first played CS:GO.  He used money unwittingly provided by Plaintiff Andy Lesko to purchase Skins on OPSkins, purchase keys from Valve to open cases to obtain Skins, and deposit Skins into Skins Gambling Websites such as Lotto, Shuffle, CSGO Big, and CSGO Crash.  His parent, Andy Lesko, was not aware that C.L. was gambling online with Skins or the lootbox slot machine process for obtaining Skins, would not have allowed him to gamble online had he known what Skins and the lootbox slot machine process for obtaining Skins truly were, and would not have given him money or would have given him money with stricter oversight had he known.  As a result, Andy Lesko lost his own money because of Valve's actions.

78.     J.P. first signed up for the Steam Marketplace at the age of 14 and first purchased and gambled Skins at the age of 14.  J.P. gambled Skins on Skins Gambling Websites like Wild,

Lotto, Big, CSGO Strong, and CSGO Sweep.  He purchased more than $730 worth of Skins on OPSkins, purchased keys from Valve to open cases to obtain Skins, and has lost more than $6,000 worth of Skins.  Plaintiff Grace Galloway, J.P.'s parent, was not aware that J.P. was gambling online with Skins or the lootbox slot machine process for obtaining Skins, would not have allowed him to gamble online had she known what Skins and the lootbox slot machine process for obtaining Skins truly were, and would not have given him money or would have given him money with stricter oversight had she known. As a result, Grace Galloway lost her own money because of Valve's actions.

79.     E.B. first purchased CS:GO and began Skins Gambling when he was 13 years old; he first played videogames on the Steam Marketplace when he was 11.  He purchased Skins on sites like OPSkins and purchased keys from Valve to open cases and engaged in Skins Gambling on Skins Gambling Websites like Lounge, CSGO Double, CSGO Diamonds, Crash, and CSGO Wild, losing more than $3,000.  His parent, Plaintiff Brenda Shoss, was not aware that E.B. was gambling online with Skins or the lootbox slot machine process for obtaining Skins, would not have allowed him to gamble online had she known what Skins and the lootbox slot machine process for obtaining Skins truly were, and would not have given him money or would have given him money with stricter oversight had she known.  She gave E.B. money with which to purchase Skins, keys, and cases, and therefore lost her own money because of Valve's actions.

80.     Plaintiffs' experiences are typical and representative of the hundreds of thousands, if not millions, of parents and guardians of minor Skins gambling users in the United States whom Valve enticed into the Skins Gambling economy that Valve allowed and facilitated through its Steam Marketplace.

## **APPLICABLE LAW**

81.     Washington is the location of Valve's headquarters, and corporate decision-making apparatus; Valve is Washington corporation and therefore a citizen of Washington; and the servers used to facilitate the Skins gambling ecosystem described herein are located in the State of Washington. The State of Washington therefore has the most significant contacts with Plaintiffs' claims.

82.     Washington is likewise the location where Plaintiffs' injuries as described herein occurred because the funds transfers from Plaintiffs' minor children to Valve, Skin and key purchases made with said funds, and the transfer of Skins between Steam accounts associated with third-party gambling websites, marketplace websites such as OPSkins, and other Steam users and Plaintiffs' minor children occurred on Valve's servers located within the State of Washington.

83.     As a result of Washington being the location of Valve and the events underlying this action, Washington has the most significant relationship to this controversy and Washington law applies to this action.

## CLASS ALLEGATIONS

84.     A class action is the proper forum to bring Plaintiffs' claims under Fed. R. Civ. P. 23. The potential Class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

85.     This action satisfies all of the implicit and explicit requirements of Fed. R. Civ. P. 23, including numerosity, commonality, typicality, adequacy, predominance and superiority.

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 26

**STRITMATTER KESSLER
KOEHLER MOORE**
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

86.     **Ascertainability:** Plaintiffs can and shall propose an administratively feasible method by which class members can be identified.

87.     **Numerosity**: the Class is so numerous that joinder of all members is impracticable.  While the exact number is not known at this time, it is generally ascertainable by appropriate discovery.  News accounts discuss how millions of users compete on the websites of Defendant.

88.     **Commonality:** the claims made by Plaintiffs meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the class wide litigation. These shared questions predominate over individual questions, and they include, without limitation:

   a.  Whether Plaintiffs and members of the Class were the parents of minor children who purchased keys from Valve using money, with those keys being used in the lootbox slot machine process for obtaining Skins and therefore gambled Skins online using Valve's services over the past eight years;
   b.  Whether Plaintiffs and members of the Class provided their minor children with monies ultimately paid to Valve in order to obtain Skins and keys in a manner that constitutes illegal gambling;
   c.  Whether Valve's operations, and those of gambling websites that Valve facilitates and supports, are illegal online gambling under all applicable laws and rules;
   d.  Whether Valve's operations as described in this Complaint violate Washington law;
   e.  Whether Plaintiffs and members of the Class are entitled to restitution and entitled to recovery of monies lost as result of Valve's actions, the disgorgement of Valve's profits and revenue derived from the same, or injunctive relief as described below;
   f.  Whether Plaintiffs and members of the Class are entitled to restitution and entitled to recovery of monies lost as result of Valve's loot crate gambling, or the disgorgement of Valve's profits and revenue derived from the same, or injunctive relief as described below;
   g.  Whether Valve was negligent or otherwise acted wrongfully in allowing, encouraging, or failing to prevent users to utilize its service to bet and gamble on CS:GO games and third party sites;
   h.  Whether Valve owed duties to the Plaintiffs and the proposed Class members, the scope of those duties, and if it breached those duties;
   i.  Whether consumers such as the Plaintiffs and the proposed Class members were harmed by Valve's actions, as described in detail above;

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

j.   The extent of the damages caused by Valve's acts; and

k.   Whether Valve violated Washington consumer protection statutes as described below.

89.   **Typicality**: Plaintiffs' claims are typical of those of the other Class members because Plaintiffs, like every other Class member, was induced to provide their minor children with funds to use Valve's services based on false and misleading advertisements of fair play, legality, safety, and lack of information about the illegal Skins lootbox slot machine/gambling process and Skins gambling ecosystem being facilitated by Valve.  Plaintiffs' claims are typical because parents universally, equally and typically want their children to avoid engaging in illegal online gambling.

90.   The claims of the Class Representative Plaintiffs are furthermore typical of other Class members because they make the same claims as other class members. Plaintiffs have an interest in seeking compensation from Valve.

91.   **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class members.

92.   **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 28

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against a large corporate defendant. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

93.     The nature of this action and the nature of Washington laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged. Without the class action mechanism, Valve would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class, and will establish the right of each member of the Class to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

94.     The proposed class is described as follows:

> **"All persons in the United States who are parents/guardians of a minor child who provided funds to their minor child(ren) for the purchase of Skins and/or Keys for the games CounterStrike:Global Offensive, Dota2 and Team Fortress 2."**

95.     Plaintiffs reserve the right to modify or amend the definition of the proposed class and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

96.     Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the class representatives are consistent with those of the other members of the Class. In

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 29

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

97.     The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

98.     Excluded from the Class are the following:

a.  Valve and any entities in which Valve has a controlling interest;

b.  Any entities in which Valve's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Valve;

c.  The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

d.  All persons or entities that properly execute and timely file a request for exclusion from the Class; and

e.  Any attorneys representing the Plaintiff or the Class.

## <u>COUNT I</u>
## VIOLATION OF THE CONSUMER
## PROTECTION ACT, RCW 19.86 *ET SEQ.*

99.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

100.    Valve is headquartered in Washington; its strategies, decision-making, and commercial transactions originate in Washington; most of its key operations and employees reside, work, and make company decisions in Washington; and Valve and many of its employees are part of the people of the State of Washington.

101.    The conduct that Plaintiffs challenge directly affects the people of the State of Washington by allowing Washington citizens, including minor children, to participate in illegal online gambling facilitated by Valve as described herein.

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

102.     The Skins Gambling Websites and Marketplace Websites engaged in commerce inside Washington with both Valve and the minor children of all Plaintiffs, and that commerce gives rise to the allegations in this Complaint.

103.     Washington's Consumer Protection Act, RCW 19.86 *et seq.* ("CPA"), protects consumers by promoting fair competition in commercial markets for goods and services.

104.     To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."  RCW 19.86.020.

105.     Valve's acts, omissions, and practices, as alleged herein, constitute unfair or deceptive acts in violation of the CPA.

106.     Valve's acts, omissions, and practices constitute *per se* violations of the CPA.  As set forth above, Valve violated WAC 230-06-010 by permitting underage gambling and violated the Gambling Act of 1973, RCW 9.46 *et seq.*, by engaging in professional gambling without a license.

107.     Plaintiffs were within the class of consumers WAC 230-06-010 seeks to protect because Plaintiffs and members of the class were the parents of children under the age of 18 who participated in Valve's gambling activities.

108.     Valve's acts, omissions, and practices as described herein impact the public interest of the Washington as set forth in the Washington Gambling Act of 1973 by facilitating illegal gambling within the State of Washington, including but not limited to illegal gambling by citizens and residents of Washington.  The Legislature enacted the Gambling Act "to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

gambling." RCW 9.46.010.  To these ends, the Legislature provided that the Gambling Act is to be liberally construed.  *Id.*

109.     Valve's acts, omissions, and practices are unfair or deceptive because they are contrary to Washington's legislatively declared policies condemning unlicensed, unregulated gambling and condemning the promotion or legitimization of gambling as entertainment for children.  In violation of the public policies of Washington, Valve created a slot machine-like process to obtain Skins in its games that involved paying money to Valve for a chance to win items that could have lesser or greater value than the amount of money paid; created and maintained an unregulated gambling market, knowingly permitted minor children to gamble in this market; and profited from these gambling activities.

110.     Valve's acts, omissions, and practices, as alleged herein, constitute deceptive acts and practices because they are predicated upon false and misleading advertisements of fair play, legality, safety, and lack of information about the illegal Skins gambling ecosystem being facilitated on its Steam platform.

111.     Valve's acts, omissions, and practices, as alleged herein, created a false impression of fair play, legality, and safety which induced Plaintiffs to unwittingly provide their minor children with monies used to purchase Skins and keys, and to otherwise participate in the illegal Skins gambling ecosystem facilitated by Valve as described herein.

112.     Valve's acts, omissions, and practices constitute immoral, unethical, oppressive, and unscrupulous business conduct that caused substantial injury to Plaintiffs.

113.     The gravity of the harm resulting from Valve's conduct described above outweighs any utility of this conduct.  There are reasonably available alternatives that would further Valve's legitimate business interests, such as ensuring that any lawful gambling

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 32

**STRITMATTER KESSLER
KOEHLER MOORE**
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

enterprises obtain proper licenses and implementing suitable age verification protocols.

114.    As a direct and proximate result of Valve's violations of the Consumer Protection Act, Plaintiffs and Class members sustained injuries, including out-of-pocket losses for funds they unwittingly provided for Skins gambling, purchasing CS:GO Skins and keys, paying an inflated price for Skins because of their increased value due to the ability to gamble them, and paying Skins-related fees.

115.    Further, Plaintiffs and the Class were harmed by unwittingly allowing their children to engage in illegal online gambling.

116.    The injuries caused by Valve's conduct were not reasonably avoidable.  Plaintiffs and Class members did not know, and had no reasonable means of learning, of Valve's violations of law.  Plaintiffs' minor children were not in a position to make contracts or understand the consequences of gambling online, and the use of Skins as an in-game purchase and other actions by Valve obscured to parents such as Plaintiffs the true nature of what their children were doing. Moreover, as described in detail above, the slot machine-like crate opening process designed by Valve and the Skins gambling ecosystem described in this Complaint could not have occurred without facilitation by Valve.

117.    Valve, a multi-billion dollar business that had actual knowledge of online gambling and the resulting harms to minor children, was slow to try to stop it and then took insufficient steps to do so, is in a superior position to parents, who were not aware that their children's video games were fronts for online gambling, to stop Plaintiffs' children from engaging in illegal online gambling.

118.    The injuries that Plaintiffs and Class members sustained as a result of Valve's unlawful and unfair conduct outweigh any benefits that could be attributed to Valve's conduct.

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 33

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

**COUNT II**
**VIOLATIONS OF THE GAMBLING ACT OF 1973,**
**RCW 9.46 *ET SEQ.***

119.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

120.    Skins are a thing of value because they may be converted to cash on various marketplace websites, used as consideration in wagers on Skins gambling websites, and traded on an open market, all using Valve's Steam platform.

121.    Washington law provides that a person is engaged in "professional gambling" when, "[a]cting other than as a player or in the manner authorized by this chapter, the person knowingly engages in conduct which materially aids any form of gambling activity."  RCW 9.46.0269(1)(a).

122.    Professional gambling is illegal under Washington law.  RCW 9.46.220-222.

123.    Valve engaged in professional gambling in the course of creating and maintaining an online gambling market which materially aided the operation of third-party Skins gambling websites and third-party Skins marketplace websites.  Valve engaged in professional gambling by creating a crate-opening process that was the equivalent of an online slot machine and therefore gambling.  Valve acted other than as a player and in a manner that was not authorized by the Gambling Act of 1973 or any other Washington law.

124.    Valve failed to act in accordance with the rules and regulations of Washington's Gambling Commission.  Valve did not obtain any gambling licenses from the Gambling Commission.

125.    In violation of RCW 9.46.220, Valve, acting in concert with five or more people, engaged in professional gambling and knowingly caused, aided, abetted, and conspired with others to engage in professional gambling.  Valve devised and created a common online gambling currency and built the platform for an online network of gambling games.  The Skins Gambling Websites, their owners, and websites like OPSkins, among other actors, conspired with Valve to

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 34

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

offer gambling games on this network.

126.    As a direct and proximate result of Valve's violations of the Gambling Act, Plaintiffs and Class members sustained injuries, including out-of-pocket losses from their minor children using money provided by Plaintiffs and Class members for gambling, paying inflated prices for Skins because of their increased market value in the Skins Gambling economy, purchasing Skins and keys, and paying Skins-related fees.

127.    Under RCW 9.46.200, Plaintiffs and Class members are entitled to money damages, plus statutory interest at a six percent rate, in an amount to be proven at trial, as well as reasonable attorneys' fees.

**COUNT III**
**UNJUST ENRICHMENT**

128.    Plaintiffs on behalf of themselves and the proposed Class, repeat and reallege all preceding paragraphs as if fully set forth herein.

129.    Plaintiffs and members of the proposed Class conferred a benefit on Defendant by providing funds to their minor children that were used to purchase video games, depositing money into their minor children's Steam wallets and/or linking their credits and/or PayPal accounts that were used for purchasing keys used for the gambling through the slot machine lootbox process and/or for purchasing Skins that were ultimately used in playing games of chance on various websites with which Valve had a financial relationship.

130.    Valve has further benefited monetarily from unlawful and/or illegal conduct directed to consumers, including from Plaintiffs and members of the class. Because of the popularity of Valve's slot machine-like lootbox opening process and online Skins gambling, Valve has received financial benefit from the sale of "keys" to open crates/loot boxes, increased sales, increased exposure and a contract with TBS, purchases of CS:GO by third-party Skins

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 35

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

gambling and marketplace websites, fees from the sale of Skins, and fees from the sale of other items on the Steam Marketplace where users buy third party software using money in their Steam wallet from the sale of Skins, and from which Valve takes a fee.

131.    Valve's benefit came at the expense and detriment of Plaintiffs and Class members.

132.    Valve has thus unjustly enriched itself in retaining the revenues derived from Plaintiffs who unwittingly provided money to their minor children used for purchasing keys to open crates/loot boxes, deposits, wagers, purchases, and gambling by Plaintiffs' minor children and the minor children of members of the proposed class.

133.    Retention of these funds under these circumstances is unjust and inequitable because Valve created an illegal and unconscionable gambling ecosystem while creating false impressions of safety and fair play on its Steam platform to Plaintiffs and other members of the proposed class, and has created an illegal international gambling economy operating in the United States and targeted at teenagers.

134.    Valve has benefited from its creation of an illegal gambling scheme through the creation of Skins and the assistance provided to international companies that provide ways to gamble Skins and convert in-game Skins into cash.  Valve has also benefited from the creation of an illegal gambling market by inflating the value of Skins, something with no intrinsic value, which they then sell or facilitate selling for a fee.  Valve has also benefited from the increased sales, increased exposure, marketing revenue, sponsorship revenue and other financial benefits that CS:GO has brought Valve because of its popularity, which is due almost entirely to Skins gambling.  Valve has also benefited from the sale of "keys" to open crates/loot boxes as described above.

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 36

**STRITMATTER KESSLER
KOEHLER MOORE**
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

135.    Plaintiffs and members of the Class were injured as a direct and proximate result of Valve's illegal activities because they provided funds used to pay for items and wagers that were unregulated, illegal gambling activities ripe for fraud, abuse and theft, and with no way of knowing whether they were fairly run.

136.    Because Valve's retention of the non-gratuitous benefit conferred on it by Plaintiffs and the members of the Class is unjust and inequitable, Valve must pay restitution to Plaintiffs and the members of the proposed class for its unjust enrichment, as ordered by the Court.

137.    Equity and good conscience require that Valve disgorge profits made from its illegal gambling activities, and Plaintiffs and members of the class further seek restitution on this basis.

## COUNT IV
## NEGLIGENCE

138.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

139.    At all times relevant to this Complaint, Valve owed Plaintiffs and the proposed Class a duty to use reasonable care to provide a reliable and safe videogaming experience, and to ensure that its Steam platform was used in a manner that comported with applicable law, including but not limited to the Washington Consumer Protection Act and Washington Gambling Act of 1973.

140.    Valve breached its duties to Plaintiffs and the proposed class by creating, allowing and maintaining a system of Skins gambling that resulted in unregulated, third-party websites harming Plaintiffs and the classes through rigged gambling websites, such as CS:GO Lotto and

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

CS:Go Shuffle. Valve also breached its duties to Plaintiffs and the proposed class by creating a process for obtaining Skins that required purchasing keys from Valve to open crates/lootboxes, closely resembled slot machine play, and constituted illegal gambling.

141.     Valve further assumed a duty of reasonable care to stop Skins gambling by taking steps to stop it, and failing, and then not taking any more steps after that.

142.     Valve knew and/or should have known that minor children were using their parents' and/or guardians' money, and that parents did not know their children were illegally gambling online.

143.     Valve breached its duties to Plaintiffs and the Class as described above.

144.     As a direct and proximate result of Valve's negligence, Plaintiffs and the proposed class suffered financial losses through the unregulated, rigged, unfair and unsafe Skins Gambling Websites.

## COUNT V
## INJUNCTIVE RELIEF

145.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding and subsequent paragraphs, as if fully set forth herein.

146.     Skins gambling websites are *still* operating on Valve's servers using Valve accounts, resources and tacit consent to operate.

147.     Valve is also continuing to promote the risking of money to teenagers and legal gambling age users to win high value Skins through an online slot machine as depicted and described above.

148.     Plaintiffs therefore request declaratory relief and/or for the Court to certify a class under F.R.C.P. 23(b)(2) and provide relief to Plaintiffs in the following ways.

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 38

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

149.    Injunctive relief requiring Valve to provide complete and conspicuous disclosure prior to each loot box purchase and/or opening. Said disclosure shall include a list of all in game items potentially contained in each loot box, with the accompanying probability of each item being contained in a given loot box.

150.    Injunctive relief requiring Valve to disclose any sponsorship or other paid relationships it has with professional gamers, Youtubers, or streamers. This shall include, but is not limited to, persons who stream or post videos of themselves opening CS:GO loot boxes online.

151.    Injunctive relief requiring Valve to establish a program that a) keeps a catalog of all Steam accounts identified as being associated with gambling website or third party market place website b) suspends game-play for twenty-four hours and suspends item trading for one week for all Steam accounts that engaged in in game item trading with any account within one week of its identification as being associated with Skins gambling websites or third party marketplace websites.

152.    Injunctive relief requiring Valve to create and staff an internal team dedicated to eliminating skins gambling and third-party skins marketplaces through changes to Steam platform features, identifying and eliminating any Steam accounts associated with skins gambling sites and third-party skins marketplaces, and/or other technological practice changes to eliminate skins gambling and third-party skins marketplaces.

153.    Injunctive relief requiring Valve to provide a modified version of its X-ray scanner feature for all CS:GO players in the United States, free of charge, with its use subject to a reasonably short cooldown period after each use.

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 39

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

154.     Injunctive relief requiring Valve to place a limit of three loot box keys that may be obtained by a single Steam account within a twenty-four hour period, either through purchase directly from Valve, purchased from other Steam accounts on Valve's "Steam Marketplace" network, or obtained through Steam's item trading feature.

155.     Injunctive relief requiring Valve to place a limit of no more than three items that can be traded during a twenty-four-hour period.

156.     Injunctive relief requiring Valve to redesign the loot box cinematic to eliminate audio and visual elements analogous to those found in slot machines. This includes, but is not limited to, the elimination of the scroll bar from the loot box cinematic that plays when Steam users open loot boxes as well as any and all sounds from the cinematic.

157.     Injunctive relief requiring Valve to restrict loot box key purchases and virtual item purchases to steam users who are age eighteen or older both directly from Valve and from other Steam users on its Steam Marketplace platform, and to verify their age by uploading a scanned copy of their photo ID at the time of their initial key purchase.

158.     Injunctive relief requiring Valve to restrict trading of CS:GO in game items to steam users who are age eighteen or older, both directly from Valve and from other Steam users on its Steam Marketplace platform, and to verify their age by uploading a scanned copy of their photo ID prior to activating the CS:GO item trading feature on their accounts.

159.     Injunctive relief requiring Valve to cease and desist from selling and/or distributing CS:GO skins and loot box keys by any means, including but not limited to, direct sales to Steam users, and from allowing the sale of CS:GO skins and loot keys between Steam users in its Steam Marketplace platform.

STRITMATTER KESSLER KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

160.    Injunctive relief requiring Valve to cease and desist from distributing loot boxes to Steam users by any means including, but limited to, random drops during game play, direct purchase from Valve, and sales between Steam users on Valve's marketplace platform. Further requiring Valve to cease and desist from the sale of loot box keys to Steam users both directly from Valve and between users on Valve's Steam marketplace platform.

161.    Injunctive relief requiring Valve to cease and desist from allowing Steam users to engage in one way trading, i.e. trades during which items are transferred from one Steam account to another without any reciprocal item transfers, applicable to all CS:GO in game items including, but not limited to, CG:GO skins, loot boxes, and loot box keys.

162.    Injunctive relief requiring Valve to cease and desist the sale of loot box keys either directly to Steam users, which may only be provided to Steam users by Valve as CS:GO gameplay achievement awards and random drops during CS:GO game play.

163.    Any and all other commercially reasonable efforts to prevent illegal, online gambling by underage children, through lootbox or through third party websites.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the proposed class pray for relief and judgment against Valve, as follows:

a.    For an order certifying the proposed classes, appointing Plaintiffs and their counsel to represent the proposed class and notice to the proposed classes to be paid by Valve;

b.    For damages suffered by Plaintiffs and members of the proposed class;

c.    For restitution to Plaintiff and the proposed class of all monies wrongfully obtained by Valve;

d.    For injunctive relief requiring Valve to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

PLAINTIFFS' FIRST AMENDED COMPLAINT - CLASS
ACTION FOR DAMAGES - 41

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

e.   An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Valve from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Valve's past conduct;

f.   For Plaintiffs' reasonable attorneys' fees, as permitted by law;

g.   For Plaintiffs' costs incurred;

h.   For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i.   For such other and further relief that this Court deems just and proper under equity or law.

DATED this 31st day of August, 2020.

By: */s/ Ray W. Kahler*
Paul L. Stritmatter
Ray W. Kahler
**STRITMATTER KESSLER KOEHLER MOORE**
413 8th Street
Hoquiam, WA  98550
Phone:360-533-2710
pauls@stritmatter.com
ray@stritmatter.com

Jasper D. Ward IV
Alex C. Davis
**JONES WARD PLC**
The Pointe
1205 East Washington St., Ste. 111
Louisville, Kentucky 40206
Tel. (502) 882-6000
Fax (502) 587-2007
jasper@jonesward.com
alex@jonesward.com