1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
8                             AT SEATTLE
9
Grace Galway and Brenda Shoss, individually and
10   on behalf of all others similarly situated,          NO. 2:16-cv-1941-JLR
11                                    Plaintiffs,          PLAINTIFFS' MOTION FOR CLASS
                                                           CERTIFICATION
12                          v.
13
VALVE CORPORATION, a Washington
14   corporation,
15                                    Defendant.
16
17          Plaintiffs Grace Galway and Brenda Shoss ("Plaintiffs"), on behalf of themselves and all

18   others similarly situated, through counsel, for their Motion for Class Certification state as

19   follows:

20          I.       **<u>INTRODUCTION</u>**

21          Whether Valve offered online gaming to consumers but concealed and omitted that it

22   offered online gambling to minors is the certifiable issue which will drive resolution of this case.

23   Valve has sought to capitalize on the online gaming market among minors with its "loot boxes".

24   Valve's loot boxes contain "skins," cosmetic virtual items of undisclosed and varying real-world

25

26

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

cash value. To obtain a skin, players may access the loot box for a price, typically by purchasing a "key" that opens the loot box. The skin the player obtains is determined entirely by chance.

Despite the presence of a prize (the skin), chance (opening the loot box, which looks and sounds the same as a slot machine), and consideration (the price of the loot box and/or key), Valve fails to disclose that the loot box it offers to minor children simulates online gambling.

Plaintiffs, the parents/guardians of minor children who engaged in Valve's illegal online gambling by purchasing keys to open loot boxes in hopes of obtaining a skin of value, seek certification of a class damaged by Valve's omissions and misrepresentations in violation of the Washington Consumer Protection Act.

## II.   FACTUAL BACKGROUND

Valve is a Washington corporation that makes and sells video games, gaming hardware, and other digital content, including video games called Counter-Strike: Global Offensive ("CS:GO"), Defense of the Ancients 2 ("Dota 2"), and Team Fortress 2 ("TF2"). Valve's sales are through Valve's proprietary online platform, Steam, which anyone who checks a box indicating they are over the age of 13 may sign up for and use, without any restrictions or age verification. *See* Deposition of Gautam Babbar ("Babbar Dep.") at 35:15-36:7, excerpts attached as Exhibit 1*, see also* https://store.steampowered.com/join/ (last visited September 15, 2021). Games or other content purchased on Steam can be paid for at the time of sale using credit cards, PayPal, or a similar method that is linked to the user's Steam account.[1]

Entering a credit card as a payment method on Steam requires providing Valve with the account holder's full name and billing address. *Id.* Users can also pay using a digital wallet

---

[1] https://store.steampowered.com/checkout/?purchasetype=updatebillinginfo (last visited September 1, 2021). PayPal no longer appears as payment option on Steam but does appear in the purchase histories of Plaintiffs' children.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 2

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

("Steam Wallet") that can be funded using one of the user's payment methods. Babbar Dep. at 46:12-47:9. Valve maintains purchase histories for all Steam accounts that identify purchases through its platform, including purchase method and payment information. *See* E.B purchase history attached as Exhibit 2, J.P. purchase history attached as Exhibit 3.

Valve has monetized the popularity of CS:GO, Dota 2, and TF2 through the sale of cosmetic in-game items, including skins. Valve intentionally designed skins to have value, and intentionally designed its Steam platform to facilitate the sale of digital items, including skins, between users, the proceeds of which can be used effectively as cash to buy hardware and software from Valve.[2] Babbar Dep. at 41:1-11. Users can also sell these virtual items on third-party websites for cash. B.S. Arb. at 72:11-73:14 (Exhibit 4). Valve maintains a series of digital ledgers and trade histories for Steam users that show the inflow and outflow of digital items—including skins—from a given account. *Id. at* 175:11-18, 325:1-17.

In addition to buying skins on Valve's online marketplace (the "Steam Community Market") or through third-party websites, users can win skins through opening loot boxes. Babbar Dep. at 21:15-22:6. Loot boxes serve as an in-game delivery system for randomized in-game content. Users can obtain loot boxes in multiple ways: either directly from Valve during gameplay, direct purchase from Valve through Steam for real money, from other users through the Steam Community Market operated by Valve, or through third-party websites. *Id.* at 24:18-25:5, 37:2-7. Loot boxes are available for CS:GO (referred to in-game as "Weapons Crates"), Dota 2 ("Treasures"), and TF2 ("Mann Co. Supply Crates"). https://steamcommunity.com/market/listings/730/CS%3AGO%20Weapon%20Case (last visited September 1, 2021.)

---

[2] Valve takes a percentage of each Steam Community Market sale, which is realized in US Dollars. Arbitration Testimony of Karl Quackenbush, *B.S. Individually and on Behalf of Her Minor Child, E.B. v. Valve Corporation*, No. 01-18-0001-7979 ("B.S. Arb.") at 41:4-15, excerpts attached as Exhibit 4.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 3

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

https://steamcommunity.com/market/listings/440/Mann%20Co.%20Supply%20Crate%20 Series%20%2318 (last visited September 1, 2021); https://steamcommunity.com/market/listings/ 570/Hallowed%20Chest%20of%20the%20Diretide. To open a CS:GO or TF2 loot box, users must obtain another digital item called a "key". Keys can be purchased via an in-game transaction directly from Valve for $2.49, purchased from another user on the Steam Community Market, or traded for with another user. Babbar Dep. at 36:8-38:5.

### A.  Valve's Loot box Opening Is Illegal Online Gambling

Simply put, loot box opening is a form of illegal online gambling, which is borne out by an examination of the loot box characteristics. While it costs $2.49 to purchase a key to open a loot box, the item received may have a market price on Steam or on third-party websites that is higher or lower than the cost to open the loot box. *Compare* https://steamcommunity.com/ market/search?appid=730#p1_price_asc; https://steamcommunity.com/market/search? appid=730#p1_price_desc. There is also no skill involved in loot box opening, and the item (or items) received is determined entirely by chance. Babbar Dep. at 74:9-75:1. Opening a loot box does not require any age verification by the user, and thus is implicitly authorized by Valve for children as young as thirteen.

The online gambling aspects of Valve's games are deeply ingrained: the look, feel, sound, and experience of opening a CS:GO loot box simulates that of an online slot machine. The cinematic displayed in CS:GO at the time of loot box opening has colored tiles depicting each skin that the user could potentially receive scrolling past a vertical line on the user's screen while a mechanical clicking sound plays. Babbar Dep. at 58:1-59:5. Just as with a slot machine, the tile under the line when the scrolling stops depicts the item the user has won. *Id.* The color of the tiles are meant to display the relative odds of receiving a given item based on a system of relative

rarity, *i.e.*, for each item of a given tier there are five items in the tier below it. Arbitration Testimony of Ido Magal, *G.G., Individually and on Behalf of Her Minor Child, J.P. v. Valve Corporation*, No. 01-18-0001-7979 ("G.G. Arb.") at 97:16-98:5, excerpts attached as Exhibit 5. However, the loot boxes also may contain an "exceedingly rare item" which does not follow this pattern. These rare and valuable virtual items can be sold for hundreds of dollars, but the most common skins are only worth pennies. *Compare* https://steamcommunity.com/market/search?appid=730#p1_price_asc; https://steamcommunity.com/market/search?appid=730#p1_price_desc. Valve does not disclose the actual numerical odds of receiving a given item when opening a loot box in CS:GO or TF2. These characteristics of loot box opening have been maintained since loot boxes were introduced as a feature of CS:GO. G.G. Arb. at 97:16-98 (Exhibit 5).

Valve's loot boxes have been banned in some countries as a form of illegal online gambling, and have been regulated in other countries, specifically because of the harmful effects of online gambling on minor children. *See, e.g.*, https://www.pcgamesn.com/counter-strike-global-offensive/csgo-lootbox-netherlands.

**B.  Class Definition**

Plaintiffs seek class certification of the following similarly situated individuals:

> All persons in the United States who are parents/guardians of a minor child who provided funds to their minor child(ren) for the purchase of keys for the games Counter-Strike:Global Offensive, Dota2 and Team Fortress 2.

Amended Complaint at ¶94. In the alternative and to the extent differences in misrepresentations and omissions about each game may affect the class certification analysis, Plaintiffs seek certification of subclasses for each of the three specific games identified in the proposed class. Plaintiffs claim this class was harmed by Valve's conduct, which violated the Washington

Consumer Protection Act ("WCPA") as to themselves and to all similarly situated parents/guardians of minor children who used their parents' or guardians' money to pay for keys to open loot boxes. Ex. 2, Ex. 3.

### C. Summary of Classwide Claims and Expert Opinions

Plaintiffs allege violations of the WCPA based on material omissions and misrepresentations by Valve about its games CS:GO, TF2 and Dota2. These allegations are supported by the expert reports, deposition testimony and documents produced in discovery, as well as publicly available information.

### 1. Valve's Representations About Its Platform and Games

CS:GO is a first-person shooter game that Valve describes as a "team-based action" game. https://store.steampowered.com/app/730/CounterStrike_Global_Offensive/. The only warnings associated with CS:GO are that it "includes intense violence and blood." *Id.* Similarly, Valve describes Dota2 as a battle-focused game where players "can collect cosmetics for heroes and fun add-ons for the world." https://store.steampowered.com/app/570/Dota_2/. There are no warnings whatsoever about any aspect of Dota2. *Id.* Finally, Valve describes TF2 as an "online action" game where players use skills to battle other characters. https://store.steampowered.com/app/440/Team_Fortress_2/. The only warnings about TF2 are that it "includes cartoon violence and gore." *Id.*

Valve's disclosure and warnings on websites about its games omit and misrepresent any and all information about loot box opening, including any information about the harms and risks, -- and even the existence of -- a gambling feature inside the games. Instead, Valve represents that its platform is appropriate for minor children aged 13 and older, despite laws that online gambling is not allowed for those under 18. *See* Am. Compl. at ¶ 70.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 6

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

**2. Plaintiffs' Experts Support Plaintiffs' Claims and Class Certification**

Plaintiffs have disclosed experts who provide opinions on Valve's conduct, including Valve's omissions and misrepresentations about CS:GO, Dota2 and TF2. *See* Expert Report of Jeffrey Derevensky, Ph.D., August 3, 2021, attached as Exhibit 6; Expert Report of Brett Abarbanel, Ph.D. and Kahlil Philander, Ph. D., August 3, 2021, attached as Exhibit 7.

<u>a. Dr. Derevensky's Qualifications and Opinions</u>

Dr. Derevensky is one of the world's foremost experts on problem gaming and gambling by youth. *See* Ex. 6, at 3-4. He is the Director of Clinical Training in School/Applied Child Psychology, Department of Educational and Counselling Psychology; and Professor, Department of Psychiatry at McGill University in Montreal, Canada. *Id.* Dr. Derevensky offers four core opinions in support of Plaintiffs' claims:

- "Exposure to pay-to-win micro transactions, such as loot boxes and skin transactions, can lead to gambling-related problems among minors."
- "There is little indication that Valve Corporation has applied reasonable methods to warn consumers about the potential harms associated with loot boxes and skin betting."
- "Valve Corporation's knowledge of the application of psychological principles to game design for consumers should have informed the company of the potential harms associated with loot boxes and skin betting, especially to minors."
- "Provided with knowledge of the gamification and gambling aspects of loot boxes in video games that promote addictive behavior in their children while not enhancing play, parents would most likely not pay for loot boxes."

Ex. 6, at 1. These opinions generally support Plaintiffs' WCPA claims and apply on a class-wide basis to support class certification.

<u>b. Drs. Abarbanel and Philander's Qualifications and Reports</u>

Plaintiffs have produced a joint report from Drs. Abarbanel and Philander. Ex. 7. Dr. Abarbanel is a professor at the University of Nevada, Las Vegas ("UNLV"), with 14 years of

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 7

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

1   experience researching the overlap of video games, e-sports, and gambling. *Id.* at 3. She is the

2   director of the UNLV International Gaming Institute. *Id.* She is the co-executive editor of the

3   *UNLV Gaming Research & Review Journal*, editorial board member at *International Gambling*

4   *Studies* and Harvard's Division on Addiction's *Brief Addiction Science Information Source*, and

5   recently completed a term on the International Advisory Panel for Singapore's National Council

6   on Problem Gambling. *Id.*

7        Dr. Philander is a professor at Washington State University with 12 years of experience

8   researching consumer behavior in the gaming industry. *Id.* at 4. He was the Director of Social

9
10  Responsibility at the British Columbia Lottery Corporation, where he oversaw the GameSense

11  program, a responsible gambling consumer education program for online and retail products that

12  has been adopted in multiple North American jurisdictions. *Id.*

13       Drs. Abarbanel and Philander offer opinions that support Plaintiffs' WCPA claims and

14  class certification, including that the CS:GO loot box opening feature constitutes illegal online

15  gambling. *Id.* at 5. Drs. Abarbanel and Philander opine that "Valve failed to provide a reasonable

16  level of safeguards to disclose risks to consumers and protect their consumers from gambling-

17  related harms." *Id.* Drs. Abarbanel and Philander "observed that the design choices made by

18
19  Valve in the case opening process share many structural characteristics with electronic gambling

20  machines that are believed to increase the risk of developing addiction." *Id.* Finally, Drs.

21  Abarbanel and Philander opined that there was "no evidence that Valve was systematically

22
23  addressing the harms that may emerge from their product" and that there was "no evidence that

24  standard elements in responsible gambling program designs were considered or practiced by

25  Valve." *Id.*

26

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 8

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

Valve's failure to disclose any of these harms and risks to parents of minor children, and these opinions generally, support Plaintiffs' WCPA claims and apply on a class-wide basis in support of class certification.

### 3. Specific Omissions That Support Plaintiffs' WCPA Claims and Class Certification

Despite Valve's representation that its platform is suitable for anyone 13 or older, not all of Valve's services are actually suitable for minor children, nor is there any mechanism by which Valve checks users' ages before allowing them to use any of Valve's services, including its games and the loot box gambling feature. *See* Babbar Dep. at 35:20-36:7, 51:22-54:5. Thus, to the extent there is inappropriate content for minor children, including the gambling features discussed at length by Plaintiffs' Experts, Valve's omissions about the harms of the subject games and the Steam platform apply class-wide. Valve also fails to disclose the odds—and thus, the expected value—of various items found in its CS:GO and TF2 loot boxes on a classwide basis. *See* Ex. 3, at 7-10.

### 4. Plaintiffs' Individual Claims Arising From These Violations of the WCPA Are Typical of the Class, Which More Likely Than Not Includes Tens of Thousands of Parents

Testimony from Plaintiffs and the expert report from Dr. Derevensky demonstrate how Valve's failure to disclose the loot box features in its games had the tendency to mislead parents no matter how much they monitored and discussed online gaming with their minor children.

#### a.   Plaintiff Grace Galway and her Son Jesse Plum

Jesse Plum began using Steam in June of 2015, when he was 14 years old. He made several purchases through Steam, predominantly using his mother Grace Galway's credit card and PayPal accounts. Deposition of Jesse Plum ("Plum Dep.") at 17:22-18:3, 43:16-18, 50:21-51:15, excerpts attached as Exhibit 8. He first learned about CS:GO Crates through YouTube

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

videos, which he described as looking like a "rush", which aligns with the reports of Plaintiffs' experts as discussed above. *Id*. at 39:23-40:3. Jesse received cases through random drops while playing CS:GO. In order to open the cases, Jesse purchased keys on the Steam Marketplace, directly from Valve, and from third-party websites.

Eventually, and as described as a common result of this type of activity by Plaintiffs' experts, Jesse "ramped up" from case opening to skins gambling on third-party websites using skins he had received by opening loot boxes. *Id.* at 40:23-41:17. When asking Ms. Galway for money to purchase keys on Steam, he would normally tell her that he needed the money for "video games". Jesse did at one point tell Ms. Galway that he wanted money for Skins and Keys, which she understood as power-ups in CS:GO. Deposition of Grace Galway ("Galway Dep.") at 38:19-39:3, 72:5-21, 86:9-12, excerpts attached as Exhibit 9. Like any reasonable parent, as described by Dr. Derevensky, Ms. Galway did not understand that loot box opening was a form of illegal gambling that Jesse was playing to win items with real world cash value. *Id*. at 75:10-76:18, 99:4-14, 109:10-20. Eventually, Jesse had accumulated winnings of approximately $20,000 worth of skins, and, as is a common risk of unsupervised gambling by minors as described by Plaintiffs' experts, he continued gambling irresponsibly and lost it all. *See* G.G. Arb. At 36:18-37:17, 70:19-71:21. Only then did Ms. Galway become aware that her son was gambling illegally online. As a reasonable parent, had she known that a form of gambling was embedded as a feature in CS:GO and that Jesse was using her money to gamble using that feature, she would not have given him the funds that he used to make key purchases. *See id.* at 78:16-18, Galway Dep. at 109:5-20. Ms. Galway's name is included on Jesse's Steam account and proof of her money being used to purchase keys is included in Jesse's Steam account. Ex. 3.

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

b. **Plaintiff Brenda Shoss, her Husband Dr. Graydon Ballard, and their son Elijah Ballard**

Similar to Ms. Galway's experience, Ms. Shoss' son, Elijah Ballard, began using Steam in August of 2012, when he was 13 years old. Many of his purchases were made through a PayPal account linked to a custodial bank account funded by Ms. Shoss. He also made Steam purchases using Plaintiff Shoss' credit card, which was linked to an account held by his father, Dr. Graydon Ballard. Deposition of Elijah Ballard ("Ballard Dep.") at 50:10-24, excerpts attached as Exhibit 10. Elijah received loot boxes as random drops when playing CS:GO. *Id.* at 22:10-13. He obtained keys through direct purchases from Valve, and purchases from third-parties using Valve accounts on Valve's Steam Community Market. *Id.* At 22:22-25.

Initially, like Jesse and common to the research and literature described by Plaintiffs' Experts, Elijah was "drawn in" to gambling through loot box opening, and later transitioned to buying skins directly. *Id.* at 23:15-19. As is expected and demonstrated by the research and literature cited by Plaintiffs' experts, he eventually switched to gambling on third-party sites after receiving low value skins and wanting better odds after seeing skins gambling on YouTube. *Id.* at 24:1-25:11. When asking his parents for money to purchase keys to open loot boxes or to buy skins directly, Elijah would say he wanted the money to buy games or would use their money without permission. *Id.* at 36:16-25. Elijah would also frequently overdraw his custodial bank account, forcing Plaintiff Shoss to deposit additional funds into the account to prevent the overdrafts from adversely affecting her credit score. Deposition of Brenda Shoss ("Shoss Dep.") at 35:22-36:6, 36:20-37:23, excerpts attached as Exhibit 11. Like Ms. Galway, and because of Valve's representations and omissions, Ms. Shoss understood skins to be something that Elijah needed to purchase in order to continue playing CS:GO. Like Ms. Galway and common to all reasonable parents as described by Dr. Derevensky, she did not suspect that a video game played

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

by children would contain an illegal online slot machine and would be an on-ramp to an online gambling ecosystem. *Id.* at 73:1-13. She filed this case to prevent minors from gambling online through Steam with money unwittingly supplied by their parents. *Id.* at 64:16-65:11,72:17-73:13. Ms. Shoss' and Dr. Ballard's names are included on Elijah's Steam account and proof of their money being used to purchase keys is included in Elijah's Steam account. Ex. 3.

### III.   DISCUSSION

#### A.   Rule 23 Standards and Class Certification Analysis

Fed. R. Civ. P. 23 governs the certification of class actions. Its main objectives are the efficient resolution of the claims or liabilities of many individuals in a single action, and the elimination of repetitious litigation and possibly inconsistent adjudication. *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979); C. Wright, A. Miller & M. Kane, *Federal Prac. & Proc. Civil* at § 1754 (1986). District courts are afforded broad discretion in determining whether an action should be certified. *Grosz v. Boeing Co.*, 136 F. App'x 960, 962 (9th Cir. 2005).

A plaintiff seeking to certify a class action must demonstrate "that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). While district courts must conduct a "rigorous" analysis of the Rule 23 requirements, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not 'turn class certification into a mini-trial' on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015) (quoting *Ellis*, 657 F.3d at 983 n.8).

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 12

STRITMATTER KESSLER
KOEHLER MOORE
413-8ᵀᴴ Street, Hoquiam, WA 98550
Tel: 360-533-271

1

**B.    The Proposed Class Satisfies the Requirements of Rule 23(a)**

2

Rule 23(a) requires: "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy

3

of representation." *Parsons v. Ryan*, 754 F.3d 657, 674 (9th Cir. 2014). The proposed class

4

satisfies each requirement.

5

**1.    The Proposed Class is Sufficiently Numerous**

6

7

To meet the requirements of Rule 23(a)(1), a proposed class must be "so numerous that

8

joinder of all members is impracticable." This element is generally satisfied if a class consists of

9

40 or more members, and "particularly where class members number in excess of one hundred."

10

*Does 1-10 v. Univ. of Washington*, 326 F.R.D. 669, 679 (W.D. Wash. 2018). A party may satisfy

11

the numerosity inquiry with "reasonable inference" drawn from the evidence. *See Miller v.*

12

*P.S.C., Inc.*, No. 3:17-cv-05864-RBL, 2018 WL 6249841, at *3 (W.D. Wash. Nov. 29, 2018).

13

Here, where members of the class are readily identifiable and number in the thousands,

14

numerosity is easily satisfied. *See Darrington v. Assessment Recovery of Washington, LLC*, No.

15

C13-0286-JCC, 2013 WL 12107633, at *3 (W.D. Wash. Nov. 13, 2013) (where plaintiffs

16

17

represented that about 1,000 individuals were in the class, numerosity was satisfied).

18

Ms. Galway and Ms. Shoss are not outliers. Sufficient evidence demonstrates their

19

experiences are common to and representative of a large number of other people, easily

20

exceeding the threshold for the numerosity prong of class certification.[3] In a move that betrays

21

Valve's recognition that numerosity is satisfied, Valve removed this case in 2016 based on

22

23

allegations about the large number of class members. *See* DE#1 at pg. 4. And in opposing remand,

24

25

26

---

3 Plaintiffs sought discovery from Valve related to numerosity and other class certification issues, but Valve refused to produce any data for Plaintiff's expert to analyze and support class certification.  Plaintiff moved to compel this discovery, and the Court denied this motion.  *See* DE 91.  To the extent Plaintiffs' evidence of numerosity or any of the other elements of class certification are challenged by Valve based on lack of data, or the Court otherwise believes Plaintiffs' evidence is insufficient, Plaintiffs respectfully request reconsideration and additional discovery on Valve's data.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 13

**STRITMATTER KESSLER
KOEHLER MOORE**
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

Valve provided further data showing the large number of accounts that engaged in skins gambling and that purchased keys to open loot boxes. *See* Declaration of Kristian Miller, attached to DE#17. First, the Miller Declaration noted that more than 380,000 accounts in the United States engaged in skins transactions with just one third-party skins gambling website, CSGO Lounge, as of January 2017. Dkt. 18 at ¶¶ 9-11, Dkt. 18-1. Further, in a sealed filing, Valve disclosed how many keys had been purchased by U.S.-based accounts. *See* Declaration Attached to DE#17 at Ex. B (produced in camera). During discovery in this case, Valve produced an attorneys' eyes only updated version showing how many keys had been purchased for all three games at issue in this case. *See* Sales Data attached collectively as Exhibit 12.

Plaintiffs' experts and the publicly available literature also support numerosity. *See, e.g.*, August 3, 2021, Expert Report of Anya Verkhovskaya at ¶¶ 51-72 ("Verkhovskaya Report") attached as Exhibit 13; *see also* Ex. 6, at 26, citing DeCamp survey reporting 24.9% of 73.4% of 8th graders playing video games purchased loot boxes and 17% of 60% of 11th graders playing video games purchased loot boxes; *see also* "What is the Financial Impact of Loot Boxes on Children and Young People?" Gambling Health Alliance, Royal Society for Public Health, *available at* https://www.rsph.org.uk/static/1997fb77-2b38-4b7f-8725b21e158d009a/Gambling-short-paperv4.pdf (last visited Sept. 7, 2021) (nearly one in four 11 to 16-year-olds said they had paid money to open loot boxes and 27% of 11 to 14-year-olds had bought a loot box in the week before completing the survey).

Further, a report released in April by the UK-based non-profit GambleAware, in conjunction with the University of Plymouth and University of Wolverhampton, found that "many consumers of loot boxes are children, with studies estimating that around 25-50% of children and adolescents have opened a loot box." https://www.begambleaware.org/sites/default/

files/2021-03/Gaming_and_Gambling_Report_Final.pdf. One source of this data was the Royal Society for Public Health, which found that 58% of youth in the UK between ages 11-24 had purchased a loot box and 60% had taken part in skins gambling. https://www.rsph.org.uk/our-work/policy/gambling/skins-in-the-game.html. Applying these results and research to Valve's United States data shows that it is more likely than not that there are a sufficient number of minor children in the United States who have used their parents/guardians' money to purchase loot box keys from Valve to exceed the threshold needed to meet the numerosity requirement.

**2.      The Proposed Class Presents Common Questions**

Rule 23(a)(2) next requires "questions of law or fact common to the class." The commonality requirement is "construed permissively." *Ellis*, 657 F.3d at 981. It is not necessary that all questions of fact and law are common so long as there is at least "a single *significant* question of law or fact." *Does 1-10*, 326 F.R.D. at 680 (emphasis in original). "When considering whether common issues predominate, the court should begin with 'the elements of the underlying cause of action.'" *Reichert v. Keefe Commissary Network, L.L.C.*, 331 F.R.D. 541, 553 (W.D. Wash. 2019) (*quoting Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," such that all their claims can be productively litigated at once. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011) (citation omitted). The common questions must "generate common answers" that are "apt to drive the resolution of the litigation." *Id. at 350*; *see also Reichert*, 331 F.R.D. at 552 ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.").

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 15

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

The question of whether Valve's practices violate the WCPA is common to all class members, and resolution of the litigation will turn on whether Plaintiffs have established the elements of a WCPA claim.[4] To prevail, Plaintiffs must show (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) impacting the public interest, (4) injury to the plaintiff's business or property, and (5) causation. *Williams v. Geico Gen. Ins. Co.*, No. C19-5823 BHS, 2020 WL 6287270, at *3 (W.D. Wash. Oct. 27, 2020); RCW 19.86.020. With respect to a deceptive act, Plaintiffs "need not show that the act in question was *intended* to deceive," but only that "the alleged act had the *capacity* to deceive a substantial portion of the public." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785, 719 P.2d 531 (1986) (emphasis in original). Whether a practice has the capacity to deceive a substantial portion of the public is a question of fact. *Behnke v. Ahrens*, 172 Wash. App. 281, 292, 294 P.3d 729 (2012). A plaintiff asserting a WCPA claim need not allege individual reliance, especially, like here where non-disclosure of material facts is alleged. *See Schnall v. AT&T Wireless Servs., Inc.*, 171 Wn.2d 260, 291, 259 P.3d 129 (2011) ("Any requirement that class members individually prove reliance precludes the CPA from sufficiently protecting the public if a corporation misrepresents its charges or services to the public.").

The central issues in this case are also common to the class: whether Valve engaged in a common course of conduct towards Plaintiffs and the class members in connection with the loot box feature. There are at least five common legal and factual questions to be resolved. First, are

---

4 The parties have consistently applied Washington state law in this dispute, as is appropriate given Washington's "substantial contacts to the Plaintiffs' claims". *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 550 (W.D. Wash. 2008). *See also* Def.'s Answer and Affirmative Defenses to Pls.' First Am. Compl. 14:15-17, Jan. 15, 2021 (asserting affirmative defense based on RCW 4.22.070). As in *Kelley*, Washington is the state where the Defendant is incorporated, does business and has its principal headquarters, and is also the location where the deceptive and unfair actions at issue were conceived and implemented. Because of these factors, Washington also has the most significant relationship to the action, as well as the greatest interest in the determination of the application of the Washington Consumer Protection Act. *Id.* at 552.

the cosmetic items received through loot boxes "things of value"? Washington law defines "thing of value" broadly to include, *inter alia*, "any... object or article exchangeable for money or property" RCW 9.46.0285. Here, money was paid for the chance to win valuable digital items, which could be and were later exchanged for real money or money on the Steam platform that could be used to purchase real world items. Valve's motion to dismiss briefing already argued that resolution of this issue is outcome-determinative. There is no version of the games at issue where cosmetic items were not offered through loot boxes. The factual determination of this "thing of value" issue will resolve in one stroke that issue for all plaintiffs and class members.

Second, the related issue of whether the in-game purchases to open loot boxes are part of "gambling games" is resolvable in one stroke. The Ninth Circuit in an analogous context recognized that if the item is a thing of value, then the game in which wagering took place is one of gambling. *See Kater v. Churchill Downs, Inc.*, 886 F.3d 784, 788 (9th Cir. 2018). Because the method of obtaining items from loot boxes occurs through a mechanism based solely on chance, the same common evidence concerning value will also answer the gambling game question.

Third, whether Valve incorporated this loot box opening process into CS:GO, Dota 2, and TF2 without a gambling license determines the claims in one fell swoop. It is undisputed that Valve never had and still does not have a gambling license.

Fourth, even if a loot box is not technically gambling under Washington law, Plaintiffs can prevail if they show that Valve designed its loot box opening process to replicate the look, feel and sound of a slot machine in a way that harms children in violation of the WCPA, and this is yet another common issue.

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

Fifth, whether Valve's failure to disclose the odds of obtaining the most valuable items in the loot boxes or that the value of the items in the loot boxes was subject to change are common issues specific to the CS:GO and TF2 subclasses.

Finally, are Valve's actions that deceived Plaintiffs or had the capacity to deceive Plaintiffs actionable? As will be set forth in §D.1., *infra*, the capacity to deceive a reasonable parent or guardian is an issue which will be decided on common evidence and will not turn on issues of individual reliance. The answers to these questions will "drive the resolution of the litigation" and therefore establish the commonality element. *Stedman v. Progressive Direct Ins. Co.*, No. C18-1254RSL, 2021 WL 3036790, at *3 (W.D. Wash. July 19, 2021).

### 3. Plaintiffs' Claims Are Typical of the Class

Typicality is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class". Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). "In determining whether typicality is met, the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 734 (9th Cir. 2007). "Under the Rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (citation omitted).

The typicality element is satisfied for the same reasons that the commonality requirement is satisfied. Indeed, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge" because "[b]oth serve as guideposts for determining whether, under the particular circumstances,

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 18

**STRITMATTER KESSLER**
**KOEHLER MOORE**
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

maintenance of a class action is economical, and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 163 n.13 (1982).

Plaintiffs each provided their minor children with funds to purchase keys to open loot boxes from Valve based on Defendant's unfair and deceptive practice of delivering illegal online gambling under the guise of online video games. Plaintiffs, like every class member, contend entitlement to recover the money spent on illegal gambling in the form of damages and to receive injunctive relief.

### 4.     Plaintiffs Are Adequate Representatives of the Class

The adequacy requirement is satisfied when the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To make this determination, "courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Id.* With respect to the adequacy of counsel, courts consider the work done to investigate the claims of the proposed class, counsel's experience in handling similar cases and litigating class actions, counsel's knowledge of applicable law, and the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

Here, Plaintiffs continue to be willing to serve as class representatives and have demonstrated their commitment to the class through their participation in depositions and written

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

discovery, arbitrations, and on appeal. Plaintiffs have retained counsel with substantial experience in litigating class actions and complex litigation. *See* Firm Resumes attached collectively as Exhibit 14. Plaintiffs' counsel have devoted a significant amount of time to identifying and investigating the potential claims through arbitration and this litigation and will continue to commit the resources necessary to representation of the class. Plaintiffs and their counsel have demonstrated their commitment to prosecuting this case on behalf of all class members and thus satisfy the adequacy requirement.

### C.    Hybrid Class Certification Should Be Granted

The Court should grant hybrid class certification pursuant to Rule 23(b)(2) with respect to injunctive and declaratory relief, and Rule 23(b)(3) with respect to damages. The WCPA provides for each of these remedies. RCW 19.86.090. "[A] court may certify a class for purposes of injunctive relief under Rule 23(b)(2) in addition to a Rule 23(b)(3) class for purposes of seeking monetary relief where the requirements for each are met." *Darrington*, 2013 WL 12107633, at *9 (collecting cases simultaneously certifying Rule 23(b)(2) and (b)(3) classes).

Where, as here, a plaintiff seeks both injunctive and monetary relief, the court may certify a damages-seeking class under Rule 23(b)(3), and an injunction-seeking class under Rule 23(b)(2). *See Darrington*, 2013 WL 12107633, at *8-9 (certification of WCPA class under Rule 23(b)(2) and (b)(3)); *Barrett v. Wesley Fin. Grp., LLC*, No. 13CV554-LAB (KSC), 2015 WL 12910740, at *7 (S.D. Cal. Mar. 30, 2015). A hybrid class "promotes judicial efficiency" because it allows the issue of liability to be determined on a classwide basis, and injunctive relief ordered, even if classwide damages cannot be established. *West v. California Servs. Bureau, Inc.*, 323 F.R.D. 295, 307 (N.D. Cal. 2017); *see also Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 651 (W.D. Wa. 2007).

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

1

**D.      The Class Should be Certified Under Rule 23(b)(2)**

2

The WCPA provides for injunctive relief at RCW 19.86.090.[5] Certification under

3

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds

4

that apply generally to the class, so that final injunctive relief or corresponding declaratory relief

5

is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs and each class

6

member were harmed in the same manner by Valve's unlawful conduct, and will continue to be

7

harmed without injunctive relief.

8

9

The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory

10

remedy warranted—the notion that the conduct is such that it can be enjoined or declared

11

unlawful only as to all of the class members or as to none of them." *Does 1-10*, 326 F.R.D. at

12

683 (citing *Dukes*, 564 U.S. at 360). "[I]t is sufficient to meet the requirements of Rule 23(b)(2)

13

that class members complain of a pattern or practice that is generally applicable to the class as a

14

whole." *Rodriguez*, 591 F.3d at 1125 (citations omitted). And "questions of manageability and

15

judicial economy are irrelevant to [Rule] 23(b)(2) class actions." *Does 1-10*, 326 F.R.D. at 684.

16

17

An order enjoining Valve's unfair and deceptive practices would provide relief to all class

18

members, and apply to them equally. Valve's practices are "generally applicable to the class as

19

a whole." *Rodriguez*, 591 F.3d at 1125. Plaintiffs seek declaratory and injunctive relief, which is

20

the type of relief that is best suited to certification under Rule 23(b)(2). *See Ries v. Arizona*

21

*Beverages USA LLC*, 287 F.R.D. 523, 541 (N.D. Cal. 2012) ("This case exemplifies the kind of

22

action that may be appropriate for certification under Rule 23(b)(2), at least insofar as plaintiffs

23

request: (1) declaratory relief that the alleged practices are unlawful, and (2) injunctive relief

24

prohibiting defendants from continuing them.").

25

26

---

5 Plaintiffs served the Amended Complaint on the Attorney General pursuant to RCW 19.86.095.  ECF No. 69.

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 21

**STRITMATTER KESSLER**
**KOEHLER MOORE**
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

Such an injunction is appropriate here as Valve has acted uniformly in making a feature available to minor children that is or is substantially similar to illegal online gambling. If the fact finder agrees with Plaintiffs that the "targeted conduct" is actionable under the WCPA, then the conduct is subject to abatement for each and every plaintiff and class member. Moreover, injunctive relief is appropriate to protect the public interest. *See Hockley v. Hargitt*, 82 Wn.2d 337, 351, 510 P.2d 1123 (1973) (holding that "an individual may seek and obtain an injunction that would, besides protecting his own interests, protect the public interest"). Injunctive relief would protect the public interest as internet gambling has never been authorized and is affirmatively illegal in Washington State, and all gambling is illegal for minor children.[6] As will be set forth in more detail below, Plaintiffs are likely to succeed on the WCPA injunction claim. There is an "injury to plaintiff," there is injury resulting from Valve's practices, and the "public interest impact" is present as expressed in the Washington gambling statute and by the ongoing nature of the violations.

## E.   The Class Should Be Certified Under Rule 23(b)(3)

Certification under Rule 23(b)(3) is appropriate when "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both of these requirements are met here.

---

6 *See* RCW 9.46.240 [2006 c 290 § 1] ("It is the policy of this state to prohibit all forms and means of gambling, except where carefully and specifically authorized and regulated. With the advent of the internet […] that were not contemplated when either the gambling act was enacted in 1973, or the lottery commission was created in 1982, it is appropriate for this legislature to reaffirm the policy prohibiting gambling that exploits such new technologies."). *See also* Washington State Gambling Commission, "Internet Gambling," *available at* https://walottery.com/ Responsibility/assets/docs/internet_gambling.pdf (last visited September 8, 2021) (Internet gambling "creates an uncontrolled environment for those with gambling addictions and for minors"); *Rousso v. State*, 170 Wash.2d 70, 91, 239 P.3d 1084 (2010) (state legislature "balanced public policy concerns and determined the interests of Washington are best served by banning Internet gambling"); *Kater*, 886 F.3d at 789 (Washington does not allow in-state businesses to offer internet-based gambling, and a business that does is an illegal gambling enterprise).

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

### 1.    Common Issues Predominate

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022. The focus of the predominance analysis should be on "important questions apt to drive the resolution of the litigation … over individualized questions which are of considerably less significance to the claims of the class." *Torres*, 835 F.3d at 1134. "Implicit in … the predominance test is … that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). "Generally, when a class challenges a uniform policy or practice, the validity of the policy or practice tends to be the predominant issue in the ensuing litigation." *CE Design Ltd. v. Cy's Crabhouse N., Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009) (citing *Gen. Tel. Co. of the Sw.*, 457 U.S. at 159 n. 15).

The classwide legal issue in this case is whether Valve's loot box feature violates the WCPA because it is an unfair or deceptive practice. An act or practice is "unfair" if it causes substantial injury to consumers, is not outweighed by countervailing benefits to consumers or competitors, and is not reasonably avoidable by consumers. *Panag v. Farmers Ins. Co.*, 204 P.3d 885, 896 (Wash. 2009). An act or practice is "deceptive" if the alleged act had "the *capacity* to deceive a substantial portion of the public." *Hangman Ridge*, 105 Wn.2d at 785 (emphasis in original). Whether a practice has the capacity to deceive a substantial portion of the public is a question of fact. *Behnke*, 172 Wash. App. at 292. Here, that capacity is demonstrated by common evidence of how the loot box feature operates, which does not change from person-to-person, and whether the practice harms minor children and/or constitutes illegal gambling.

Consistent with the Court's ruling on Defendant's motion to dismiss, to prove that Valve engaged in an unfair or deceptive act or practice under the WCPA, Plaintiffs can adduce evidence

supporting the loot box theory—namely that Valve intentionally designed its loot boxes to replicate the look, feel and sound of a slot machine; incorporated this system into CS:GO, Dota2, and TF2, without a gambling license; and failed to adequately disclose the odds of obtaining the most valuable items in the loot boxes or that that the value of the items in the loot boxes was subject to change. *See* Am. Compl. at Factual Background ¶¶ 16-22. Further, Defendant's acts and practices occurred in the conduct of trade or commerce throughout the United States, including the State of Washington. *See* Am. Compl. at Factual Background ¶¶ 9-34. These practices were universal to the Class and had a capacity to deceive a substantial portion of the public. *See* Abarbanel-Philander Report, Ex. 7, at 24-26.

The second classwide common element of liability is whether Valve's acts and practices occurred in trade or commerce, which includes "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2). Defendant's acts and practices occurred in the conduct of trade or commerce throughout the United States, including the state of Washington. *See* Am. Compl. at Factual Background ¶¶ 9-34. This showing will be made with common evidence.

The third element of liability is whether Valve's misconduct impacted the public interest. The following factors are relevant to establishing the public interest:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

*Hangman Ridge*, 105 Wn.2d at 790. This element will be proved by common evidence as it relates to the first four questions. *See* Am. Compl. at Factual Background ¶¶ 2-80. Moreover, Washington State public policy prohibits Internet gambling to protect the public interest and

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 24

STRITMATTER KESSLER
KOEHLER MOORE
413-8ᵀᴴ Street, Hoquiam, WA 98550
Tel: 360-533-271

1 prohibits all form of gambling by minors; thus, Defendant's loot boxes, which are a form of

2 Internet gambling, negatively impact the public's interest.

3 The fourth element of liability is whether Defendant's misconduct caused injury to

4 Plaintiffs' business or property. "The injury involved need not be great, but it must be

5 established." *Hangman Ridge*, 105 Wn.2d at 792. "[T]he [W]CPA requires only an injury, not

6 damages." *Geier v. M-Qube Inc.*, 314 F.R.D. 692, 698 (W.D. Wash. 2016). The Washington

7 Court of Appeals has previously found the temporary deprivation of funds to be a sufficient injury

8 to support a WCPA claim. *See Sorrel v. Eagle Healthcare, Inc.*, 110 Wash. App. 290, 298, 38

9 P.3d 1024 (2002) ("Sufficient injury ... is established when a plaintiff is deprived of the use of

10 his property as a result of an unfair or deceptive act or practice."))." *See also Van v. LLR, Inc.*,

11 962 F.3d 1160, 1162 (9th Cir. 2020) (customer who was refunded $531.25 by business for

12 improper sales tax charges suffered a cognizable and concrete injury under the WCPA based on

13 temporary loss of use of her money).

14 Here, Plaintiffs' expert has established a common method of calculating damages.

15 Specifically, a summing of amounts of Plaintiffs; and class members' money spent by minor

16 children is readily available from Valve's records yet to be produced.[7] *See* Verkhovskaya Report,

17 Ex. 13, at ¶¶ 73-76.

18 Even when some individualized damages calculations may be required,

19 "[i]n this circuit,...damage calculations alone cannot defeat certification" under Rule
23(b)(3). As long as the class members are able to show that their damages stemmed from
the conduct that created the common legal liability, the common questions predominate
over any individualized damage calculation.

---

26 [7] Valve incorrectly represented that a parent's name and credit card information could not be found in Valve's
records. DE 88. In fact, as Plaintiffs' expert testified, that information is contained in Plaintiffs' children's accounts
that were produced by Valve in this litigation. Verkhovskaya Dep. at 99:3-101:16, excerpts attached as Exhibit 15.

**STRITMATTER KESSLER
KOEHLER MOORE**
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

*Stedman v. Progressive Direct Ins. Co.*, No. C18-1254RSL, 2021 WL 3036790, at *4 (W.D. Wash. July 19, 2021) (*citing Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) and *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).

As set forth above, the damages at issue here stemmed from Valve's misconduct related to the loot box feature which is the basis of the WCPA claim. Damages inquiries, accordingly, do not prevent certification under Rule 23(b)(3). *See, e.g.*, *Torres*, 835 F.3d at 1136 (the need for individualized damages calculations and the presence of non-injured individuals within the class did not defeat predominance); *Reichert*, 331 F.R.D. at 556 ("[T]he Ninth Circuit has recognized that injury is just one element of a WCPA claim that does not necessarily overwhelm the others".).

The fifth and final element of liability is causation. In *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wn.2d 59, 170 P3d 10 (2007), the Court held that "the proximate cause standard embodied in WPI 15.01 is required to establish the causation element in a [WCPA] claim. A plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." *Id.* at 84.

Here, Valve omitted that its platform and games include a feature that is online gambling and harms children who use it. Valve uniformly fails to disclose that the loot box replicates online gambling because of the characteristics and aspects of loot box opening that are similar to a slot machine, and through the purchase of keys to play a game of chance in order to perhaps win a worthless cosmetic item that the user could purchase for pennies, far less than the cost of the key. Valve fails to disclose the expected value of paying for a key to open a loot box. Ex. 7, pg. 7-10. "A presumption of reliance is appropriate in fraud cases such as this one, where Plaintiffs have primarily alleged omissions, even though the Plaintiffs allege a mix of misstatements and

omissions." *Reichert*, 331 F.R.D. at 556 (citations omitted). Valve points to no disclosures or disclaimers, much less anything unique to each parent and player, which would lead a reasonable parent to understand that money spent on a video game ostensibly involving shooting opponents was really money spent playing an illegal online slot machine. Moreover, Valve presents no evidence that it complied with Washington law through its own affirmative analysis or any Attorney General opinions.

Common issues predominate here, so certification under Rule 23(b)(3) is warranted.

### 2.    A Class Action Is the Superior to Numerous Individual Actions

The superiority requirement is one of judicial economy and assurance that a class action is the "most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175. A class action is superior when it will reduce the costs inherent in litigation and "no realistic alternative exists" for the class members. *Valentino*, 97 F.3d at 1234-35. Rule 23(b)(3) sets forth factors for assessing whether a class action is superior: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." All of these factors weigh in favor certification.

The individual class members do not have an interest to bring separate actions. The costs to bring an individual action, including retaining experts, would likely dwarf the budget of an individual and make individual litigation infeasible. There are minimal, if any, manageability concerns because nearly all the evidence to prove Plaintiffs' claims, and class-wide injury, is common to all class members. As discussed above, "the criteria for identifying class members

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

are objective and do not rely on the actions or beliefs of particular" class members. *Reichert*, 331 F.R.D. at 556–557.

Any individual issues regarding damages cannot defeat certification and can be resolved at a later point in the process. The Ninth Circuit recognized in *Yokoyama* that "[t]he potential existence of individualized damage assessments, however, does not detract from the action's suitability for class certification," and cannot defeat certification. 594 F.3d at 1089 (quoting *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1985)). The Ninth Circuit confirmed in *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015) that *Yokoyama* remains the rule after the Supreme Court ruling in *Comcast. Id.* at 988.

This forum is where this litigation belongs. The claims are defined by and arise under Washington law. Valve is headquartered here and many of the witnesses are subject to subpoena power before this Court so the fact finder can adjudge demeanor and credibility through live testimony. And this Court is well-versed in this litigation, including the arbitration record, putting it in a unique position vis-à-vis each class member having to file an action and start over.

**F.     Alternatively, The Common Issues of Liability Should Be Certified Under Rule 23(c)(4)**

Rule 23(c)(4) provides that when appropriate, "an action may be brought or maintained as a class action with respect to particular issues." *See also Valentino*, 97 F.3d at 1234 ("Even if the common questions do not predominate … Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues"). Under this approach, the Court may certify select issues for a class without finding that the cause of action as a whole satisfies the predominance and superiority requirements. *Id.* Courts faced with a proposed issue class should consider "whether the adjudication of the certified issues would significantly advance the resolution of the underlying

case, thereby achieving judicial economy and efficiency." *Id.* at 1229; *see also Valenzuela v. Union Pac. R.R. Co.*, 2017 WL 1398593, *2 (D. Ariz. 2017) ("Regardless of the provenance of the 'materially advances' standard, its focus on whether issue class certification will move the litigation forward—saving money, time, and judicial resources in the process—is a sensible consideration. Even where courts have not used that specific language, the factors that have guided their decisions are consistent with the theme of moving the litigation forward efficiently.") (citation omitted).

Here, it is indisputable that certifying all issues related to liability or even core liability issues—including, but not limited to, (1) whether Defendant's loot box opening is illegal online "gambling" as defined by RCW 9.46, *et seq.*, and (2) whether Defendant violated the WCPA, RCW 19.86, *et seq.*—would significantly advance the case resolution and economize judicial resources, and provide a more efficient mechanism than repeatedly relitigating these issues. Any individual issues regarding determination of damages could be deferred until after liability is determined. *Kamakahi v. American Soc'y for Reprod. Med.*, 305 F.R.D. 164, 193 (N.D. Cal. 2015) (it would be far more efficient to litigate liability on a classwide basis, when it depends on classwide facts); *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014).

Alternatively, the Court should certify certain or all issues identified in Section III.B.2 because interests of judicial economy and efficiency call for adjudicating these issues in one as opposed to hundreds or thousands of separate individual trials given that the same witnesses and evidence would be presented at each trial. *See Arthur Young & Co. v. U.S. Dist. Court*, 549 F.2d 686, 697 (9th Cir. 1977) (affirming certification of whether misrepresentations and omissions were made and their materiality, and excluding other issues like reliance and causation).

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 29

STRITMATTER KESSLER
KOEHLER MOORE
413-8TH Street, Hoquiam, WA 98550
Tel: 360-533-271

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## IV.    <u>CONCLUSION</u>

Plaintiffs' claims meet all the requirements of Fed. R. Civ. P. 23 for class certification. Plaintiffs respectfully request that their motion be granted.

DATED this 28th day of September, 2021.

By: */s/ Ray W. Kahler*
Paul L. Stritmatter
Ray W. Kahler
Lisa Benedetti
**STRITMATTER KESSLER
KOEHLER MOORE**
413 8th Street
Hoquiam, WA 98550
Phone:360-533-2710
pauls@stritmatter.com
ray@stritmatter.com
lisa@stritmatter.com

Jasper D. Ward IV
Alex C. Davis
**JONES WARD PLC**
The Pointe
1205 East Washington St., Ste. 111
Louisville, Kentucky 40206
Tel. (502) 882-6000
Fax (502) 587-2007
jasper@jonesward.com
alex@jonesward.com

PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION - 30

1

## **CERTIFICATE OF SERVICE**

2   I hereby certify that on this day, September 28th, 2021, a true and correct copy of the

3 foregoing was filed and served electronically via the CM/ECF system, which automatically sends

4 a copy to all counsel of record.

5

6               *s/ Kerry Fuller*

7               Kerry Fuller, Legal Assistant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**STRITMATTER KESSLER
KOEHLER MOORE**
413-8ᵀᴴ Street, Hoquiam, WA 98550
Tel: 360-533-271