1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

G.G., et al.,

CASE NO. C16-1941JLR

11

            Plaintiffs,

ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

12

    v.

13

VALVE CORPORATION,

14

            Defendant.

15

## I.    INTRODUCTION

16

Before the court is Defendant Valve Corporation's ("Valve") motion for summary

17

judgment.  (Mot. (Dkt # 103); *see also* Reply (Dkt. # 116).)  Plaintiffs Grace Galway and

18

Brenda Shoss (collectively, "Plaintiffs" [1]) oppose Valve's motion.  (Resp. (Dkt. # 109).)

19
20
21
22

---

[1] In prior litigation in this court, in their arbitrations, and in their Ninth Circuit appeal, the parties referred to Ms. Galway as "G.G." and Ms. Shoss as "B.S."  (*See, e.g.*, 3/26/19 Order (Dkt. # 44).)  Plaintiffs now use their full names, rather than their initials, in their amended complaint and briefing.  (*See, e.g.*, Am. Compl. (Dkt. # 58); Resp. (Dkt. # 109).)  The court follows Plaintiffs' practice and refers to Plaintiffs by their names in this order.

1   The court has considered the motion, all submissions filed in support of and in opposition

2   to the motion, the relevant portions of the record, and the applicable law.  Being fully

3   advised,[2] the court GRANTS Valve's motion.

## II.    BACKGROUND

4

5       In their sole remaining claim in this action, Plaintiffs allege that Valve supported

6   illegal gambling in its popular video games such as Counter Strike: Global Offensive

7   ("CS:GO") by embedding within them a "lootbox" feature that, they assert, "simulated an

8   online slot machine and effectively constituted a gambling feature in what otherwise

9   appeared to be normal video games."  (Resp. at 1; *see also* 12/16/20 Order (Dkt. # 65)

10  (dismissing the remainder of Plaintiffs' claims).)  The lootbox feature enables players to

11  spend money on virtual keys to open virtual weapons cases[3] containing virtual guns and

12  knives, referred to as "skins," which have a variety of different looks and textures and are

13  of different levels of rarity.  (*See* Am. Compl. at 3-8, ¶¶ 9-11.[4])  Players can then trade or

14  sell the skins using Valve's online Steam Marketplace.[5]  (*See id.* at 3-5, ¶¶ 9-14.)

15

16      [2] Neither party requests oral argument (*see* Mot. at 1; Resp. at 1), and the court finds oral
17  argument unnecessary to its disposition of the motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

        [3] The parties also refer to weapons cases as "crates," "loot boxes," or "lootboxes."  For
18  consistency in this order, the court uses the term "weapons case" to refer to the cases, and
    "lootbox feature" to refer to the process of buying keys and opening weapons cases.
19
        [4] Because Plaintiffs' amended complaint repeats paragraph numbers, the court cites to
20  both the page number and paragraphs of the amended complaint in the interest of clarity.

21      [5] Plaintiffs also assert that the skins received in weapons cases can be used to gamble on
    third-party websites.  Because the court dismissed Plaintiffs' claims based on Valve's alleged
22  support for gambling with skins (*see* 12/16/20 Order at 25-26), the court focuses its discussion of
    the background facts on evidence relating to Valve's lootbox feature.

1  Plaintiffs allowed their minor children to use their bank accounts, credit cards, and

2  PayPal accounts to play CS:GO and, unknown to Plaintiffs, the children used those

3  accounts to purchase keys to open weapons cases.  (*See id.* at 7-8, ¶¶ 27-29; *see id.* at 35,

4  ¶ 129.  Plaintiffs assert that Valve's failure to disclose information about its lootbox

5  feature violated the Washington Consumer Protection Act ("CPA"), ch. 19.86 RCW.  (*Id.*

6  at 30-33, ¶¶ 99-118.)  Below, the court sets forth the relevant factual and procedural

7  background of this case.

8  **A.    Factual Background**

9        The court begins by describing the CS:GO lootbox feature and then discusses the

10  relevant facts relating to each plaintiff's claims.

11        1.    CS:GO Weapons Cases

12        Valve operates the Steam platform, which includes the Steam Marketplace,

13  through which consumers can purchase video games (including CS:GO), movies, and

14  hardware such as virtual reality headsets.  (Kahler Sealed Decl. (Dkt. # 113) ¶ 2.F, Ex. F

15  ("Valve 30(b)(6) Dep.") (sealed) at 202:1-7.)  The Steam Marketplace also facilitates

16  purchases and sales of weapons cases, keys, and skins among players through its Steam

17  Community Market.  (*See* Philander Decl. (Dkt. # 112) ¶ 3, Ex. A ("Philander-Arbabanel

18  Rep.") (sealed) at 8.)

19        The CS:GO weapons case opening process begins with the creation of a Steam

20  account.  (*See id.* at 7.)  As part of this process, a prospective Steam user enters and

21  confirms their email address, selects their country of residence, and confirms, via a

22  checkbox, that they are 13 years of age or older and agree to the terms of the Steam

1    Subscriber Agreement and the Valve Privacy Policy.  (*See id.* at 7-8.)  After opening a

2    Steam account, the user can make purchases and trade items on the Steam Marketplace.

3    (*Id.*)

4          To make purchases on the Steam Marketplace, users must pay real money to add

5    Steam Wallet funds to their Steam accounts.  (Kahler Sealed Decl. ¶ 2.L, Ex. L ("Babbar

6    Dep.") (sealed) at 45:15-24.)  Within the United States, users can add funds using a credit

7    card, bank account, or PayPal account, among other methods.  (*Id.* at 46:14-47:9.)  Funds

8    in the Steam Wallet appear as one "Steam Buck" per U.S. dollar deposited.  (Valve

9    30(b)(6) Dep. at 216:5-8.)  Thus, a user who deposits $100.00 in the Steam Wallet has

10   $100.00 in Steam Bucks to spend in the Steam Marketplace.  (*Id.*)  Deposits to a Steam

11   Wallet are reflected on credit card, bank, or PayPal statements as having been made to

12   "Steamgames.com," "Steampowered.com," or "Steam Games."  (*See, e.g.*, Kahler Decl.

13   (Dkt. # 110) ¶ 2.B, Ex. B (Ms. Galway's bank and credit card statements).)

14         Users can acquire CS:GO weapons cases as a reward for CS:GO gameplay, by

15   trading with another Steam user, or by purchasing them from other users in the Steam

16   Community Market.  (Philander-Arbabanel Rep. at 8; Babbar Dep. at 36:8-37:9.)  Each

17   weapons case has a description and a list of skins that may be included in the case; each

18   listed skin is color-coded based on its rarity.  (Philander-Arbabanel Rep. at 8.)  Skins are

19   "exclusively cosmetic in the game; they do not change gameplay other than

20   aesthetically."  (*Id.*)

21         To open a weapons case, the user must use a key, which can be purchased from

22   Valve on the Steam Marketplace for about $2.50 in Steam Wallet funds.  (*Id.*; Babbar

1  Dep. at 36:8-37:1; *see also* Valve 30(b)(6) Dep. at 114:23-25.)  Users can also purchase

2  keys from other users in the Steam Community Market.  (Babbar Dep. at 37:18-38:5.)

3        When a user opens a weapons case, an animation displays the skins that may be

4  available in the case.  (Philander-Arbabanel Rep. at 8.)  The frequency of seeing a skin in

5  the animated display matches the odds in which the skin will appear when the case opens.

6  (*Id.* at 9.)  Plaintiffs assert that this animation "simulate[s] an online slot machine."

7  (Resp. at 1.)  The skin that ultimately appears in the open weapons case may have a value

8  either greater or less than the price of the key used to open the case.

9  (Philander-Arbabanel Rep. at 9.)  The value of the skin is set through market forces in the

10  Steam Community Market.  (*Id.*)

11        A user can sell or trade the skins he or she receives in a weapons case to other

12  users in the Steam Community Market.  (*Id.*)  The seller receives the amount paid, minus

13  a fee to Valve, in the form of Steam Wallet funds.  (*Id.*; Valve 30(b)(6) at 201:17-25,

14  211:14-19.)  The Steam Wallet funds are tied to the user's Steam account and cannot be

15  moved, exchanged for cash, or withdrawn to a bank account through Steam.

16  (Philander-Arbabanel Rep. at 9-10.)  The Steam Wallet funds can, however, be used

17  within the Steam Marketplace to purchase items such as virtual reality hardware, movies,

18  or a subscription to another game.  (*Id.* at 10; Valve 30(b)(6) at 202:1-7.)  They can also

19  be used to buy virtual items from other users.  (Philander-Arbabanel Rep. at 11; Valve

20  30(b)(6) at 114:23-25.)

21  //

22  //

2.   Ms. Galway

Ms. Galway's son, Jesse Plum,[6] played CS:GO.  (*See* Kahler Decl. ¶ 2.K, Ex. K ("Plum Dep.") at 28:16-21.)  Ms. Galway's credit card was linked to her son's Steam account and incurred charges by Steam.  (Galway Dep.[7] at 85:15-16; *see* Kahler Decl. Ex. B.)  Ms. Galway understood at the time that skins would give a player "some time of advantage in the game."  (Galway Dep. at 38:23-39:3.)  From time to time, Mr. Plum would ask Ms. Galway for money for games or to put on his Steam account.  (*Id.* at 84:15-86:1.)  Ms. Galway was not aware that Mr. Plum was using the money to obtain or open weapons cases.  (*Id.* at 73:21-24.)  Although Mr. Plum had been playing CS:GO since at least 2015, it was not until Christmas of 2017 that he told his mother that he had "won a bunch of money" with skins and then subsequently lost the money.  (*Id.* at 38:23-39:3, 39:22-40:11.)  He explained to Ms. Galway that he could sell skins to other players for money and gamble the skins in the game.  (*Id.* at 40:12-20.)

Nearly all of Mr. Plum's key and skins purchases were made using Ms. Galway's bank account or credit card.  (*See* Plum Dep. at 17:22-18:3, 50:21-51:1; *see also id.* at 43:16-23 (stating he would ask his mother for money for video games).)  He learned about opening weapons cases from watching a YouTube video, thought it looked like fun, and hoped he could be lucky like the YouTube personalities.  (*Id.* at 39:13-40:3;

---

[6] Because Mr. Plum and Ms. Shoss's son, Elijah Ballard, are no longer minors, the court follows the parties' practice and refers to them by name.

[7] Both parties have submitted excerpts from Ms. Galway's deposition.  (*See* Skok Decl. (Dkt. # 104) ¶ 2, Ex. A; Kahler Decl. ¶ 2.A, Ex. A.)  For ease of reference, the court cites directly to the page and line number of Ms. Galway's deposition.

42:3-10.)  The first time he opened a weapons case, he received a relatively rare item; he recalls that opening weapons cases gave him a "little rush" that made him want to open a case again.  (*Id.* at 42:11-17, 84:18-22.)

Ms. Galway never visited the Valve website or the Steam website, nor has she ever used Steam.  (Galway Dep. at 33:11-12, 34:23-25; Skok Decl. ¶ 4, Ex. C ("Galway RFA Resp.") Nos. 1-4.)  She had never heard of Steam before December 2018 and has never read anything online about Steam or looked into the features it offers.  (Galway Dep. at 34:16-22, 35:7-12.)  She has never played CS:GO.  (Galway RFA Resp. No. 5.)  She has no understanding of how weapons cases are opened, nor has she seen a weapons case being opened.  (Galway Dep. at 70:4-14.)  She has never talked with her son about weapons cases or keys and does not believe she ever asked her son if he had opened any weapons cases in CS:GO.  (*Id.* at 71:7-8, 72:22-24, 86:15-17.)  Before the December 2018 arbitration in this case, she had no knowledge of her son spending money or asking for money to open CS:GO weapons cases.  (*Id.* at 73:21-24, 82:2-5; *see also* Galway RFA Resp. Nos. 14, 17.)

3.    Ms. Shoss

Ms. Shoss's son, Elijah Ballard, also played CS:GO.  (*See* Kahler Decl. ¶ 2.J, Ex. J ("Ballard Dep.") at 22:10-13.)  Mr. Ballard bought keys from Valve to open weapons cases and traded skins for keys on the Steam Community Market.  (*Id.* at 22:25-23:11.)  He used his parents' money to buy keys and skins.  (*Id.* at 33:4-9; 36:16-25, 46:1-47:4.)  Mr. Ballard did not directly ask his parents for money to use on the Steam platform;

1   instead, he asked for money for PayPal.  (Shoss Dep.[8] at 37:24-38:5.)  Eventually, he

2   used his mother's personal credit card and a credit card for his mother's nonprofit without

3   her knowledge or permission for charges related to his Steam account.  (Shoss Dep. at

4   27:11-29:6.)

5         Ms. Shoss first learned about Steam when she saw the name appear on her credit

6   card statements.  (Shoss Dep. at 13:20-24.)  She originally thought Steam was simply the

7   corporate name of the video game her son played.  (*Id.* at 13:25-14:9.)  She also thought

8   that her son had to buy keys in order to open elements required for him to play CS:GO

9   and that he needed a certain amount of money to participate in the game community.  (*Id.*

10  at 20:14-21:3; 38:16-39:2.)  She states that she never "would have suspected that a video

11  game that catered to tweens and kids could have anything to do with gambling."  (*Id.* at

12  48:11-24.)

13        Ms. Shoss has personally never used Steam, visited any Valve website, visited a

14  Steam website, or played CS:GO.  (Shoss Dep. at 15:15-22; Skok Decl. ¶ 5, Ex. D

15  ("Shoss RFA Resp.") Nos. 1-5.)  She has never seen a key, read any articles about keys,

16  or seen anything on any Valve or Steam website about keys or weapons cases.  (Shoss

17  Dep. at 21:7-16.)  She also has never seen anything on any Steam or Valve website about

18  weapons cases and has never observed any CS:GO gameplay nor seen a weapons case

19  opening.  (*Id.* at 27:17-23, 56:10-14; Shoss RFA Resp. Nos. 6, 22.)  Ms. Shoss had no

20

21            [8] Both parties have submitted excerpts from Ms. Shoss's deposition.  (*See* Skok Decl. ¶ 3,
     Ex. B; Kahler Decl. ¶ 2.C, Ex. C.)  For ease of reference, the court cites directly to the page and
22   line number of Ms. Shoss's deposition.

1  knowledge of keys or weapons cases when she provided funds to her son, and the time of

2  her deposition in July 2021, she did not know whether Mr. Ballard had spent any of her

3  money on keys.  (Shoss RFA Resp. Nos. 9, 17; Shoss Dep. at 94:21-95:3.)

4  **B.   Procedural Background**

5        Plaintiffs originally filed their complaint in King County Superior Court on

6  November 29, 2016.  (Compl. (Dkt. # 1-3).[9])  Each of the Plaintiffs alleged that their

7  minor children purchased CS:GO from Valve, purchased skins, "gambled [the skins] and

8  lost money," and knew that they could "cash out the [s]kins for real money prior to losing

9  them while gambling."  (*Id.* ¶¶ 13-15; *see also id.* ¶¶ 99-101.)  Based on these allegations,

10  Plaintiffs alleged state-law claims on behalf of themselves and their minor children based

11  on skins gambling for violation of the CPA; recovery of money lost at gambling under

12  RCW 4.24.070; violation of the Washington Gambling Act of 1973, RCW 9.46, *et seq.*

13  ("Gambling Act"); unjust enrichment; negligence; and declaratory relief.  (Compl.

14  ¶¶ 118-72.)

15        On December 20, 2016, Valve removed the action to this court (Not. of Removal

16  (Dkt. # 1)), and on February 13, 2017, United States District Judge John C. Coughenour

17  denied Plaintiffs' motion to remand (*see* 2/13/17 Order (Dkt. # 25)).  On April 3, 2017,

18  Judge Coughenour granted Valve's motion to compel arbitration of the claims brought by

19  Plaintiffs on behalf of themselves and their minor children and stayed the case pending

20

21        [9] The original and amended complaints also named a third adult plaintiff, Andy Lesko.
22  (*See id.* at 1; Am. Compl. at 1.)  The parties stipulated to the dismissal of Mr. Lesko's claims on
    June 25, 2021.  (*See* Stip. (Dkt. # 85).)

1    arbitration.  (4/3/17 Order (Dkt. # 30) at 8.)  The court upheld the enforceability of the

2    arbitration clause within the Steam Subscriber Agreement that Plaintiffs' children agreed

3    to when they registered their Steam accounts and found that the claims of both the

4    Plaintiffs and their children were within the scope of that arbitration clause.  (*Id.* at 4-8.)

5         The claims of Plaintiffs and their children proceeded to arbitration with the

6    American Arbitration Association ("AAA").  In both arbitrations, the arbitrators ruled in

7    favor of Valve on all of the claims brought by Plaintiffs and their children.  (*See* 12/16/20

8    Ord. at 5-7 (summarizing the results of the arbitrations).)

9         After the AAA closed the arbitrations, Valve moved Judge Coughenour to lift the

10   stay and dismiss Plaintiffs' claims with prejudice.  (Mot. to Lift Stay & Dismiss (Dkt.

11   # 33).)  The court granted Valve's request to lift the stay, denied Plaintiffs' renewed

12   challenge to the arbitrability of their claims, and denied Plaintiffs' request to set aside the

13   arbitrators' awards.  (*See generally* 3/26/19 Order.)  The court granted Valve's request to

14   dismiss all of Plaintiffs' claims with prejudice.  (*See id.* at 10.)

15        Plaintiffs appealed the court's order and judgment.  (Not. of Appeal (Dkt. # 46).)

16   On April 3, 2020, the Ninth Circuit Court of Appeals affirmed in part and vacated in part

17   the court's order and judgment.  *G.G. v. Valve Corp.*, 799 F. App'x 557 (9th Cir. 2020).

18   The Ninth Circuit held that the court erred in compelling Plaintiffs, in their individual

19   capacities, to arbitrate their claims because Plaintiffs were not signatories to the Steam

20   Subscriber Agreement and were not bound to it by equitable estoppel.  *Id.* at 558.  The

21   Ninth Circuit also held that the court erred when it entered judgment on the claims that

22   Plaintiffs brought in their individual capacities because a district court can confirm an

1    arbitral award only against parties who "have agreed that a judgment of the court shall be

2    entered upon the award made pursuant to arbitration." *Id.*  Thus, the Ninth Circuit

3    remanded the claims Plaintiffs brought in their individual capacities, "to the extent they

4    are viable." *Id.*  It affirmed, however, the court's judgment dismissing the claims that

5    Plaintiffs brought on behalf of their children. *Id.* at 558-59.

6           After remand, Plaintiffs amended their complaint and added allegations relating to

7    Valve's lootbox feature. (*See generally* Am. Compl.).  The amended complaint alleged

8    claims based on both "skins gambling" and "lootbox gambling" for violation of the CPA,

9    violation of the Gambling Act, unjust enrichment, negligence, and injunctive relief, on

10   behalf of the parents of the minor children whose claims were dismissed by the court in

11   its March 26, 2019 order and a proposed class of all similarly situated persons. (*Id.* at

12   30-41, ¶¶ 99-163.)  Plaintiffs proposed the following class definition:

13          All persons in the United States who are parents/guardians of a minor child
            who provided funds to their minor child(ren) for the purchase of Skins and/or
14          Keys for the games [CS:GO], Dota2 and Team Fortress 2.

15   (*Id.* at 29, ¶ 94.)

16          On October 1, 2020, Valve moved to dismiss Plaintiffs' amended complaint in its

17   entirety. (*See* MTD (Dkt. # 59).)  The court granted Valve's motion in part. (*See*

18   12/16/20 Order at 26-27.)  Specifically, the court (1) denied Valve's motion to dismiss

19   Plaintiffs' CPA claims based on alleged support for lootbox gambling because those

20   claims were not raised in the parties' arbitrations; (2) dismissed without prejudice and

21   with leave to amend Plaintiffs' unjust enrichment and negligence claims based on alleged

22   support of lootbox gambling; and (3) dismissed with prejudice Plaintiffs' claims for

1    violation of the Gambling Act and all claims based on alleged support of skins gambling.

2    (*Id.*)  Although the court granted leave to amend, Plaintiffs chose not to amend their

3    complaint.  (*See generally* Dkt.)  Thus, the only claim remaining is Plaintiffs' CPA claim

4    based on Valve's alleged support for lootbox gambling.

5         Plaintiffs moved for class certification on September 28, 2021.  (MCC (Dkt.

6    # 94).)  On October 21, 2021, Valve filed the instant motion for summary judgment.

7    (Mot.)

8                        **III.    ANALYSIS**

9         Below, the court sets forth the summary judgment standard and then evaluates

10   Valve's motion.

11   **A.    Summary Judgment Standard**

12        Summary judgment is appropriate if the evidence viewed in the light most

13   favorable to the non-moving party shows "that there is no genuine dispute as to any

14   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

15   56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Beaver v. Tarsadia Hotels*,

16   816 F.3d 1170, 1177 (9th Cir. 2016).  A fact is "material" if it might affect the outcome

17   of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute

18   is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the

19   non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001)

20   (citing *Anderson*, 477 U.S. at 248-49).

21        The moving party bears the initial burden of showing there is no genuine dispute

22   of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

**B.    Claims Based on Dota 2 and Team Fortress 2**

Valve argues that Plaintiffs' claims, if any, relating to alleged lootbox gambling in its games Dota 2 and Team Fortress 2 must be dismissed because the undisputed evidence shows that neither Ms. Galway nor Ms. Shoss gave their children money for use in those games. (Mot. at 11; *see* Plum Dep. at 32:10-33:3 (Ms. Galway's son's testimony that he never purchased virtual items or crates in Team Fortress 2 and that he never played Dota 2); Ballard Dep. at 93:7-11 (Ms. Shoss's son's testimony that he did no gambling other than with CS:GO skins); Shoss Dep. at 59:5-19 (Ms. Shoss's testimony that she knows nothing about Dota 2 and cannot identify Team Fortress 2 as a Valve "entity").) Indeed, nowhere in their amended complaint do Plaintiffs allege that their children played either of those games; rather, they allege simply that "Skins refers not just to CS:GO Skins but the equivalent virtual items that are things of value in other Valve games such as [Dota ]2 and [Team Fortress] 2." (Am. Compl. at 2-3, ¶ 8; *see also id.* at 29, ¶ 94 (class definition).)

1    In response, Plaintiffs offer no evidence that either of them gave money to their

2    children to play Dota 2 or Team Fortress 2.  (*See generally* Resp.)  Instead, they counter

3    that whether Plaintiffs have standing to pursue CPA claims based on Dota 2 and Team

4    Fortress 2 on behalf of the proposed class "is properly raised in the context of a motion

5    for class certification, not a motion for summary judgment."  (Resp. at 23-24.)

6    The court agrees with Valve that it is entitled to summary judgment on Plaintiffs'

7    CPA claims based on Dota 2 and Team Fortress 2.  None of Plaintiffs' cited cases stand

8    for the proposition that a court may not consider whether the named plaintiffs in a

9    proposed class action have met their burden to defeat a motion for summary judgment on

10   claims they purport to assert on behalf of themselves and a proposed class.  (*See*

11   *generally id*.)  Because there is no evidence in the record that Plaintiffs gave money to

12   their children to play Dota 2 and Team Fortress 2, Plaintiffs cannot, as a matter of law,

13   establish that they suffered injuries to their business or property caused by Valve's

14   conduct with respect to those two games.  *See Mai v. Supercell Oy*, No.

15   5:20-cv-05573-EJD, 2021 WL 4267487, at *3 (N.D. Cal. Sept. 20, 2021) (dismissing, in

16   a proposed class action, plaintiff's California consumer protection claims based on games

17   that plaintiff never alleged he had played).  The court GRANTS Valve's motion for

18   summary judgment on Plaintiffs' claims based on Dota 2 and Team Fortress 2 and

19   DISMISSES them with prejudice.

20   **C.    Claim Based on CS:GO**

21   To prevail on a CPA claim, a plaintiff must show (1) an unfair or deceptive act or

22   practice, (2) occurring in trade or commerce, (3) impacting the public interest, (4) injury

to the plaintiff's business or property, and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986); RCW 19.86.020. Valve argues that Plaintiffs cannot meet this burden because Plaintiffs cannot show (1) that they were injured because the funds used for case opening belonged to the minor children rather than to Plaintiffs; (2) assuming Plaintiffs were injured, that any act or omission by Valve caused that injury because Plaintiffs never used Steam, viewed Valve's website, or played CS:GO; and (3) that Valve committed an unfair or deceptive act or practice because lootbox opening is not "gambling" as a matter of law. (*See* Mot. at 3-11.) The court GRANTS Valve's motion because Plaintiffs have not met their burden to show a genuine issue of material fact regarding the causation element of their CPA claim.[10]

To prevail under the CPA, Plaintiffs must show that Valve's allegedly unfair or deceptive acts or practices proximately caused their alleged injury. *Indoor Billboard/Wash. Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 22 (Wash. 2007). In other words, the "plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." *Id.* If the injury would have occurred regardless of whether the alleged violation existed, causation cannot be established. *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 903 (Wash. 2009).

---

[10] Because the court's holding with respect to the causation element is dispositive, the court does not analyze Valve's arguments regarding injury and the existence of an unfair or deceptive act or practice.

Although proof that the plaintiff relied on the defendant's misrepresentations or omissions is not generally required to show causation under the CPA, a court may require the plaintiff to show reliance where reliance is the plaintiff's own causation theory. *Young v. Toyota Motor Sales*, U.S.A., 472 P.3d 990, 996-97 (Wash. 2020).  Thus, because Plaintiffs base their causation theory on their reliance on Valve's misrepresentations or omissions, the court must determine whether they have met their burden to establish a genuine issue of material fact regarding whether they relied on Valve's misrepresentations or omissions to their detriment.  (*See, e.g.*, Am. Compl. at 32, ¶ 111 (alleging that "Valve's acts, omissions, and practices . . . induced Plaintiffs to unwittingly provide their minor children with monies used to purchase Skins and keys . . . .").)  The court first addresses Plaintiffs' claims based on alleged misrepresentations before turning to their claims based on alleged omissions.

> a.  Misrepresentations

Valve contends that Plaintiffs cannot show that they were injured as a result of any misrepresentations because it is undisputed that Plaintiffs never saw or read any representations from Valve about CS:GO, keys, or weapon cases; did not know about the weapons case features; and did not know that their children used their money to open weapons cases.  (Mot. at 4-5; *see also* Shoss Dep. at 15:17-22, 56:10-14 (stating she had never used Steam, been to any Valve website, been to a Steam website, or seen a case or crate opening); Galway Dep. at 33:11-12, 33:23-35, 70:4-14 (stating she had never gone to any Valve website, visited the Steam website, or seen a crate opening).)  Thus, according to Valve, if Plaintiffs never saw any representations by Valve, they cannot

1    show that they relied on or were induced by Valve's misrepresentations and, as a result,

2    their claims based on alleged misrepresentations must fail.  (Mot. at 5-6.)

3            Plaintiffs do not dispute that they never used Steam or viewed any Valve or Steam

4    website.  (*See generally* Resp.)  Rather, they counter that "the only affirmative

5    representations" that they relied on were the line items on their credit card and bank

6    statements reflecting the payments they made to Valve through its Steam platform.

7    (Resp. at 15 (citing Galway Dep. at 20:4-8; Shoss Dep. at 13:20-24).)  They assert that

8    these statements "misrepresented and omitted that the purchases were for keys to open

9    loot boxes."  (*Id.* (citing Kahler Decl. ¶¶ 2.D-E, Exs. D & E (Shoss credit card and bank

10   statements, showing that the payments to Valve were reflected as made to

11   "Steamgames.com," "Steampowered.com," or "Steam Games"); *id.* Ex. B (Galway bank

12   and credit card statements, showing the same).)

13           The court agrees with Valve that no reasonable factfinder could find that the line

14   items on Plaintiffs' bank and credit card statements were misrepresentations or omitted a

15   material fact because the statements accurately reflect that the payments were made to

16   Valve's Steam platform.  Steam users upload funds to their Steam Wallet; it is only after

17   the funds are added to the Steam Wallet that they can be used to purchase keys, cases, or

18   skins.  (*See* Babbar Dep. at 45:15-24, 46:14-47:9; Philander-Arbabanel Rep. at 9-10.)

19   Plaintiffs present no evidence that would permit an inference that the line items on their

20   statements were false or otherwise misrepresented the charges.  (*See* Resp. at 15-16.)

21   Accordingly, the court GRANTS Valve's motion for summary judgment on Plaintiffs'

22   CPA claims to the extent they rely on an affirmative misrepresentation theory.

1              b.    Omissions

2          Valve also contends that Plaintiffs cannot prove causation based on omissions.

3    (Mot. at 6-7.)  Where the plaintiff alleges causation based on an omission of a material

4    fact, "Washington courts apply a rebuttable presumption that the plaintiff relied on the

5    defendant's representations concerning the product, so as to avoid putting the plaintiff in

6    the 'impossible position' of proving 'they believed the opposite of the omitted fact.'"

7    *Nazar v. Harbor Freight Tools USA Inc.*, No. 2:18-CV-00348-SMJ, 2020 WL 4741091,

8    at *3 (E.D. Wash. Aug. 14, 2020) (quoting *Deegan v. Windermere Real Estate / Ctr.-Isle,*

9    *Inc.*, 391 P.3d 582, 587 (Wash. Ct. App. 2017)); *see also Blough v. Shea Homes, Inc.*,

10   No. C12-1492RSM, 2014 WL 3694231, at * 13 (W.D. Wash. July 23, 2014) (citing

11   *Morris v. Int'l Yogurt Co.*, 729 P.2d 33, 41 (Wash. 1986)).  This presumption can be

12   rebutted by a showing that "the plaintiff's decision would have been unaffected even if

13   the omitted fact had been disclosed."  *Blough*, 2014 WL 3694231, at *14 (quoting

14   *Morris*, 729 P.2d at 41).

15         Plaintiffs assert that their amended complaint "clearly focuses on actionable

16   omissions by Valve, *i.e.*, what Valve was not representing to parents of minor children

17   regarding the harms and dangers of opening a loot box, rather than what Valve was

18   affirmatively representing to parents about its harms and dangers—which was nothing."

19   (Resp. at 13.)  They argue that Valve's actionable omissions include "deceptively

20   embedd[ing] a gambling feature in what otherwise appeared to be a typical first-person

21   shooter game"; "conceal[ing] both the true odds of a loot box containing a given item and

22   the value of various items contained within a loot box"; and "conceal[ing] the harms and

1    risks presented by loot boxes." (*Id.* at 10; *see also* Am. Compl. at 4, ¶ 12; *id.* at 13-14,

2    ¶¶ 21-22.)  It is undisputed, however, that Plaintiffs never visited a Valve or Steam

3    website, never used Steam, never played CS:GO, and never saw or read any

4    representations from Valve about CS:GO, keys, or weapon cases.  (*See generally* Resp.;

5    *see also* Shoss Dep. at 15:17-22, 56:10-14; Shoss RFA Resp. Nos. 1-5; Galway Dep. at

6    33:11-12, 33:23-35, 70:4-14; Galway RFA Resp. Nos. 1-5.)  Thus, even if Valve had

7    disclosed on its websites, on the Steam platform, and in CS:GO "the true odds of a loot

8    box containing a given item and the value of various items contained within a loot box";

9    "the harms and risks presented by loot boxes"; and that Valve had embedded an alleged

10   gambling feature in the game (Resp. at 10), there can be no dispute that Plaintiffs would

11   not have seen those disclosures.  Although Plaintiffs assert that they would not have

12   "given their children money to purchase keys to open Valve's loot boxes had they known

13   it amounted to gambling" (Resp. at 21), they do not explain how they would have learned

14   this information where they never visited or used any of the websites or platforms where

15   Valve might have made such disclosures (*see id.* at 21-22).  The court agrees with Valve

16   that no reasonable factfinder could find that Plaintiffs' decisions would have been

17   affected by information to which they were never exposed.  Therefore, the court

18   GRANTS Valve's motion for summary judgment on Plaintiffs' CPA claims based on

19   alleged omissions of material fact.

20   //

21   //

22   //

IV.   CONCLUSION

For the foregoing reasons, the court GRANTS Valve's motion for summary judgment (Dkt. # 103) and DISMISSES Plaintiffs' remaining claims with prejudice. Plaintiffs' motion for class certification (Dkt. # 94) is DENIED as moot.

Dated this 7th day of January, 2022.

JAMES L. ROBART
United States District Judge